UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
JAKIL S.P.A.,                                  :        08 CIV 5613 (DC)
                                               :
                          Plaintiff,           :        **ECF CASE**
                                               :
        - against -                            :
                                               :
AGRIMPEX CO. LTD.,                             :
                                               :
                          Defendant.           :
-----------------------------------------------------X

# MEMORANDUM OF LAW IN SUPPORT
## OF DEFENDANT'S MOTION TO VACATE MARITIME ATTACHMENT

LENNON, MURPHY & LENNON, LLC
Attorneys for Defendant
AGRIMPEX CO. LTD.
The GrayBar Building
420 Lexington Avenue, Suite 300
New York, New York 10170
Telephone:     (212) 490-6050
Facsimile:     (212) 490-6070
Charles E. Murphy (CM2125)
Anne C. LeVasseur (AL3333)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS ........................................................................................................1

ARGUMENT............................................................................................................................3

POINT I
IT IS PLAINTIFF'S BURDEN TO SHOW CAUSE WHY THE ATTACHMENT
SHOULD NOT BE VACATED....................................................................................................3

POINT II
THE ATTACHMENT SHOULD BE VACATED AS THERE IS NO
ADMIRALTY JURISDICTION ....................................................................................................4

    A. RULE B MARITIME ATTACHMENT CAN BE INVOKED ONLY WHEN
       ADMIRALTY JURISDICTION EXISTS OVER A MARITIME CLAIM ..................4

    B. THE PLAINTIFF HAS THE BURDEN OF ESTABLISHING THE FEDERAL
       COURT'S SUBJECT MATTER JURISDICTION OVER ITS CLAIMS. ....................5

    C. ADMIRALTY JURISDICTION DOES NOT EXTEND TO CONTRACTS IN
       WHICH THE MARITIME ASPECTS ARE INCIDENTAL TO THE
       PURPOSE OF THE CONTRACT...............................................................................6

CONCLUSION........................................................................................................................14

## PRELIMINARY STATEMENT

Defendant, AGRIMPEX CO. LTD. (hereinafter "Defendant" or "Agrimpex") by and through its undersigned counsel, Lennon, Murphy & Lennon, LLC, respectfully submits this Memorandum of Law in Support of its Motion to Vacate the Maritime Attachment issued pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule B"). Plaintiff also respectfully submits the accompanying declaration of P.G. Philippas, (Philippas Decl.), director of Agrimpex. As Plaintiff, JAKIL S.P.A. (hereinafter "Plaintiff" or "Jakil") has failed to allege a recognizable claim in admiralty as required under Rule B, Defendant's motion should be granted and the attachment vacated for lack of subject matter jurisdiction and Plaintiff's Verified Complaint should be dismissed in its entirety.

## FACTS

Jakil was, and still is, a foreign business entity duly organized and existing pursuant to the laws of Italy. Agrimpex was, and still is, a foreign corporation, with its principal place of business located at 1138 High Road, Whetstone, London N20 0RA, United Kingdom.

The underlying dispute arises from Jakil's claim that Agrimpex has breached five separate sale contracts. *See Plaintiff's Verified Complaint, at ¶ 7.* However, the contracts are not directly and intimately related to the operation of a vessel or its navigation, i.e., they are not maritime in nature.

Specifically, Jakil and Agrimpex entered into five separate purchase and sale contracts ("the sales contracts") by which Jakil contracted to purchase 20,000 metric tons (total 100,000 metric tons), 10% more or less at seller's option, of Sudanese durra feterita from Agrimpex. The first contract (no. DFS/56207) was dated June 27, 2007, the second contract (no. DFS/56307)

was dated July 3, 2007, the third contract (no. DFS/56407) was dated July 10, 2007, the fourth contract (no. DFS/56607) was dated July 17, 2007, and the fifth contract (no. DFS/56907) was dated July 27, 2007. *See Sales Contracts annexed to the Declaration of Anne C. LeVasseur as Exhibits "1", "2", "3", "4" and "5" respectively.* The sales contract was a contract of carriage. Agrimpex is not a vessel owner or a transporter of goods. Agrimpex then entered into a separate contract with a third party for shipment of the cargo.

Due to supply and production problems from its suppliers, Agrimpex could not provide the full cargo of durra feterita as provided for in the sales contracts. Disputes arose between Jakil and Agrimpex under the sales contracts. The parties attempted to negotiate a resolution of the matter but were unable to resolve their disputes.

The sale contracts incorporate, by reference, provisions which govern arbitration of claims arising under the sales contracts. All five sales contracts provide that additional terms and conditions not found in the sales contracts are governed by "GAFTA contract 61 including the Arbitration Rule form No. 125". *See Exhibits 1-5 to LeVasseur Decl.; See Philippas Decl. at ¶ 9.*. GAFTA is an acronym for the Grain and Feed Trade Association and provides arbitration services to parties adopting GAFTA's standard form contracts. Jakil has commenced arbitration proceedings under the sales contract by nominating an arbitrator. *See Plaintiff's Verified Complaint, at ¶ 11.*

On June 20, 2008, Jakil applied for and obtained an ex parte maritime attachment order under Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure. On or about August 4, 2008, Agrimpex received notice of lawsuit and maritime attachment from Jakil's counsel, Chalos & Co, advising Agrimpex that

2

funds in the amount of $1,829,901.45 had been attached at BNP Paribas allegedly belonging to

Agrimpex.  Agrimpex denies that these funds being held at BNP Paribas belong to it.

Agrimpex makes the instant motion to vacate the attachment as Jakil has failed to allege a

*prima facie* maritime claim as required under Rule B.

## ARGUMENT

### POINT I

### IT IS PLAINTIFF'S BURDEN TO PROVE
### WHY THE ATTACHMENT SHOULD NOT BE VACATED

A Plaintiff that has obtained and an ex parte Rule B attachment order shoulders the

burden at the post-attachment hearing to prove *inter alia* that "it has a valid prima facie admiralty

claim against the defendant." *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty. Ltd.,* 460 F.3d 434,

445 (2d Cir. 2006).  Supplemental Admiralty Rule E(4)(f) of the Federal Rules of Civil

Procedure provides:

> Whenever property is arrested or attached, any person claiming an
> interest in it shall be entitled to a prompt hearing at which the
> plaintiff shall be required to show why the arrest or attachment
> should not be vacated or other relief granted consistent with these
> rules.

In such cases, Local Admiralty and Maritime Rule E.1 provides:

> The adversary proceeding following arrest or attachment or
> garnishment that is called for in Supplemental Rule E(4)(f) shall be
> conducted by a judicial officer within three court days, unless
> otherwise ordered.

At the Rule E(4)(f) hearing, a defendant or a party claiming an interest in the attached

property may challenge "the complaint, the arrest, the security demanded, or any other alleged

deficiency in the proceedings." *Aqua Stoli,* 384 F. Supp. 2d. at 728 (quoting Supp. R. Fed. Civ.

P. advisory committee's notes).  To satisfy the requirement of Rule B, the Plaintiff has the

3

burden to show that: (a) it has a prima facie valid maritime claim; (b) the named defendant

cannot be found within the district; (c) the named defendant's property was within the district;

and (d) no other statutory or maritime law bar to the attachment. *Aqua Stoli,* 460 F. 3d at 445.

It is the plaintiff's burden to prove that the attachment is proper. The Second Circuit

Court of Appeals commented on Rule E(4)(f) in *Aqua Stoli* and established the following

standard:

> [A] district court must vacate an attachment if the plaintiff fails to sustain his burden of showing that he has satisfied the requirements of Rules B and E. We also believe vacatur is appropriate in other limited circumstances. While, as we have noted, the exact scope of a district court's vacatur power is not before us, we believe that a district court may vacate the attachment if the defendant shows at the Rule E hearing that 1) the defendant is subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain in personam jurisdiction over the defendant in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise. n5.

> Rule E(4)(f) clearly places the burden on the plaintiff to show that an attachment was properly ordered and complied with the requirements of Rule B and E. Although Rule E does not explicitly mention a district court's equitable power to vacate an attachment or who bears such a burden, former Local Rule 12 required the defendant to establish any equitable grounds for vacatur, and we believe that defendants still bear that burden under the Supplemental Rules.

*Aqua Stoli,* 460 F.3d at 445.

## POINT II

### THE ATTACHMENT SHOULD BE VACATED AS THERE IS NO ADMIRALTY JURISDICTION

**A. Rule B maritime attachment can be invoked only when admiralty jurisdiction exists over a maritime claim.**

4

Rule B maritime attachment can be invoked only when a plaintiff files a verified complaint sufficient to make a prima facie showing that the plaintiff has a valid maritime claim against the defendant in the amount sued for. *See Maritima Petroleo E Engenharia Ltda. v. Ocean Rig 1 AS and Ocean Rig 2 AS,* 78 F. Supp. 2d 162, 166 (S.D.N.Y. 1999) *citing* 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law*, §21-2 at 471 (2d ed. 1999). Thus, a plaintiff seeking a maritime attachment order under Rule B must properly allege a maritime claim. "The absence of maritime jurisdiction would prove fatal to [a] plaintiff's attachment." *Maritime Petroleo*, 78 F. Supp. at 166. As will be shown herein, Jakil has failed to make a prima facie showing that it has a valid maritime claim.

## B. The Plaintiff has the burden of establishing the federal court's subject matter jurisdiction over its claims.

The Plaintiff bears the burden of establishing that the federal court has subject matter jurisdiction over its claims. As shown above, in Rule B cases a plaintiff necessarily relies on the admiralty jurisdiction of the federal court. Therefore, the plaintiff bears the burden of showing that it has a maritime claim. Furthermore, the subject matter jurisdiction of the court must be affirmatively proved. The court may not infer subject matter jurisdiction. *See Shipping Financial Serv. Corp. v. Drakos,* 140 F.3d 129, 131 (2d. Cir. 1998)(stating that "when the question to be considered is one involving the jurisdiction of a federal court, jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." ) Thus, Jakil cannot merely allege its claim is maritime, it must <u>prove</u> it.

Jakil alleges that as a result of Agrimpex' failure to deliver the entire quantity of cargo as provided for in the sales contracts, Agrimpex has breached the sales contract. *See Plaintiff's Verified Complaint at ¶ ¶ 7, 8.* A breach of a sales contract is not a maritime claim. *See See*

5

*Aston Agro-Industrial Ag v. Star Grain Ltd.*, 2006 U.S. Dist. 91636 (S.D.N.Y. December 20, 2006). Jakil has alleged in ¶1 of its Verified Complaint that its claim falls within the admiralty jurisdiction of the court. Jakil's claim under the sales contract is not maritime in nature and Jakil is not claiming damages under any alleged maritime provisions of the sales contract. Rather, Jakil is claiming for general damages which arose from Agrimpex' alleged breach of the production requirements of the sales contract.

### C. Admiralty jurisdiction does not extend to contracts in which the maritime aspects are incidental to the purpose of the contract.

Admiralty jurisdiction is provided for under 28 U.S.C. §1333(1) which affords district courts original jurisdiction over "any civil case of admiralty or maritime jurisdiction." While the courts have found the boundaries of admiralty jurisdiction as based on maritime contracts difficult to draw, "[t]he United States Supreme Court has held that the 'true criterion' and 'crucial consideration' for determining admiralty jurisdiction is the 'nature and subject matter of the contract at issue.'" *See Sea Transport Contractors, Ltd. v. Industries Chemique Du Senegal*, 411 F. Supp. 2d 386, 393 (2006); *see also Kossick v. United Fruit CO*, 365 U.S. 731 (1961).

Furthermore, in general the "subject matter of the contract must be directly and intimately related to the operation of a vessel and navigation; it is not enough that the contract relate in some preliminary (shore side) manner to maritime affairs." 1 *Shoenbaum* § 3010 at 111.

"Admiralty jurisdiction does not attach to a contract merely because the services to be performed under the contract have reference to a ship, or to its business, or that the ship is the object of such services or that it has reference to navigable waters." *See Intercontinental Contractors, Inc. v. Canadian Maritime Carriers, Ltd. and Maritime Port Services Division of Maritime Group (Canada) Inc.*, 1986 U.S. Dist. LEXIS 25872 at *2 (E.D.Penn. May 6, 1986) *citing 1 Benedict on Admiralty* § 183 (7th ed. 1985).

6

"In order to be considered maritime, there must be a direct and substantial link between the contract and the operation of the ship, its navigation, or its management afloat, taking into account the needs of the shipping industry, for the very basis of the constitutional grant of admiralty jurisdiction was to ensure a national uniformity of approach to world shipping." 1-XII *Benedict on Admiralty* § 182 (2005).

There are exceptions to the general rule that admiralty jurisdiction arises only when the subject of the contract is purely maritime in nature. In *Folksamerica Reinsurance v. Clean Water of NY, Inc.*, 413 F.3d 307, 314 (2d Cir. 2005) the Second Circuit held that the court can exercise admiralty jurisdiction where the non-maritime provisions of a contract are "incidental to" the maritime provisions. *Id.* at 314-315. The *Folksamerica* Court held that when deciding whether a 'mixed contract' falls into this exception, the court must determine whether the contract's principal objective is the accomplishment of a maritime transaction, not whether the non-maritime portions of the contract are 'merely incidental' to the maritime ones. *Id.*

Another exception applies to "mixed contracts", which contain maritime and non-maritime provisions. If a claim arises from a breach of the maritime provisions, which are severable from the non-maritime provisions, the court can properly exercise admiralty jurisdiction. *Id.* However, mixed contracts do not usually fall within the Court's admiralty jurisdiction. *See Maritima Petroleo e Engenhaira Ltd. v. Ocean Rig 1A,* 78 F. Supp. 2d 162 (S.D.N.Y. October 6 1999)(granting defendant's motion to dismiss plaintiff's complaint and vacating maritime attachment because contract claim was too far removed from navigation or maritime commerce to justify the exercise of federal maritime jurisdiction.)

Neither exception applies to the instant case. First, the primary purpose of the sales contracts was clearly not maritime. Rather, it was the purchase and sale of land based goods, not

7

the transportation of such goods by sea. A contract does not become subject to maritime

jurisdiction simply because there is a sale of goods which will be transported by sea. *See Lucky-*

*Goldstar Int'l (America) Inc. v. Phibro Energy International Ltd.*, 985 F.2d 59 (5th Cir. 1992)("it

is well-settled that a sale of goods by itself would not be 'maritime' in nature merely because the

seller agrees to ship the goods by sea to the buyer.") Moreover, Jakil's claim does not arise from

an alleged breach of any alleged maritime provisions of the sales contracts.

New York courts have recently addressed the issue of whether the breach of a sales

contract supports a Rule B attachment. In *Aston Agro-Industrial AG v. Star Grain Ltd.*, 2006

U.S. Dist. LEXIS 91636 (S.D.N.Y. Dec. 20, 2006) Judge Daniels vacated a maritime attachment

holding that the Court lacked admiralty jurisdiction over contracts for the sale of Russian Wheat.

Judge Daniels held:

> [T]he contracts at issue were not maritime because their primary
> objective was not the transportation of goods by sea. Instead, their
> primary objective was, undoubtedly, the sale of wheat. That the
> wheat was transported on a ship does not make the contracts
> maritime contracts any more than it would make them aviation
> contracts had the wheat been shipped via airplane. Nor were they
> contracts between a seller and a shipper. In fact, Aston entered
> into two separate charter parties to accomplish the shipment of the
> wheat, and it was the primary maritime objective of those contracts
> to transport the wheat by sea. Thus, the charter parties between the
> seller and the shipper . . . are maritime contracts. . . The contracts
> for the sale of wheat are not.

*Aston-Agro Industrial AG v. Star Grain*, 2006 U.S. Dist LEXIS 91636 at 9-10.

Judge Lynch reached a similar result in *Shanghai Simon Import and Export v. Exfin*

*(India) Mineral Ore Co., PVT. LTD.*, Docket No. 06 cv 4711 (GEL)(S.D.N.Y. Oct. 5,

2006)(Transcript annexed hereto as Exhibit 1). *Shanghai Simon Import and Export* involved a

contract for the sale of iron ore from plaintiff, a Chinese company, to Defendant, an Indian

company. Plaintiff's claim arose from defendant's alleged failure to timely deliver the entire

quantity of cargo as required by the contract. Judge Lynch noted that the contract at issue contained certain provisions which specifically related to a requirement that the goods be shipped by sea. *Id. at 3.* Judge Lynch also considered the fact that the contract at issue contained provisions that related to nominating a vessel, demurrage and laytime calculations, and different conditions that would apply to ocean carriage. *Id.* However, Judge Lynch held that the contract at issue was not a contract for maritime transportation, rather, it was a sales contract which also included maritime provisions requiring the cargo to be shipped by sea and specifying the conditions for shipment. *Id. at 4-5.* "[T]he contract is not a contract for maritime transportation; rather, the contract contemplates that the defendant will enter such a contract with a suitable ship owner." *Id.* at 10. Judge Lynch further held:

> [B]oth common sense and long-established case law suggests that this is a nonmaritime dispute between a purchaser and a seller over the alleged failure to deliver purchased goods.
>
>       \*\* \*
>
> The Fifth Circuit's decision in *Lucky Gold Star v. Phibro Energy*, 958 F.2d 58 (1992), states the long-established law on this subject, noting that a contract for a land-based sale of goods is not maritime merely because the seller agrees to ship the goods by sea to the buyer. Citing its earlier decision in *Loredo Offshore Contractors v. Hunt Oil Company*, 754 F.2d 1223, 1231-32 (Fifth Circuit 1985), the court noted that "It is fundamental that the mere inclusion of maritime obligations in a mixed contract does not without more bring nonmaritime obligations within the pale of admiralty law.
>
>       \*\*\*
>
> The purchase of goods by a buyer in one country from a seller in another, with a proviso that the goods are to be sent by sea, and with some incidental provisions bearing on the nature of that shipment, the alleged breach here was a breach wholly of the sale of goods provisions of the contract, not of its incidental maritime aspects, or indeed, of any transportation aspects at all. There is thus no basis in this case for maritime jurisdiction.

*Shanghai Simon Import and Export v. Exfin (India) Mineral Ore Co., PVT. LTD.*, Docket No. 06 cv 4711 (GEL) at 12-13.

Jakil may rely on Judge Preska's recent decision in *Noble Resources v. Yugtranzitservix and Silverstone,* Docket No. 08 cv 3876 (LAP)(S.D.N.Y. July 23, 2008)(Transcript annexed hereto as Exhibit 2). In that case, Judge Preska upheld plaintiff's maritime attachment despite challenges raised by defendants that the contract at issue was not maritime in nature and not subject to the maritime jurisdiction of this Court. Judge Preska held, "To determine if an issue related to maritime interests has been raised, an issue will not give rise to maritime jurisdiction if the subject matter of the dispute is so attenuated from the business of maritime commerce that it does not implicate the concerns underlying admiralty jurisdiction." *Id.*

In determining whether plaintiff's claim was maritime in nature, Judge Preska looked at the contract at issue and held that maritime transportation was integral to the agreement. This is because the contract at issue set out in great detail the dates open for loading in the specified port, set out in detail how the loading of the vessel was to be effected, and provided that the vessel should be confirmed or rejected by the sellers in writing, and in this case, the sellers had rejected the first three vessel that were nominated. Accordingly, the underlying contract touched upon the "business of maritime commerce." *Id. at 3-4.* Moreover, Judge Preska held that the Court was required to look at the nature of the dispute between the parties. In that case, Judge Preska held that the dispute "touched upon maritime commerce" for the following reasons:

> As set out in plaintiff's claim submissions in the arbitration, and perhaps more importantly as reflected in the award, the dispute centered on two issues. First, the default by YTS in failing to provide a berth for the vessel after she had tendered her notice of readiness and refusal to load the vessel constituting default under the contract. And, secondly, a request for wasted vessel costs, that is, the costs incurred by the vessel following tendering of her notice of readiness.

> As set out in the award damages were awarded for both these items and indeed there was a lengthy discussion in Section 6 of the award about the wasted costs incurred on behalf the vessel's lack of use because of defendant YTS's default. The waster vessel expenses included bunkering costs, port and survey costs, and hire payments, all clearly within the maritime jurisdiction.
>
> For all those reasons, I find that the contract and dispute at issue fall within the Court's maritime jurisdiction.

*Noble Resources v. Yugtranzitservis and Silverstone*, Docket No. 08 cv 3876 (LAP) *at 3-4*.

*Noble Resources* is readily distinguishable from the instant case. The *Noble Shipping* plaintiff alleged disputes arising from the maritime portions of the contract. Moreover, the Arbitration Award issued in Noble's favor in the arbitration related solely to the maritime portions of the contract and the maritime nature of the contract between the parties was highlighted in the Arbitration Award issued in Noble's favor. The instant case is distinguishable because here, unlike in *Noble*, the disputes do not arise out of any maritime provisions of the sales contract and Jakil's arbitration claims relate solely to damages related to Agrimpex' alleged failure to deliver the quantity of goods provided for in the sales contract.

Additionally, Jakil has alleged that "disputes arising out of the agreement are to be resolved by way of maritime arbitration proceedings held before arbitrators who are expert in maritime matters. JAKIL has appointed its arbitrator and demanded AGRIMPEX to proceed to arbitration with this matter." *See Plaintiff's Verified Complaint, at ¶ 11.* Contrary to Jakil's allegation, the sales contracts clearly state as follows:

> All other terms, conditions and rules not in contradiction with the above, as per GAFTA contract 61, including the Arbitration Rule form No. 125 (of which the parties admit that they have knowledge and notice) apply to this contract, the details given shall be taken as having been written into such form in the appropriate place.

11

As noted *supra*, GAFTA is the Grain and Feed Trade Association, which is a trade body. The arbitration is a commodity dispute which simply includes shipping as a minor element. *See Philippas Decl. at ¶ 14.* Accordingly, it is evident that the sales contracts are not subject to maritime arbitration proceedings and are not to be held before arbitrators who are experts in maritime matters.

On or about June 10, 2008, Jakil sent correspondence to Agrimpex through Studio Legale Associato notifying it that it pursuing a claim in arbitration against it under the Rules of GAFTA. *See Philippas Decl. at ¶ 10.* Jakil further notified Agrimpex that it was nominating Mr. Cyril Carr as an arbitrator in accordance with GAFTA 125 Rule 3. *A copy of this correspondence is annexed to the Philippas Decl. as Exhibit 1.* This correspondence notes that Mr. Carr is a GAFTA qualified arbitrator who can be contacted through his present employer, "TORC Grain and Feed Ltd.". *See Exhibit 1 to the Philippas Decl.* Additionally, attached to the Declaration of Mr. Philippas is an extract from the GAFTA Handbook showing Mr. Carr's qualifications. *See Exhibit 2 annexed to the Philippas Decl.* Mr. Carr is not an expert in maritime matters and is not a member of any maritime arbitration panels, such as LMAA (London Maritime Arbitrators Association) or the Baltic Exchange. The GAFTA Handbook lists Mr. Carr as a member of GAFTA Trade Diploma and a Member of the Chartered Institute of Arbitrators. As noted in the handbook, Mr. Carr is involved in commodity trading, specifically grains and oilseed products. The GAFTA Handbook does not identify Mr. Carr as an expert in maritime matters. *See Exhibit 2 to Philippas Decl.*

It is notable that LMAA arbitration is not specified in the sales contract. This further emphasizes that the sales contract was not maritime in nature. *See Aston Agro-Industrial Ag v. Star Grain Ltd.*, 2006 U.S. Dist. 91636 at *13, n.5 (S.D.N.Y. December 20, 2006)("It is also

noteworthy. . . that the contracts provided for arbitration before GAFTA, and not maritime arbitration, as would have been customary had the contracts truly been maritime in nature.")

On or about August 5, 2008, Jakil submitted its Claim Submissions to GAFTA. *A copy of Jakil's claim submission is annexed to the Philippas Decl. as Exhibit 3.* Jakil's claim is based solely on Agrimpex' alleged shipment of only 25,800 metric tons in total cargo. Jakil claims as its damages the difference between the market price of the cargo and the contractual price of the cargo. In support of its claim, Jakil presents evidence of the prevailing market rates for Sudanese durra feterita. *See Exhibit 3 to Philippas Decl.* Clearly, Jakil has not alleged a breach of any alleged maritime provisions of the sales contract, and has not alleged a maritime claim in the underlying GAFTA arbitration. Hence, its claim is not maritime as it arises solely from a sales contract. Here, the subject matter of the contracts between Jakil and Agrimpex is the purchase and sale of Sudanese durra feterita. *See Exhibits "1"through "5" annexed to the LeVasseur Decl.* Neither Sudanese durra feterita nor the purchase thereof is directly and intimately related to the operation of a vessel or its navigation. Moreover, Jakil does not allege how specifically this commodity sales contract is maritime in nature.

In sum, in the instant case a buyer of durra feterita (Jakil) is attempting to recover damages from the seller of durra feterita (Agrimpex) as there were problems with delivery. The fact that the delivery happened to take place on a ship is completely incidental to the purpose of the contract, namely, the sale of the Sudanese durra feterita.

As the sales contracts at issue are not directly and intimately related to the operation of a vessel and its navigation, they are not sufficiently maritime to come within maritime jurisdiction.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, it is respectfully requested that this Court

grant Defendant Agrimpex' motion to vacate the attachment.

Dated: New York, NY
         August 26, 2008


The Defendant,
AGRIMPEX CO. LIMITED

By:    _Anne C. LeVasseur_

Anne C. LeVasseur
Charles E. Murphy
LENNON MURPHY & LENNON LLC
The GrayBar Building
420 Lexington Avenue, Suite 300
New York, NY 10170
(212) 490-6050 - phone
(212) 490-6070- fax
acl@lenmur.com
cem@lenmur.com


## AFFIRMATION OF SERVICE

I hereby certify that on August 26, 2008, a copy of the foregoing MEMORANDUM OF

LAW IN SUPPORT OF MOTION TO VACATE MARITIME ATTACHMENT was filed

electronically and served by mail on anyone unable to accept electronic filing.  Notice of this

filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or

by mail to anyone unable to accept electronic filing.  Parties may access this filing through the

Court's CM/ECF system.


By:    _Anne C. LeVasseur_

Anne C. LeVasseur

14

EXHIBIT 1

6A57SHAM

1 UNITED STATES DISTRICT COURT
 SOUTHERN DISTRICT OF NEW YORK
2 -------------------------------x

3 SHANGHAI SINOM IMPORT AND EXPORT,

4     Plaintiff,

5    v.       06 Civ. 4711

6 EXFIN (INDIA) MINERAL ORE CO.,
 PVT. LTD.,

7

     Defendant.
8

9 -------------------------------x

          October 5, 2006
10         4:30 p.m.

11 Before:

12      HON. GERARD E. LYNCH

13            District Judge

14        APPEARANCES

15 TISDALE & LENNON, LLC
   Attorneys for Plaintiff
16 BY: LAUREN COZZOLINO DAVIES
   CHARLES E. MURPHY
17
 DeORCHIS WIENER & PARTNERS, LLP
18   Attorneys for Defendant
 BY: JOHN ORZEL
19   SUBIR MAJUMDAR

20

21

22

23

24

25

6A57SHAM

| 1 | (Case called) |

2        (In open court)

3        MS. DAVIES:  Good afternoon.  Lauren Davies for the

4    plaintiff.  And this is Charles Murphy of our office.

5        THE COURT:  Good afternoon.

6        MR. ORZEL:  Good afternoon, your Honor.  John Orzel

7    from DeOrchis Wiener & Partners, for the defendant.  With me is

8    Mr. Subir Majumdar, who is Indian counsel for us.

9        THE COURT:  OK.  Welcome Mr. Majumdar, and good

10   afternoon, Mr. Orzel.

11       All right.  We are here on the defendant's application

12   to vacate an order of maritime attachment.  The essential

13   argument of the defendant is that this is not a maritime

14   contract and, therefore, there is no admiralty jurisdiction,

15   and, therefore, the rules permitting the attachment have no

16   application and indeed the case should be dismissed for lack of

17   jurisdiction.

18       Do I have that right, Mr. Orzel?

19       MR. ORZEL:  That is correct, your Honor.

20       THE COURT:  OK.  I have read the parties' submissions,

21   and I have also read a number of the critical precedents that

22   are cited.  Let me see if I understand the facts correctly,

23   Ms. Davies.  This is a contract for the sale of iron ore from a

24   company in India to your client which is a company in China.

25       MS. DAVIES:  That's correct, your Honor.

6A57SHAM

1          THE COURT:   OK.  And the contract, which is in the

2     record, has certain provisions that specifically relate to a

3     requirement that the goods will be shipped by sea.

4          MS. DAVIES:   That is correct.

5          THE COURT:   OK.  Is there actually something that

6     explicitly says "And, by the way, you have to send this by

7     water."  I take it there is no question it would be sent by

8     water.  We are talking about tons of iron ore; it's not going

9     to fly or go by truck or something.

10          MS. DAVIES:   The provisions, specifically ten through

11     13, and several others, relate specifically to the nomination

12     of a vessel.

13          THE COURT:   They all assume.  These provisions assume

14     it's going to be by sea, but I just didn't see something that

15     said that you have to ship by sea.

16          MS. DAVIES:   I would presume that by nominating or

17     requiring the nomination of a vessel it would need to be by

18     water.

19          THE COURT:   Yes.  Whether there is such an explicit

20     provision or not, it's clear that the contract contemplates

21     transportation by sea.

22          And then there are all of these provisions that

23     specifically relate to nominating a particular vessel, things

24     like demurrage and lay time, and different conditions that

25     would apply to such a shipment by sea.

6A57SHAM

1    Now, I take it the plaintiff does not contend that the

2    defendant breached any of those specific maritime conditions.

3    MS. DAVIES:  Actually, your Honor, we do.  I mean not

4    in terms of specifically breaching, say, clause 10 or clause

5    11, but these clauses taken together are maritime provisions

6    for the delivery of the iron ore from India to China.

7    THE COURT:  But it got to China.  It didn't wash

8    overboard somewhere along the way.

9    MS. DAVIES:  No, it did not.  But we did not receive

10   the entirety of the cargo at the discharge port in China.

11   THE COURT:  Right.  But that's because -- I mean tell

12   me if there is a dispute about this, but I thought it was

13   undisputed that the iron ore got to China, actually got off the

14   ship and then got seized by some other party due to some other

15   litigation.

16   MS. DAVIES:  Yes, that is correct.  There is not a

17   dispute to the seizure.  Just to clarify that a bit, when the

18   vessel arrived at the port in China, the day prior to the

19   vessel's arrival a nonparty named the Red Horse had effected a

20   maritime attachment against the cargo.

21   THE COURT:  Ah, live by the sword and die by the

22   sword.

23   MS. DAVIES:  Yes.

24   THE COURT:  But the basic breach of contract action is

25   pretty simple:  You bought something, you paid for it, and you

6A57SHAM

1    didn't get it, or you didn't get all of it in a timely way as

2    required by the contract.  Right?

3              MS. DAVIES:  I would agree with that, yes.

4              THE COURT:  And whatever the defendant failed to do --

5    which I think essentially is simply that they failed in the

6    basic provision of delivering the goods to you -- they didn't

7    fail to comply with any of those specifically maritime

8    requirements in the contract.

9              MS. DAVIES:  I would respectfully disagree on the same

10    basis, because they did fail to deliver the cargo, and in a --

11              THE COURT:  Well, I hear that, but that would have

12    been true -- I mean suppose, I don't know, somebody else came

13    along and offered them a higher price, and the defendant sold

14    the iron ore that was destined for you to another company in

15    India, and it never got on a boat at all, they just send you a

16    cable saying, sorry, we found a better price, better luck next

17    time, we're not sending anything.  Right?  That would have been

18    a breach of this contract too, right?

19              MS. DAVIES:  Yes, I agree.

20              THE COURT:  And that wouldn't have had anything to do

21    with boats.

22              MS. DAVIES:  I agree, because that would have been

23    before the maritime portion of this contract, meaning the ocean

24    transportation for delivery had been effected.

25              THE COURT:  But the ocean transportation has been

6A57SHAM

1    effected, right, successfully.  It gets to Shanghi or wherever

2    it's going.

3              MS. DAVIES:  Yes, it does get there.

4              THE COURT:  OK.  And lastly, this is clearly not a

5    contract between any kind of party and a vessel owner or

6    transporter of goods of any sort.  Right?

7              MS. DAVIES:  Well, what do you mean by a transporter

8    of goods?

9              THE COURT:  Well, am I correct that there -- maybe you

10   don't know from where your client sits -- but the defendant

11   doesn't own any ships, I take it.

12             MS. DAVIES:  That's correct.

13             THE COURT:  And the contract contemplates that they're

14   going to enter a contract with somebody who does own ships in

15   order for that -- in order to charter a boat, to take the cargo

16   to China.

17             MS. DAVIES:  That is true, but what the defendant does

18   do is they act as somebody who would have been a ship owner in

19   a traditional charter party by setting forth the requirements

20   that you see in the contract:  The type of vessel that needs to

21   be demurraged, lay time, all those provisions.

22             THE COURT:  What is the commercial purpose of that?

23   Is this something that matters?  And, if so, to whom?

24             In other words, is there a reason why the purchaser in

25   a contract of this kind cares about these various maritime

6A57SHAM

1    terms?

2        MS. DAVIES:  My opinion would be that both parties in

3    this instance want to see -- especially the buyer -- want to

4    see the cargo arrive safely and in the condition in which it's

5    supposed to be.  This is iron ore, so the common issues with

6    that would be salt water, rust, corrosion of the vessel.  It

7    could be improperly loaded, improperly stowed.  The vessel

8    could be of an improper type.  So those types of things seem to

9    be what they were contemplating.

10        THE COURT:  Mr. Orzel, maybe you can give me a

11   perspective on this.  Isn't at least some part of this contract

12   one in which your client undertakes a role similar to that of

13   at least some party -- I'm not sure what kind of party -- in a

14   typical maritime transaction?  I'm not sure whether it's a

15   broker or an MVOCC.  Somebody out there is in the business of

16   chartering boats and entering these specifications, and the

17   seller in this contract undertakes that role, don't they?

18        MR. ORZEL:  I don't believe so, your Honor.  At best I

19   think we undertake, or these provisions are prefatory to our

20   entering into a maritime contract.

21        The provision such as the lay time, the dispatch, even

22   the vessel itself, they all have commercial import.  Lay time

23   provisions, because the buyer is the one who would be

24   responsible for paying for lay time.  They want to know what

25   that is beforehand, so that's why that type of provision would

6A57SHAM

1    be in the contract.

2        The provision about giving them the right to review

3    the vessel before we enter into the charter party, it's because

4    if the vessel is more than 20 years old, they probably couldn't

5    get cargo insurance for it, and under the contract it's their

6    obligation to provide the cargo insurance.

7        The risk of loss passed when we loaded the vessel.

8        THE COURT:  The risk of loss passed when you loaded

9    the vessel, meaning if -- well, I take it there is some dispute

10   about that, isn't there?

11       MR. ORZEL:  No, it's clause 17, which is very clear.

12   Risk of loss passes when the cargo leaves our discharge chute

13   at the load port.  So if the vessel sank, it's their loss, not

14   ours.

15       THE COURT:  And they would have to go after the --

16       MR. ORZEL:  Ship owner.

17       THE COURT:  -- after the ship for that --

18       MR. ORZEL:  Correct.

19       THE COURT:  -- for that recovery.

20       MR. ORZEL:  So at best this lays the groundwork for us

21   entering into the charter party, which we did.  But in and of

22   itself it's not a contract of carriage.

23       THE COURT:  Yes, and you then did enter into a

24   contract of carriage with somebody.

25       MR. ORZEL:  Correct.

6A57SHAM

1            THE COURT:  And you also agree that that contract was

2    successfully completed.

3            MR. ORZEL:  Correct.

4            THE COURT:  And the goods get offloaded, in fact.

5            MR. ORZEL:  That is correct.

6            THE COURT:  All right.  And at that point there is

7    other attachment.

8            MR. ORZEL:  Right.  And just as a point of clarity,

9    it's the plaintiff's responsibility in China to discharge the

10   vessel.

11           THE COURT:  Right, that's provided specifically under

12   the contract.

13           MR. ORZEL:  Correct.

14           THE COURT:  All right.  I think I'm prepared to rule.

15   The defendant moves to vacate an order of maritime attachment,

16   arguing that admiralty jurisdiction does not exist in this case

17   since the underlying contract that's the basis of plaintiff's

18   claims is not a maritime contract.

19           It is undisputed that the contract is primarily a

20   contract for the sale of goods, specifically iron ore, from an

21   Indian company to another in China.

22           The contract, in addition to various provisions

23   typical of such a sales contract, also includes maritime

24   provisions requiring the ore implicitly to be shipped by sea

25   and specifying certain requirements regarding the conditions

6A57SHAM

1    for such shipment.

2    It is clear, however, that the contract is not a

3    contract for maritime transportation; rather, the contract

4    contemplates that the defendant will enter such a contract with

5    a suitable ship owner.

6    There is no allegation here that defendant breached

7    the specifically maritime aspects of the contract.  It provided

8    for appropriate ship transportation in accordance with the

9    terms of the contract, and, in fact, the shipment of ore was

10   delivered intact to China as the contract required.  However,

11   it was not delivered to the plaintiff purchaser, because the

12   ore was attached as part of an unrelated lawsuit between the

13   defendant and another Chinese company.  For present purposes

14   there is no need to address the nature or merits of that

15   dispute or the merits of plaintiff's claims of breach of

16   contract.

17   Suffice to say, that plaintiff has sued because it did

18   not receive the goods, or all of them, in a timely manner, and

19   it seeks various items of damages for such nondelivery.

20   On this record, both common sense and long-established

21   case law suggests that this is a nonmaritime dispute between a

22   purchaser and seller over the alleged failure to deliver

23   purchased goods.  I note that that dispute has no connection to

24   the United States whatsoever, and there is apparently no basis

25   for in personam jurisdiction over the defendant in this court

6A57SHAM

1    or for subject matter jurisdiction in the federal courts on any

2    nonadmiralty basis.  This case is only here because of the

3    liberal provisions for attachment and *in rem* jurisdiction in

4    admiralty cases.

5        The Fifth Circuit's decision in *Lucky Gold Star v.*

6    *Phibro Energy*, 958 F.2d 58 (1992), states the long-established

7    law on this subject, noting that a contract for a land-based

8    sale of goods is not maritime merely because the seller agrees

9    to ship the goods by sea to the buyer.  Citing its earlier

10   decision in *Loredo Offshore Contractors v. Hunt Oil Company*,

11   754 F.2d 1223, 1231-32 (Fifth Circuit 1985), the court noted

12   that "It is fundamental that the mere inclusion of maritime

13   obligations in a mixed contract does not without more bring

14   nonmaritime obligations within the pale of admiralty law."

15       Our Court of Appeals in *Phypin Steel Company v. Asoma*

16   *Corporation*, 215 F.3d 273, 277 (2d Cir. 2000), drew a similar

17   distinction, noting that "Admiralty jurisdiction extends only

18   to wholly maritime contracts or severable maritime portions of

19   mixed contracts."

20       Contrary to plaintiff's argument, *Phypin* does not

21   support its position.  Although the mixed contract there did

22   indeed permit admiralty jurisdiction, that was because the

23   action there arose specifically under the bill of lading, which

24   the court found to be a maritime contract in itself.

25       As the court noted, Phypin's *in rem* claim "arises

6A57SHAM

1   under and is based on their purported entitlement to the bill

2   of lading" as opposed to the cargo itself.  That is not so in

3   this case.

4        The plaintiff argues, however, that these cases have

5   been superseded by the Supreme Court's more recent decision in

6   *Norfolk Southern Railroad v. Kirby*, 543 U.S. 12 (2004).  It's

7   true that the Supreme Court there rather expanded the notion of

8   a maritime contract and declined to treat a contract specifying

9   both land and sea shipment as composed of severable land-based

10  and maritime components, but the contract in *Norfolk Southern*

11  was dramatically different in nature from the one here.

12       In *Norfolk Southern* the court found the contract to be

13  maritime in nature because its primary objective was to

14  accomplish the transportation of goods by sea from Australia to

15  the United States.  The contract -- unlike the contract here --

16  was specifically a contract of carriage, and the fact that the

17  last leg of the journey was to have been by rail did not

18  undermine the fact that the principal objective of the contract

19  was maritime commerce.

20       The reasons why the court took the approach that it

21  did to the contract in *Norfolk Southern* are instructive and are

22  highly distinguishable from any considerations applicable here.

23       As the Supreme Court noted, maritime commerce has

24  evolved along with the nature of transportation.  Given the

25  container revolution, maritime transportation is often

6A57SHAM

1    inseparable from land-based aspects of transportation in a new

2    era in which cargo owners can contract for transportation

3    across oceans to inland destinations in a single transaction.

4    I am here paraphrasing very closely the words of the Supreme

5    Court which can be found at 543 U.S. 24-25.

6         These conditions and this change in the nature of

7    maritime commerce critical to the decision in *Norfolk Southern*

8    have no bearing here.  What we have here is a contract of the

9    sort perfectly familiar long before the advent of container

10   ships and integrated transportation systems.  The purchase of

11   goods by a buyer in one country from a seller in another, with

12   a proviso that the goods are to be sent by sea, and with some

13   incidental provisions bearing on the nature of that shipment,

14   the alleged breach here was a breach wholly of the sale of

15   goods provisions of the contract, not of its incidental

16   maritime aspects, or indeed, of any transportation aspect at

17   all.  There is thus no basis in this case for maritime

18   jurisdiction.

19        Now, those are the reasons for my ruling, but I think

20   it would be a blinking reality to ignore another factor about

21   the case.

22        In recent years, maritime attachments in this District

23   in particular, and distinct from just about everywhere else in

24   the United States, have become a rather prominent heading of

25   our jurisdiction.  This stems from the Second Circuit's

6A57SHAM

1    decision in *Winter Storm Shipping*, 310 F.3d 263 (2d Cir. 2002),

2    in which the Court of Appeals permitted the attachment of

3    transient assets, essentially wire transfers, passing through

4    New York City and through the banks and the New York

5    clearinghouse, which essentially has resulted in a system in

6    which disputes between parties all over the world tend to find

7    their way here not so that the case can actually be litigated

8    here but solely for the purpose of obtaining security via the

9    maritime attachment provisions of Rule B of the admiralty

10   rules.

11        And the Second Circuit recently applied Rule B in a

12   rather literal manner that disapproved of the actions of some

13   district court judges -- this one not included -- in trying to

14   set additional limits or additional restrictions on the ability

15   to obtain maritime attachments.  And that decision, *Aqua Stoli*,

16   it seems to me to press a continuation of the liberal use of

17   maritime attachments in this District, though I do note that

18   the opinion in *Aqua Stoli* contained a footnote, which loosely

19   paraphrased says, my God, what have we done, and casts some

20   doubt on whether *Winter Storm* was correctly decided.  But it is

21   decided, and we have to live with it.

22        This is relevant only for the following reasons:  I

23   note that in light of the decisions in *Winter Storm* and *Aqua*

24   *Stoli*, we can expect efforts by plaintiffs, entirely

25   legitimately, to try to obtain maritime attachments by

6A57SHAM

1    interpreting the admiralty jurisdiction of this court

2    liberally.  Were such efforts to be countenanced, we would have

3    in effect the kind of perfect storm -- forgive me, the courts

4    addressing admiralty cases always seem inclined to nautical

5    puns -- but we have a kind of perfect storm in which the

6    combination of expansive maritime attachments and expansive

7    interpretations of admiralty jurisdiction would mean that just

8    about any international dispute in any sort of commercial

9    context all over the world, wherever anything came close to a

10   boat, would result in the potential for filing attachments in

11   this District.

12        Now, that would be great news for the New York bar,

13   which is not something that in my family has ever been regarded

14   as a negative, but it would be less good news for this court

15   and less good news for the banks that would have to administer

16   these attachments, and ultimately less good news for the

17   orderly resolution of disputes around the world.

18        Now, none of that constitutes a reason for declining

19   to find admiralty jurisdiction in a case where admiralty

20   jurisdiction exists, and that's why I first made clear that in

21   this case I believe that under the case law this is not

22   properly viewed as a maritime case.

23        But in the event this decision is reviewed by the

24   Second Circuit, I wanted them to be aware that I am aware of

25   the realistic consequences here and of the reasons why there is

6A57SHAM

1   an incentive for plaintiffs to seek expansive interpretations
2   of the admiralty jurisdiction.

3            I am convinced that none of this was in the mind of
4   the Supreme Court justices who unanimously decided the *Norfolk*
5   *Southern* case.  In fact, it is clear that that court was quite
6   admirably looking to the realities of modern commerce in a way
7   that suggested that admiralty jurisdiction needs to be
8   interpreted in keeping with the commercial realities of the
9   Modern Age, and they had in mind the fact that we no longer
10  have a system that can so readily be separated between maritime
11  transportation and land-based transportation when goods are
12  loaded into a container, put on a truck, taken to the port, the
13  container is then put on a ship, the ship goes somewhere else,
14  and the container is put on a railroad flat car for ultimate
15  delivery, and all of this is arranged by a single contract of
16  carriage.

17           I think that to say, as the Supreme Court did in that
18  case, that where the contract of carriage includes going all
19  the way from Australia to Atlanta or someplace by ship, and
20  then a little rail journey at the end, to call that anything
21  other than a maritime contract would be a mistake.

22           But here we don't have a defendant that undertook to
23  be an integrated carrier, or a ship owner, or any kind of
24  maritime party; we have essentially a basic land-based contract
25  for the sale of goods.  And unless all such contracts which

6A57SHAM

1    involve anything heavy enough that it's inevitably going to be

2    shipped by sea are to be treated as admiralty contracts, with

3    all of the consequences that that entails, I don't think that

4    some of the expansive language in *Norfolk Southern* casting

5    doubt on the traditional rule about severing maritime and

6    nonmaritime aspects of contracts, I don't think that language

7    should be interpreted broadly, lest the admiralty jurisdiction

8    swallow up all other forms of commercial cases. So that's the

9    ruling.

10       Now, Mr. Orzel, I want to get -- specifically the

11    motion is a motion to vacate the attachment.

12       MR. ORZEL: Correct.

13       THE COURT: And that's been granted.

14       I take it that given the rationale, you are also

15    implicitly or explicitly, you are now going to move to dismiss

16    the action for lack of jurisdiction.

17       MR. ORZEL: Correct, your Honor.

18       THE COURT: OK. And I also assume then, Ms. Davies,

19    that you have no problem with my dismissing the underlying

20    action for lack of jurisdiction, which will put you in a

21    position, if you choose, to pursue this further, to take this

22    ruling directly to the Second Circuit and not worry about

23    the -- I don't know if the vacation order in itself would be

24    appealable.

25       MS. DAVIES: We have no problem with that, your Honor,

6A57SHAM

1    although we would respectfully request that you stay the

2    release of the funds while plaintiff considers their options to

3    appeal.

4            THE COURT:  No, I'm not going to do that.  I think

5    this is a case where there is no jurisdiction, and, you know,

6    if we're wrong you will get it back, because it seems like this

7    company engages in enough transactions that if at some point it

8    turns out that I'm wrong, you file a new attachment, or the

9    attachment is reinstated, and unless they go bankrupt between

10   now and then -- which nobody is suggesting is going to

11   happen -- you will have new security once more.

12           All right.  So the stay is denied.  The order of

13   attachment is vacated.  The underlying action is dismissed for

14   lack of jurisdiction.  The plaintiff's motion to stay those

15   rulings is denied, and I think we have done our day's work.

16           OK.  Thank you very much.

17           Mr. Orzel, we will issue a written order, just sort of

18   invoking the on-the-record opinion, and I guess you will get

19   that tomorrow.  OK?

20           MR. ORZEL:  OK.  Very good.

21           THE COURT:  All right.  Very good.

22                              - - -

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

EXHIBIT 2

87N6NOBC

1

87N6NOBL
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  NOBLE RESOURCES,
3
4           Plaintiff,
4
5      v.                              08 CV 3876(LAP)
5
6  YUGTRANZITSERVIS and
6  SILVERSTONE,
7
7           Defendants.
8
8  ------------------------------x
9                                    New York, N.Y.
9                                    July 23, 2008
10                                   9:45 a.m.
10
11 Before:
11
12              HON. LORETTA A. PRESKA,
12
13                                   District Judge
13
14                    APPEARANCES
14
15 TISDALE LAW OFFICES, LLC
15      Attorneys for Plaintiff
16 BY:  CLAURISSE OROZCO
16
17 CHALOS & CO.
17      Attorneys for Defendants
18 BY:  GEORGE M. CHALOS
18
19
20
21
22
23
24
25
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

2

87N6NOBL
1          (Case called; in open court)
2
3          THE COURT:  Counsel have very graciously agreed to
4  prepare their papers quickly so that the hearing required to be
5  conducted quickly on a motion to vacate a maritime attachment
6  could take place promptly.  I am grateful to counsel for doing
7  that.
8          Defendant argues first that the contract at issue is
9  not subject to maritime jurisdiction.  We all agree to the law
10 which is that the threshold inquiry examines the subject matter
11 of dispute as opposed to the underlying contract.  To determine
12 if an issue related to maritime interests has been raised, an
13 issue will not give rise to maritime jurisdiction if the
14 subject matter of the dispute is so attenuated from the
                        Page 1

87N6NOBC
15   business of maritime commerce that it does not implicate the
16   concerns underlying admiralty and maritime jurisdiction.
17           As the Court of Appeals acknowledged in FolksAmerica,
18   Reinsurance Co. v. Cleanwater New York, Inc., 413 F.3d 307 (2d
19   Cir. 2005) the court directed that the jurisdictional inquiry
20   be focused upon whether the nature of the transaction was
21   maritime and observed that the fundamental interest giving rise
22   to maritime jurisdiction is the protection of maritime
23   commerce.
24           Here, the contract itself makes clear that maritime
25   transportation was integral to the agreement.  For example, the
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    3
87N6NOBL
1    contract provided that Plaintiff Noble would purchase a cargo
2    from YTS and the contract set out in great detail the
3    conditions for transportation and delivery.
4            The contract set out in the portion under delivery the
5    window of dates open for loading in the specified port, that
6    portion of the contract also required that the vessel nominated
7    by buyers was required to tender her notice of readiness at the
8    designated port.  It set out how the loading of the vessel was
9    to be effected.  It set out in great detail the type of vessel
10   that would be acceptable, that is, "A self-trimming bulk
11   carrier, single-decker vessel suitable for direct loading
12   (wagon-board of the vessel)."
13           The Contract also provided that the vessel could be --
14   should be confirmed or rejected by sellers in writing and, in
15   fact, here the sellers rejected the first three vessels that
16   were nominated eventually accepting the Southgate.
17           The contract further set out the preadvise that buyers
18   were to give the sellers of the vessel's ETA, name, flag,
19   dimensions, hatches and hold dimensions and alike.  It set out
20   in detail the loading instructions, the loading rate, detailed
21   the notice of readiness and the laytime and the demurrage,
22   among other provisions.  So the underlying contract certainly
23   touched upon the business of maritime commerce.
24           In addition, the dispute between the parties also
25   touches upon the maritime commerce.  As set out in plaintiff's
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    4
87N6NOBL
1    claim submissions in the arbitration, and perhaps more
2    importantly as reflected in the award, the dispute centered on
3    two issues.  First, the default by YTS in failing to provide a
4    berth for the vessel after she had tendered her notice of
5    readiness and refusal to load the vessel constituting a default
6    under the contract.  And, secondly, a request for wasted vessel
7    costs, that is, the costs incurred by the vessel following
8    tendering of her notice of readiness.
9            As set out in the award damages were awarded for both
10   these items and indeed there was a lengthy discussion in
11   Section 6 of the award about the wasted costs incurred on
12   account of the vessel's lack of use because of defendant YTS's
13   default.  The wasted vessel expenses included bunkering costs,
14   port and survey costs, and hire payments, all clearly within
15   the maritime jurisdiction.
16           For all those reasons, I find that the contract and
17   dispute at issue fall within the Court's maritime jurisdiction.
18           The question has also been presented as to whether or
19   not the guarantee by Silverstone falls within the Court's
                            Page 2

87N6NOBC
20    maritime jurisdiction. As the Court has set out recently in C
21    Transport Panamax, Ltd. v. Kremikovtzi Trade, et al., 07 CR 893
22    (June 19, 2008 S.D.N.Y.) courts in this circuit and elsewhere
23    have long held that an agreement to act as a surety on a
24    maritime contract is not maritime in nature. They have
25    recognized that the same is not true of an agreement to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

5

87N6NOBL
1     guarantee the performance of a maritime contract.
2              See e.g. Compagnie Francaise, DE Navigational Avapeur
3     v. Bonnase, 19 F.2d 777, 779 (2d Cir. 1927) (L. Hand, J).
4              Here the guarantee by Silverstone specifically states
5     "The guarantor (Silverstone) irrevocably and unconditionally,
6     A, as principal obligor guarantees to the Buyers the prompt
7     performance by (YTS) of all its obligations under the
8     Contract...." Accordingly, the guarantee at issue here based
9     on longstanding Second Circuit law falls within the meaning of
10    maritime contracts.
11             Finally, with respect to defendant's argument that the
12    matter is not ripe, the arbitral award has ordered that the
13    payment be made and it has not yet been paid. Accordingly, the
14    matter is ripe with respect to the guarantor. In addition, it
15    is most frequently the case that Rule B attachments are used to
16    provide security for arbitral awards and that has been the use
17    here. Accordingly, defendants' motion to vacate the attachment
18    is denied.
19             THE COURT: Is there anything else today?
20             MR. CHALOS: Yes, your Honor, two points if I may.
21             THE COURT: Sir.
22             MR. CHALOS: We thank the Court for hearing us on an
23    expedited basis. We would first off like to make an
24    application to the Court to reduce the amount of security. On
25    page 14 of the award, the panel clearly sets forth that the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

6

87N6NOBL
1     plaintiff was awarded $3,362,400 and no more as the words of
2     the panel. Here the amount of the order attachment is almost
3     double that. It is significantly more.
4              THE COURT: What is the story with the interest,
5     Mr. Chalos?
6              MR. CHALOS: According to the panel, it is 7.5 percent
7     beginning August 16, 2007. That is only one year's worth of
8     interest. Surely this can be resolved in the next, I would
9     assume, six months or so with the upcoming appellate deadlines.
10             THE COURT: Has anyone done the calculation of the
11    interest?
12             MS. OROZCO: I have, your Honor. But I would just
13    like to speak on that point. The panel awards the amount less
14    than we had sought in our application, but it also awards
15    interest 7.5 percent from the date of the default until it is
16    paid and it also awards costs of arbitrator, not legal costs.
17             We have attached to date as outlined in my declaration
18    $4 million. It is paragraph 34 of my declaration at page 6.
19    We have not calculated the interest out for a year. What we
20    have done is calculated it out for three years, which is
21    normally what we undertake in anticipating appeals and that
22    sort of thing. If we allow for three years of interest,
23    security for three years of interest, plus the costs of the
24    Gafta arbitration, the security that we would be entitled to
                           Page 3

87N6NOBC
25    would be $4,225,000.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

7

87N6NOBL
1            So we are at this time undersecured by 200,000.
2     However, if the Court wants us to reevaluate the interest, we
3     would be willing to do so and then release the funds
4     accordingly if that was a proper analysis.
5            THE COURT:  Counsel.
6            MR. CHALOS:  Those calculations are flawed.  Those
7     calculations are based on the principal claim of 3.9 million.
8     That is not what the panel awarded.  7.5 percent on the $3.3
9     million award is about, 21 to $210,000.
10           MS. OROZCO:  I actually calculated the three-year
11    interest on the amount awarded by the arbitrators, which was
12    $3,362,400.  And the interest from August 15th, 2007 through
13    August 15th, 2010 is $840,000.
14           MR. CHALOS:  I submit through 2010 is a bit long.  I
15    can certainly understand maybe two years, but not three.
16           Also, seeing as they are already secured from the
17    guarantor's EFTs, I renew my application and dismiss the matter
18    against YTS.  They are secured or they are not secured.  They
19    have it already attached.  There is no in rem quasi
20    jurisdiction over the party whose funds who haven't been
21    attached.
22           THE COURT:  I don't hear counsel going out and seeking
23    further attachments here.
24           MR. CHALOS:  But they would, though.  That is the
25    point if they sought to move money.  In fact, in the papers
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

8

87N6NOBL
1     that counsel submitted last night, they said exactly that they
2     would do that.  If they wound up -- U.S. dollar transfers on
3     behalf of Yugtranszitservis came through New York, they would
4     catch that and release monies belonging to the guarantor.
5            THE COURT:  What do you say to that, counsel?
6            MS. OROZCO:  Was that was a statement that we made.
7     That statement as made with respect to the application of the
8     New York CPLR in that case, which we didn't address and we say
9     we are not applied.  We actually have stopped serving the writ
10    of attachment in this case and we are no longing serving on any
11    of the defendants.
12           THE COURT:  First, I decline to reduce the amount.
13           Second, obviously counsel knows that plaintiff may not
14    be oversecured.  If, Mr. Chalos, you find that plaintiff is
15    attaching more than the four million two number -- is that the
16    total number?  Please remind me.
17           MS. OROZCO:  Yes.  The total number is comprised of
18    $3,362,400 of principal pursuant to the arbitration award
19    issued on July 4th, 2008, with the rate of interest calculated
20    at 7.5 percent which is also the rate awarded for three years
21    from August 15th, 2007 through August 15th, 2010.  The interest
22    on that amount is $840,501.
23           In addition, the arbitration award also allowed costs,
24    Gafta costs, to the plaintiff and the Gafta costs incurred were
25    23,000 U.S. dollars.  So the total security we would be
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

9

87N6NOBL

87N6NOBC

```
 1   entitled to or we would be seeking is $4,225,901.
 2           THE COURT:  To the extent, Mr. Chalos, counsel
 3   attaches more than that, you let me know.
 4           MR. CHALOS:  Thank you, your Honor.
 5           Finally, your Honor, we would like to ask the Court to
 6   certify this for immediate appeal to the Second Circuit.
 7           THE COURT:  I will take a letter on that.
 8           How is this a complex or novel issue?
 9           MR. CHALOS:  Well, it is a novel issue in the sense
10   that the Court has for the first time found a Gafta contract to
11   be within the meaning of a maritime contract and a maritime
12   claim under Rule B.  It stands starkly in contrast to Judge
13   Daniels' decision as to Aston Agro as well as Judge Sullivan, I
14   am not sure about that, in the Tan Shan case.  These exact
15   arguments were presented there with a 180-degree different
16   result and I do believe that if we can bring this to a head
17   Second Circuit level promptly that would help provide some
18   clarity on these types of issues.
19           THE COURT:  The law is not in doubt.  It is the
20   application, right?
21           MR. CHALOS:  Well, I think the law is in doubt in a
22   sense that our position is that the Court needs to look to the
23   primarily objective of the contract.  Our argument has been
24   that the primary objective of the contract is one of sale and
25   purchase.
```

87N6NOBL

```
 1           THE COURT:  I didn't see any of the Second Circuit
 2   cases talking about the primary objective of the contract.
 3           MR. CHALOS:  Well, I think we set out the argument
 4   based on the precedent of Judge Daniels' decision, which can be
 5   found for the Court's reference on page 3 of the Aston Agro
 6   decision where he writes, In this case the contracts are not
 7   maritime contracts because they are primary objective was not
 8   the transportation of goods by sea.  Instead, their primary
 9   objective was undoubtedly the sale of wheat.  That the wheat
10   was transported on a ship does not make the contracts maritime
11   contracts anymore than it would make them aviation contracts
12   had the wheat been shipped via airplane.  Nor would the
13   contracts between a seller and shipper -- that is true here.
14   the judge in that matter goes on to write, Nor can maritime
15   jurisdiction be exercised under an exception to the general
16   rule that maritime jurisdiction "Arises only when the subject
17   matter of the contract is purely or wholly maritime in nature.
18   Under the first exception, federal court can exercise --
19           THE COURT:  Counsel, do you want this taken down?  If
20   you do, you better read so the court reporter can take it down.
21           MR. CHALOS:  The Court has it before it.
22           THE COURT:  So you don't need to read it.
23           MS. OROZCO:  May I respond?
24           THE COURT:  Yes, ma'am.
25           MS. OROZCO:  The key to the quotes by defendant from
```

87N6NOBL

```
 1   the Ashon Agro case is the first line where it says, "In this
 2   case." and further or in the quote Judge Daniels says that
 3   based on the facts of that particular case they are not within
 4   the maritime jurisdiction.
 5           I would just like to point out that the Exxon case,
```

87N6NOBC

```
 6  500 U.S. 603, 612 reminds us -- this is the U.S. Supreme
 7  Court -- reminds us that courts are required to look to the
 8  subject matter of the relevant contract. And in this case the
 9  relevant contract, the Noble YTS contract, provides maritime
10  jurisdiction.
11          MR. CHALOS:  Your Honor, this is the shifting sands
12  that I have been arguing again. The Court is required to look
13  to the nature of the contract, not the dispute. Twenty minutes
14  ago counsel was arguing the Court needs to look to the dispute
15  and I rejected that. The contract is a sale and purchase
16  contract, not a maritime contract. It is not maritime contract
17  with third parties. We had nothing do with it. My clients had
18  nothing to do with it. That is the dispute here. If you look
19  to the nature and substance of the contract, we are selling and
20  they are buying. Full stop. It is the sale and purchase
21  contract.
22          In fact, your Honor, that was precisely what was
23  addressed by Judge Daniels. He writes here invoking the first
24  exception, Aston contends that maritime jurisdiction exists
25  because the particular claims at issue involve only the
```

12

87N6NOBL

```
 1  maritime portions of the contracts, and it was rejected, which
 2  is precisely the argument presented by plaintiff. Our
 3  opposition is precisely the argument adopted by Judge Daniels.
 4          THE COURT:  The Court denies the request for
 5  certification under 28, U.S.C., Section 1292(b). The
 6  controlling law is not at all at issue in this case. Everyone
 7  agrees on the cases that should be looked to for guidance. The
 8  only dispute is the application of those cases to the facts of
 9  this case as opposed to the facts of other cases. Accordingly
10  certification for immediate appeal is denied.
11          Anything else, counsel?
12          MR. CHALOS:  Nothing further, your Honor.
13          THE COURT:  Thank you, ladies and gentlemen. Thank
14  you for your excellent arguments.
15                           o0o
16
17
18
19
20
21
22
23
24
25
```