UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
JAKIL S.P.A.

                *Plaintiff*                    08 CIV 5613 (DC)

      -against-

AGRIMPEX CO. LTD.,

                *Defendant.*
--------------------------------------------------------------X

## DECLARATION OF GEORGE M CHALOS

    I, **GEORGE M. CHALOS,** having been duly sworn, deposes and states the following under the penalty of perjury pursuant to Section 1746 of Title 28 of the United States Code:

1. I am an individual of sound mind and body, and have never been convicted of a crime of moral turpitude.

2. I am a principal in the law firm of Chalos & Co, P.C., counsel for the Plaintiff, JAKIL S.P.A. (hereinafter "JAKIL").

3. I submit this declaration in support of Plaintiff, JAKIL's, opposition to defendant's motion to vacate the pending maritime attachment.

4. I make this declaration based upon my personal knowledge; my discussions with our client and their authorized representatives; my own investigation; and review of the client's official company records which have been provided to me.

5. Attached hereto as Exhibit 1 is a true and accurate copy of the first contract (no. DFS/56201) between the parties dated June 27, 2007.

6.  This first contract required defendant to provide a bulk "cargo" to be loaded at "one (1) Italian Adriatic port" in the range of Venice/Ancona/Ravenna where a vessel with up to 31 foot salt water arrival draft could be berthed.

7.  This cargo was to be provided on a "C+F" basis; meaning "cost and freight" basis. "Cost and freight" is an internationally accepted commercial term which, under the circumstances, required the defendant to arrange for and obtain a vessel of the type specified in the contract, as well as to pay to transport the cargo to the discharge port. *See In re Daewoo International (America) Corp. v. Daewoo International (America) Corp.*, 2001 U.S. Dist. LEXIS 19796 (S.D.N.Y. Nov. 29, 2001).

8.  Payment for said cargo was to be made at or about the time of arrival of the vessel at the discharge port, and no later than the commencement of discharge of the cargo from the vessel.

9.  The parties further agreed that the cargo was to be discharged at an average rate of USD 5,000 MT/day for a four 4 (hatch) vessel with the rate to be adjusted as necessary and appropriate.  The parties further agreed both demurrage and dispatch rates to be paid if the agreed vessel discharging rate was exceeded or, in the alternative, not met.

10. The parties further agreed that the vessel the subject cargo was to be loaded upon was to be "Classed with the highest Lloyds register or equivalent" Classification Society.

11. Any costs or expenses incurred as a result of loading said cargo on to an overage vessel were to be strictly for the account of defendant.

12. Attached hereto as Exhibit 2 is a true and accurate copy of the second contract (no. DFS/56307) between the parties dated July 3, 2007.

13. This contract required defendant to provide a bulk "cargo" to be loaded at "one (1) Italian Adriatic port" in the range of Venice/Ancona/Ravenna where a vessel with up to 31 foot salt water arrival draft could be berthed.

14. This cargo was also to be provided on a "C+F" basis.

15. Payment for said cargo was to be made at or about the time of arrival of the vessel at the discharge port, and no later than the commencement of discharge of the cargo from the vessel.

16. The parties further agreed that the cargo was to be discharged at an average rate of USD 5,000 MT/day for a four 4 (hatch) vessel with the rate to be adjusted as necessary and appropriate. The parties further agreed both demurrage and dispatch rates to be paid if the agreed vessel discharging rate was exceeded or, in the alternative, not met.

17. The parties further agreed that the vessel the subject cargo was to be loaded upon was to be "Classed with the highest Lloyds register or equivalent" Classification Society.

18. Any costs or expenses incurred as a result of loading said cargo on to an overage vessel were to be strictly for the account of defendant.

19. Attached hereto as Exhibit 3 is a true and accurate copy of the third contract (no. DFS/56407) between the parties dated July 10, 2007.

20. This third contract required the defendant to provide a bulk "cargo" to be loaded at "one (1) Italian Adriatic port" in the range of Venice/Ancona/Ravenna where a vessel with up to 31 foot salt water arrival draft could be berthed.

21. This cargo was also to be provided on a "C+F" basis.

22. Payment for said cargo was to be made at or about the time of arrival of the vessel at the discharge port, and no later than the commencement of discharge of the cargo from the vessel.

23. The parties further agreed that the cargo was to be discharged at an average rate of USD 5,000 MT/day for a four 4 (hatch) vessel with the rate to be adjusted as necessary and appropriate. The parties further agreed both demurrage and dispatch rates to be paid if the agreed vessel discharging rate was exceeded or, in the alternative, not met.

24. The parties further agreed that the vessel the subject cargo was to be loaded upon was to be "Classed with the highest Lloyds register or equivalent" Classification Society.

25. Any costs or expenses incurred as a result of loading said cargo on to an overage vessel were to be strictly for the account of defendant.

26. Attached hereto as Exhibit 4 is a true and accurate copy of the first contract (no. DFS/56607) between the parties dated July 17, 2007.

27. This fourth contract required the defendant to provide a bulk "cargo" to be loaded at "one (1) Italian Adriatic port" in the range of Venice/Ancona/Ravenna where a vessel with up to 31 foot salt water arrival draft could be berthed.

28. This cargo was also to be provided on a "C+F" basis.

29. Payment for said cargo was to be made at or about the time of arrival of the vessel at the discharge port, and no later than the commencement of discharge of the cargo from the vessel.

30. The parties further agreed that the cargo was to be discharged at an average rate of USD 5,000 MT/day for a four 4 (hatch) vessel with the rate to be adjusted as

necessary and appropriate.  The parties further agreed both demurrage and dispatch rates to be paid if the agreed vessel discharging rate was exceeded or, in the alternative, not met.

31. The parties further agreed that the vessel the subject cargo was to be loaded upon was to be "Classed with the highest Lloyds register or equivalent" Classification Society.

32. Any costs or expenses incurred as a result of loading said cargo on to an overage vessel were to be strictly for the account of defendant.

33. Attached hereto as Exhibit 5 is a true and accurate copy of the first contract (no. DFS/56907) between the parties dated July 27, 2007.

34. This fifth contract required defendant to provide a bulk "cargo" to be loaded at "one (1) Italian Adriatic port" in the range of Venice/Ancona/Ravenna where a vessel with up to 31 foot salt water arrival draft could be berthed.

35. This cargo was also to be provided on a "C+F" basis.

36. Payment for said cargo was to be made at or about the time of arrival of the vessel at the discharge port, and no later than the commencement of discharge of the cargo from the vessel.

37. The parties further agreed that the cargo was to be discharged at an average rate of USD 5,000 MT/day for a four 4 (hatch) vessel with the rate to be adjusted as necessary and appropriate.  The parties further agreed both demurrage and dispatch rates to be paid if the agreed vessel discharging rate was exceeded or, in the alternative, not met.

38. The parties further agreed that the vessel the subject cargo was to be loaded upon was to be "Classed with the highest Lloyds register or equivalent" Classification Society.

39. Any costs or expenses incurred as a result of loading said cargo on to an overage vessel were to be strictly for the account of defendant.

40. Attached hereto as Exhibit 6 is a true and complete copy of the transcript of the oral argument and corresponding ruling issued by Judge Preska in the *Noble Resources v. Yugtranzitservis, et. al.* matter (08 CV 3876)(LAP).

41. Attached hereto as Exhibit 7 is a true and complete copy of the transcript of the oral argument and corresponding ruling issued by Judge Lynch in the *Noble Resources v. Sarl Quest Import* matter (08 CV 3587)(GEL).

42. Defendant has failed to fully honor its obligations, as is even acknowledged in the declaration of Mr. Philippas submitted in response to Defendant's motion to vacate.

I hereby declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and accurate to the best of my knowledge.

Dated: September 5th, 2008
        Oyster Bay, New York

George M. Chalos, Esq.

EXHIBIT 1

REF. NO:05113073        28/06/2007 15:08 FROM        +3902976516 PG:002

28 GIU. 2007 12:49        JAKIL SPA        NR. 724    P. 2/4

# Agrimpex Co. Limited

Regal House, 1130 High Road, London, N20 0RA
Telephone: 020 8446 6921 Fax: 020 8446 7716 Telex: 296141 AGRICO G.
e-mail: trade@agrimpex.co.uk

*Contract of Sale No.* DFS/56207                    *Date* 27th June 2007

*Buyer*
Jakil SPA
Foro Buonaparte, 68
20121 Milano
Italy

Dear Sirs,

We confirm having sold to you on 27/06/2007 the following:-

| | |
|---|---|
| COMMODITY: | Sudanese durra feterita 2005/2006 and/or 2006/2007 crop at sellers option cleaned to within maximum 3% admixture, maximum 0.50% Tannin in sound good condition at time and place of shipment.<br>Quality/condition/description all final as per certificate/s issued at time of shipment by SGS or their agents in Sudan.<br>Delivered weight |
| QUANTITY: | One cargo/cargoes 20,000 Mt 10% more or less at sellers option and at contract price. |
| SHIPMENT: | July / August 2007 from origin. |
| PACKING: | In bulk. |
| PRICE: | US$ 230 (Two hundred and thirty US Dollars) per mton.<br>C+F Free Out one Italian Adriatic port out of Venice/Ancona/Ravenna at buyers option, where buyers guarantee berth to accommodate vessel upto 31' feet swad. In the event buyers want additional ports, then this will be as per rates stipulated in the Charter Party which shall be for buyers account.<br>Discharge port to be declared at sellers first demand but not later than commencement of loading of vessel. |
| PAYMENT: | 100% cash against documents on presentation in Italy with payment latest on arrival of vessel/s at discharge port and prior commencement of discharge by T/T. T/T charges for buyers account.<br>Should documents be presented at buyers bank before 11:00 hrs AM then sellers will be credited with value within 48 hours, otherwise within 72 hours value. |

AGRIMPEX CO LIMITED                                        (Cont'd...)

Page 1

Directors: P. G. Philippou, K. L. Philips. Registration number: 81378076

...5113873        28/06/2007 15:09 FROM        +3982876516 PG:003

28.GIU.2007 12:49        IAKI. SPA        №.724    P. 3/4

# Agrimpex Co. Limited

Regal House, 1136 High Road, London, N20 0RA
Telephone: 020 8446 6921 Fax: 020 8446 7116 Telex: 296143 AGRICO G.
e-mail: trade@agrimpex.co.uk

*Contract of Sale No.* DFS/S6207                    *Date* 27th June 2007

**PAYMENT**
**CONT/D...:**        In the event vessel's arrive prior presentation of shipping documents
                      sellers have the option to either ask buyers to take delivery on first class
                      bank guarantee as required by owners of vessel pending presentation of
                      shipping documents. The relative charges of such bank guarantee for
                      sellers account, or alternatively 100% cash latest on arrival of vessel/s
                      before breaking bulk against presentation of original invoice, insurance
                      certificate and indemnity letter for allowing the discharge of the goods
                      without production of B/Ls.
                      Such letter of indemnity to be confirmed directly from vessel agents to
                      the buyers. This confirmation to reach buyers before payment is effected
                      and then cargo will be released against presentation of the original
                      letter of indemnity to vessels agents.

- **DISCHARGE:**      Buyers to discharge goods at their risk and expenses at the average rate
                      of 5,000 MT basis 4 hatches, in the case of 3 hatches or less discharging
                      rate to be adjusted/reduced prorata if vessel singledecker/bulkcarrier, or
                      at the rate of 1,500 Mt if vessel tweendecker per weather working day of
                      24 consecutive hours SSHEX unless used and prorata. If used only time
                      actually worked to count as laytime.
                      Time at first disport to start counting as from 08.00 AM hours the next
                      working day after presentation of N.O.R. given during ordinary office
                      hours. WIBON/WIPON/WIFPON/WICCON.
                      Demurrage as per C/P rate for buyers account. Despatch to be half of
                      demurrage.
                      All other terms and conditions not in conflict with the above as per
                      governing Charter Party.

**OTHER TERMS/**
**CONDITIONS:**       1) - All export duties and/or taxes and/or levies present and/or future are
                      for sellers account.
                      2) - All import duties and/or taxes and/or levies present and/or future
                      are for buyers account.
                      3) - Buyers have the exclusivity on performing vessel/s at discharge
                      port.
                      4) - Sellers guarantee provision on EUR 1 certificate at discharge port
                      before completion of discharge and a copy of phytosanitary certificate
                      on board vessel.

                                                                  (Cont/d...)

Page 2

Directors: P. G. Phillppou. K. L. Phillpou. Registration number: 01570974

05113873

28 GIU 2007 12:50

28/06/2007 15:10 FROM          +3902876516 PG 004

VAKIL SPA                      N. 724    P. 4/4

# Agrimpex Co. Limited

Regal House, 1128 High Road, London, N20 0RA.
Telephone: 020 8446 6921 Fax: 020 8446 7116 Telex: 266142 AGRICO G.
e-mail: trade@agrimpex.co.uk

*Contract of Sale No.* DFS/56207                    *Date* 27th June 2007

OTHER TERMS/
CONDITIONS
CONT/D......:

5) - Fumigation certificate
6) - Vessel/s to be singledecker/bulkcarrier/tweendecker classed
highest Lloyds register or equivalent. Vessel/s over 20 years old is/are
acceptable in which case overage premium to be for sellers account as
per Official Lloyds London Schedule.
7) - In the event that the quantity shown on the EUR 1 certificate is
higher than that shown on B/L quantity, buyers to accept same.

All other terms, conditions and rules not in contradiction with the above, as per GAFTA
contract 61 including the Arbitration Rule form No: 125 (of which the parties admit that
they have knowledge and notice) apply to this contract, the details given shall be taken as
having been written into such form in the appropriate place.

The validity of this contract will be unaffected by the non return of the counter
confirmation duly signed by buyers.

SELLERS                                            BUYERS

AGRIMPEX CO. LIMITED                               AXEL S.S.A.

Page 3

Directors: P. C. Philippou. K. L. Philippou. Registration number: 8157087G

Effective 1ˢᵗ January 2006

# *Gafta No.61*

Copyright
**THE GRAIN AND FEED TRADE ASSOCIATION**

## CONTRACT FOR MEDITERRANEAN AND MOROCCO
## IN BULK OR BAGS
### CARGOES
### TALE QUALE - CIF TERMS

*\* delete/specify as applicable*          *Date* ................................................................

1  **SELLERS** ....................................................................................................................................
2
3  **INTERVENING AS BROKERS** ..................................................................................................
4
5  **BUYERS**........................................................................................................................................
6  have this day entered into a contract on the following terms and conditions.
7
8  **1.   GOODS-** a cargo of ............................................................................................................
9       shipped in bulk and/or bags. If in bags, then the bags to be of suitable strength to withstand ordinary wear and tear to port of
10      destination. Such bags to be taken and paid for as goods.
11
12  **2.   QUANTITY-** ............................................................................................units, 5% more or less.
13      Sellers have the option of shipping a further 5% more or less on contract quantity, excess or deficiency over the above 5% to be
14      settled at the CIF price on the date of the last bill of lading, and on the quantity thereof; value to be fixed by arbitration, unless
15      mutually agreed
16
17  **3.   PRICE AND DESTINATION - At** ..........................................................................................
18      \* per tonne of 1000 kilograms          }
19                                              } gross weight, cost, insurance and freight to ....................................
20      \* per ton of 1016 kilograms or 2240 lbs.   }
21
22  **4.   BROKERAGE**.................................per tonne, to be paid by Sellers on the mean contract quantity, goods lost or not
23      lost, contract fulfilled or not fulfilled unless such non-fulfilment is due to the cancellation of the contract under the terms of
24      the Prohibition Clause.  Brokerage shall be due on the day shipping documents are exchanged or, if the goods are not
25      appropriated then brokerage shall be due on the 30th consecutive day after the last day for appropriation.
26
27  **5.   QUALITY-**
28      \*   **Warranted to contain** ......................................................................... at time and place of discharge.
29
30      \*   **Natural weight** of ............................................................... kilograms per hectolitre guaranteed at time and place of
31          discharge, to be ascertained according to GAFTA Sampling Rules No.124, or other accepted authority, and any allowances
32          determined to be allowed for off contract price, in accordance with GAFTA Sampling Rules No. 124.
33
34      \*   **Admixture Barley-** Any admixture of dirt and/or other foreign substance over ........................% to be allowed for by
35          Sellers at contract price, but any pulse, seed or grain other than Barley to be reckoned as foreign substances at half their
36          quantities.
37      \*   **Other Grain and Seed-** Any admixture of dirt and/or other foreign substance over .................% to be allowed for by
38          Sellers at contract price. The percentage of admixture to be determined by GAFTA, or its duly appointed Analyst.
39
40      \*   **Official** ................................ certificate of inspection, or certification of inspection of......................... at time and place of
41          loading into the ocean carrying vessel, shall be final as to quality.  The Buyers shall not be entitled to reject a tender of a
42          higher grade of grain of the same colour and description.
43      \*   **F.A.Q.** (fair average quality) of the season's shipment at time and place of loading, to be assessed upon the basis of, and by
44          comparison with the GAFTA F.A.Q. standard of the month during which the bill of lading is dated. In the event of no F.A.Q.
45          Standard being established by the Association, the Arbitrator(s) shall in his/their discretion decide what is the fair average
46          quality.  An average sample of the delivery shall be taken and sealed jointly at the port of discharge by the representatives of
47          the shipper and the representatives of the holders of the bill of lading or shipper's delivery order, and shall be forwarded
48          immediately to the Association for the purposes of establishing the F.A.Q. standard.  The expenses of such sampling and
49          forwarding shall be paid half by the Receiver and half by the Sellers.  Place of shipment under this contract shall be

50 understood as the port or group of ports adopted by the appointed Standards Committee in making the Standard. If the
51 difference between the delivery and the F.A.Q. Standard shall not amount to 0.50% on contract price, no allowance for
52 quality shall be due; otherwise the Buyers shall be entitled to the full difference in value.
53

54     **\***   **Sample,** at time and place of shipment about as per sealed sample marked............................. in possession of;.....................
55 the word "about" when referring to quality shall mean the equivalent of 0.50% on contract price.
56 Difference in quality shall not entitle Buyers to reject except under the award of arbitrator(s) or board of appeal, as the case may
57 be, referred to in the Arbitration Rules specified in the Arbitration Clause.
58 **Condition-** Shipment shall be made in good condition. Should the goods arrive out of condition, due regard shall be made for the
59 time of the year in which the shipment took place. The fact of the goods so arriving shall not necessarily be sufficient proof of an
60 improper shipment.
61

62 **6. PERIOD OF SHIPMENT-** as per bill(s) of lading dated or to be dated ...........................................................................................
63 The bill(s) of lading to be dated when the goods are actually on board. Date of the bill(s) of lading shall be accepted as proof of
64 date of shipment in the absence of evidence to the contrary. In any month containing an odd number of days, the middle day shall
65 be accepted as being in both halves of the month.
66

67 **7. SALES BY NAMED VESSELS –** For all sales by named vessels, the following shall apply: -
68 (a) Position of vessel is mutually agreed between Buyers and Sellers;
69 (b) The word "now" to be inserted before the word "classed" in the Ship's Classification Clause;
70 (c) Appropriation Clause cancelled if sold "shipped".
71

72 **8. SHIP'S CLASSIFICATION -** Shipment from ............................................................................................................................
73 by first class mechanically self-propelled vessel(s) suitable for the carriage of the contract goods, classed in accordance with the
74 Institute Classification Clause of the International Underwriting Association in force at time of shipment, excluding tankers and
75 vessels which are either classified in Lloyd's Register or described in Lloyd's Shipping Index as "Ore/Oil" vessels.
76

77 **9. EXTENSION OF SHIPMENT-** The contract period for shipment, if such be 31 days or less, shall be extended by an additional
78 period of not more than 8 days, provided that Sellers serve notice claiming extension not later than the next business day following
79 the last day of the originally stipulated period. The notice need not state the number of additional days claimed. Sellers shall make
80 an allowance to Buyers, to be deducted in the invoice from the contract price, based on the number of days by which the originally
81 stipulated period is exceeded, in accordance with the following scale:-
82         1 to 4 additional days, 0.50%;
83         5 or 6 additional days, 1%;
84         7 or 8 additional days 1.50% of the gross contract price.
85 If, however, after having served notice to Buyers as above, Sellers fail to make shipment within such 8 days, then the contract shall
86 be deemed to have called for shipment during the originally stipulated period plus 8 days, at contract price less 1.50%, and any
87 settlement for default shall be calculated on that basis. If any allowance becomes due under this clause, the contract price shall be
88 deemed to be the original contract price less the allowance and any other contractual differences shall be settled on the basis of
89 such reduced price.
90

91 **10. APPROPRIATION-**
92 (a) Notice of appropriation shall state the vessel's name, the approximate weight shipped, and the date or the presumed date of
93 the bill of lading.
94 (b) The notice of appropriation shall within 10 consecutive days, (or if shipped from a Moroccan port 7 consecutive days),
95 from the date of the bill(s) of lading be served by or on behalf of the Shipper direct on his Buyers or on the Selling Agent or
96 Brokers named in the contract. The Non-Business Days Clause shall not apply.
97 (c) Notice of appropriation shall, within the period stated in sub-clause (b) be served by or on behalf of subsequent Sellers on
98 their Buyers or on the Selling Agent or Brokers named in the contract, but if notice of appropriation is received by subsequent
99 Sellers on the last day or after the period stated in sub-clause (b) from the date of the bill of lading, their notice of appropriation
100 shall be deemed to be in time if served: -
101     (1)     On the same calendar day, if received not later than 1600 hours on any business day, or
102

103     (2)     Not later than 1600 hours on the next business day, if received after 1600 hours or on a non-business day.
104 (d) A notice of appropriation served on a Selling Agent or Brokers named in the contract shall be considered an appropriation
105 served on Buyers. A Selling Agent or Brokers receiving a notice of appropriation shall serve like notice of appropriation in
106 accordance with the provisions of this clause. Where the Shipper or subsequent Sellers serves the notice of appropriation on
107 the Selling Agent, such Selling Agent may serve notice of appropriation either direct to the Buyers or to the Brokers.
108 (e) The bill of lading date stated in the notice of appropriation shall be for information only and shall not be binding, but in
109 fixing the period laid down by this clause for serving notices of appropriation the actual date of the bill of lading shall prevail.
110 (f) Every notice of appropriation shall be open to correction of any errors occurring in transmission, provided that the sender
111 is not responsible for such errors, and for any previous error in transmission which has been repeated in good faith.
112 (g) Should the vessel arrive before receipt of the appropriation and any extra expenses is incurred thereby, such expenses shall
113 be borne by Sellers.
114 (h) When a valid notice of appropriation has been received by Buyers, it shall not be withdrawn except with their consent.
115 (i) In the event of less than 95 tonnes being tendered by any one vessel Buyers shall be entitled to refund of any proved extra
116 expenses for sampling, analysis and lighterage incurred thereby at port of discharge.

**11. PAYMENT-**

(a) **Payment** ................................................................ % of invoice amount by cash in .......................................................
in exchange for and on presentation of shipping documents.

(b) **Shipping documents** – shall consist of – 1. Invoice. 2. Full set(s) of on board Bill(s) of Lading and/or Ship's Delivery Order(s) and/or other Delivery Order(s) in negotiable and transferable form. Such other Delivery Order(s) if required by Buyers, to be countersigned by the Shipowners, their Agents or a recognised bank. 3. Policy (ies) and/or Insurance Certificate(s) and/or Letter(s) of Insurance in the currency of the contract. The Letter(s) of Insurance to be certified by a recognised bank if required by Buyers. 4. Other documents as called for under the contract. Buyers agree to accept documents containing the Chamber of Shipping War Deviation Clause and/or other recognised official War Risk Clause.

(c) In the event of shipping documents not being available when called for by Buyers, on arrival of the vessel at destination, Sellers shall provide other documents or an indemnity entitling Buyers to obtain delivery of the goods and payment shall be made by Buyers in exchange for same, but such payment shall not prejudice Buyers' rights under the contract when shipping documents are eventually available.

(d) Should Sellers fail to present shipping documents or other documents or an indemnity entitling Buyers to take delivery, Buyers shall take delivery under an indemnity provided by themselves and shall pay for the other documents when presented. Any reasonable extra expenses, including the costs of such indemnity or extra charges incurred by reason of the failure of Sellers to provide such documents, shall be borne by Sellers, but such payment shall not prejudice Buyers' rights under the contract when shipping documents are eventually available.

(e) Should shipping documents be presented with an incomplete set of bill(s) of lading or should other shipping documents be missing, payment shall be made provided that delivery of such missing documents is guaranteed, such guarantee to be countersigned, if required by Buyers, by a recognised bank.

(f) Costs of collection shall be for account of Sellers, but if Buyers demand presentation only through a bank of their choice, in that event any additional collection costs shall be borne by Buyers.

(g) No obvious clerical error in the documents shall entitle Buyers to reject them or delay payment, but Sellers shall be responsible for all loss or expense caused to Buyers by reason of such error and Sellers shall on request furnish an approved guarantee in respect thereto.

(h) Amounts payable under this contract shall be settled without delay. If not so settled, either party may notify the other that a dispute has arisen and serve a notice stating his intention to refer the dispute to arbitration in accordance with the Arbitration Rules.

(i) **Interest** – If there has been unreasonable delay in any payment, interest appropriate to the currency involved shall be charged. If such charge is not mutually agreed, a dispute shall be deemed to exist which shall be settled by arbitration. Otherwise interest shall be payable only where specifically provided in the terms of the contract or by an award of arbitration. The terms of this clause do not override the parties' contractual obligation under sub-clause (a).

**12. INSURANCE-** Sellers shall provide insurance on terms not less favourable than those set out hereunder, and as set out in detail in GAFTA Insurance Terms No.72 viz.:-

(a) Risks Covered: -

| | |
|---|---|
| Cargo Clauses (WA) with average payable, with 3% franchise or better terms | - Section 2 of Form 72 |
| War Clauses (Cargo) | - Section 4 of Form 72 |
| Strikes, Riots and Civil Commotions Clauses (Cargo) | - Section 5 of Form 72 |

(b) Insurers - The insurance to be effected with first class underwriters and/or companies who are domiciled or carrying on business in the United Kingdom or who, for the purpose of any legal proceedings, accept a British domicile and provide an address for service of process in London, but for whose solvency Sellers shall not be responsible.

(c) Insurable Value - Insured amount to be for not less than 2% over the invoice amount, including freight when freight is payable on shipment or due in any event, ship and/or cargo lost or not lost, and including the amount of any War Risk premium payable by Buyers.

(d) Freight Contingency - When freight is payable on arrival or on right and true delivery of the goods and the insurance does not include the freight, Sellers shall effect insurance upon similar terms, such insurance to attach only as such freight becomes payable, for the amount of the freight plus 2%, until the termination of the risk as provided in the above mentioned clauses, and shall undertake that their policies are so worded that in the case of a particular or general average claim the Buyers shall be put in the same position as if the C.I.F. value plus 2% were insured from the time of shipment.

(e) Certificates/Policies - Sellers shall give all policies and/or certificates and/or letters of insurance provided for in this contract, (duly stamped if applicable) for original and increased value (if any) for the value stipulated in (c) above. In the event of a certificate of insurance being supplied, it is agreed that such certificate shall be exchanged by Sellers for a policy if and when required and such certificate shall state on its face that it is so exchangeable. If required by Buyers, letter(s) of insurance shall be guaranteed by a recognised bank, or by any other guarantor who is acceptable to Buyers.

(f) Total Loss - In the event of total or constructive total loss, or where the amount of the insurance becomes payable in full, the insured amount in excess of 2% over the invoice amount shall be for Sellers' account and the party in possession of the policy (ies) shall collect the amount of insurance and shall thereupon settle with the other party on that basis.

(g) Currency of Claims - Claims to be paid in the currency of the contract.

(h) War and Strike Risks Premiums – Any premium in excess of 0.50% to be for account of Buyers. The rate of such insurance not to exceed the rate ruling in London at time of shipment or date of vessel's sailing whichever may be adopted by underwriters. Such excess premium shall be claimed from Buyers, wherever possible, with the Provisional Invoice, but in no case later than the date of vessel's arrival, or not later than 7 consecutive days after the rate has been agreed with underwriters, whichever may be the later, otherwise such claim shall be void unless, in the opinion of Arbitrators, the delay is justifiable. Sellers' obligation to provide War Risk Insurance shall be limited to the terms and conditions in force and generally obtainable in London at time of shipment.

(i) Where Sellers are responsible for allowances or other payments to Buyers under Rye Terms or other contractual terms, (and which risks are also covered by the insurance provided by Sellers), the Buyers, on receipt of settlement, shall immediately return to Sellers the insurance documents originally received from them and shall, if required, subrogate to Sellers all right of claim against the Insurers in respect of such matters.

**13. DUTIES, TAXES, LEVIES, ETC.** – All export duties, taxes, levies, etc., present or future, in country of origin, shall be for Sellers' account. All import duties, taxes, levies, etc., present or future, in country of destination, shall be for Buyers' account.

**14. DISCHARGE**- Ship to discharge according to the custom of the port. Ship to discharge at the rate of ...............................................

If documents are tendered which do not provide for discharge as above, or contain contrary stipulations, Sellers to be responsible to Buyers for all extra expenses incurred thereby.

**15. WEIGHING**- the terms and conditions of GAFTA Weighing Rules No. 123 are deemed to be incorporated into this contract. Unless otherwise agreed, final settlement shall be made on the basis of gross delivered weights at time and place of discharge at Buyers' expense. If the place of destination is outside the port limits, Buyers agree to pay the extra expenses incurred by Sellers or their agents for weighing. No payment shall be made for increase in weight occasioned by water and/or oil during the voyage. If final at time and place of loading, as per GAFTA registered superintendents' certificate at Sellers' choice and expense, (in which case the Deficiency Clause will not apply).

**16. DEFICIENCY**- any deficiency in the bill of lading weight shall be paid for by Sellers and any excess over bill of lading weight shall be paid for by Buyers at contract price.

**17. SAMPLING, ANALYSIS AND CERTIFICATES OF ANALYSIS**- the terms and conditions of GAFTA Sampling Rules No.124, are deemed to be incorporated into this contract. Samples shall be taken at the time of discharge on or before removal from the ship or quay, unless the parties agree that quality final at loading applies, in which event samples shall be taken at time and place of loading. The parties shall appoint superintendents, for the purposes of supervision and sampling of the goods, from the GAFTA Register of Superintendents. Unless otherwise agreed, analysts shall be appointed from the GAFTA Register of Analysts.

**18. PROHIBITION**- In case of prohibition of export, blockade or hostilities or in case of any executive or legislative act done by or on behalf of the government of the country of origin or of the territory where the port or ports of shipment named herein is/are situate, restricting export, whether partially or otherwise, any such restriction shall be deemed by both parties to apply to this contract and to the extent of such total or partial restriction to prevent fulfilment whether by shipment or by any other means whatsoever and to that extent this contract or any unfulfilled portion thereof shall be cancelled. Sellers shall advise Buyers without delay with the reasons therefor and, if required, Sellers must produce proof to justify the cancellation.

**19. LOADING STRIKE-**
(a) Should shipment of the goods or any part thereof be prevented at any time during the last 28 days of guaranteed time of shipment or at any time during guaranteed contract period if such be less than 28 days, by reason of riots, strikes or lock-outs at port(s) of loading or elsewhere preventing the forwarding of the goods to such port or ports, then the Shipper shall be entitled at the termination of such riots, strikes or lock-outs to as much time, not exceeding 28 days, for shipment from such port or ports as was left for shipment under the contract prior to the outbreak of the riots, strikes or lock-outs, and in the event of the time left for shipment under the contract being 14 days or less, a minimum extension of 14 days shall be allowed. In the event of further riots, strikes or lock-outs occurring during the time by which the guaranteed time of shipment has been extended by reason of the provisions of the foregoing paragraph, the additional extension shall be limited to the actual duration of such further riots, strikes or lock-outs. In case of non-fulfilment under the above conditions the date of default shall be similarly deferred.
(b). The Shipper shall serve notice naming the ports not later than 3 business days after the last day of guaranteed time of shipment if he intends to claim an extension of time for shipment, such notice shall limit the port(s) for shipment after expiry of contract period to those from which an extension is claimed.
(c). If required by Buyers, Sellers must provide documentary evidence to establish any claim for extension under this clause.

**20. NOTICES-** All notices required to be served on the parties pursuant to this contract shall be communicated rapidly in legible form. Methods of rapid communication for the purposes of this clause are defined and mutually recognised as: - either telex, or letter if delivered by hand on the date of writing, or telefax, or E-mail, or other electronic means, always subject to the proviso that if receipt of any notice is contested, the burden of proof of transmission shall be on the sender who shall, in the case of a dispute, establish, to the satisfaction of the arbitrator(s) or board of appeal appointed pursuant to the Arbitration Clause, that the notice was actually transmitted to the addressee. In case of resales/repurchases all notices shall be served without delay by sellers on their respective buyers or vice versa and any notice received after 1600 hours on a business day shall be deemed to have been received on the business day following. A notice to the Brokers or Agent shall be deemed a notice under this contract.

**21. NON-BUSINESS DAYS-** Saturdays, Sundays and the officially recognised and/or legal holidays of the respective countries and any days, which GAFTA may declare as non-business days for specific purposes, shall be non-business days. Should the time limit for doing any act or serving any notice expire on a non-business day, the time so limited shall be extended until the first business day thereafter. The period of shipment shall not be affected by this clause.

**22. DEFAULT**- In default of fulfilment of contract by either party, the following provisions shall apply: -

(a) The party other than the defaulter shall, at their discretion have the right, after serving a notice on the defaulter to sell or purchase, as the case may be, against the defaulter, and such sale or purchase shall establish the default price.

(b) If either party be dissatisfied with such default price or if the right at (a) above is not exercised and damages cannot be mutually agreed, then the assessment of damages shall be settled by arbitration.

(c) The damages payable shall be based on, but not limited to, the difference between the contract price and either the default price established under (a) above or upon the actual or estimated value of the goods, on the date of default, established under (b) above.

(d) In no case shall damages include loss of profit on any sub-contracts made by the party defaulted against or others unless the Arbitrator(s) or Board of Appeal, having regard to special circumstances, shall in his/their sole and absolute discretion think fit.

(e) Damages, if any, shall be computed on the quantity appropriated if any but, if no such quantity has been appropriated then on the mean contract quantity, and any option available to either party shall be deemed to have been exercised accordingly in favour of the mean contract quantity.

(f) Default may be declared by Sellers at any time after expiry of the contract period, and the default date shall then be the first business day after the date of Sellers' advice to their Buyers. If default has not already been declared then (notwithstanding the provisions stated in the Appropriation Clause) if notice of appropriation has not been served by the 10th consecutive day after the last day for appropriation laid down in the contract, the Sellers shall be deemed to be in default, and the default date shall then be the first business day thereafter.

23. **INSOLVENCY**- If before the fulfilment of this contract, either party shall suspend payments, notify any of the creditors that he is unable to meet debts or that he has suspended or that he is about to suspend payments of his debts, convene, call or hold a meeting of creditors, propose a voluntary arrangement, have an administration order made, have a winding up order made, have a receiver or manager appointed, convene, call or hold a meeting to go into liquidation (other than for re-construction or amalgamation) become subject to an Interim Order under Section 252 of the Insolvency Act 1986, or have a Bankruptcy Petition presented against him (any of which acts being hereinafter called an "Act of Insolvency") then the party committing such Act of Insolvency shall forthwith serve a notice of the occurrence of such Act of Insolvency on the other party to the contract and upon proof (by either the other party to the contract or the Receiver, Administrator, Liquidator or other person representing the party committing the Act of Insolvency) that such notice was thus served within 2 business days of the occurrence of the Act of Insolvency, the contract shall be closed out at the market price ruling on the business day following the serving of the notice. If such notice has not been served, then the other party, on learning of the occurrence of the Act of Insolvency, shall have the option of declaring the contract closed out at either the market price on the first business day after the date when such party first learnt of the occurrence of the Act of Insolvency or at the market price ruling on the first business day after the date when the Act of Insolvency occurred.

In all cases the other party to the contract shall have the option of ascertaining the settlement price on the closing out of the contract by re-purchase or re-sale, and the difference between the contract price and the re-purchase or re-sale price shall be the amount payable or receivable under this contract.

24. **CIRCLE**- Where Sellers re-purchase from their Buyers or from any subsequent Buyer the same goods or part thereof, a circle shall be considered to exist as regards the particular goods so re-purchased, and the provisions of the Default Clause shall not apply. (For the purpose of this clause the same goods shall mean goods of the same description, from the same country of origin, of the same quality, and, where applicable, of the same analysis warranty, for shipment to the same port(s) of destination during the same period of shipment). Different currencies shall not invalidate the circle.

Subject to the terms of the Prohibition Clause in the contract, if the goods are not appropriated, or, having been appropriated documents are not presented, invoices based on the mean contract quantity shall be settled by all Buyers and their Sellers in the circle by payment by all Buyers to their Sellers of the excess of the Sellers' invoice amount over the lowest invoice amount in the circle. Payment shall be due not later than 15 consecutive days after the last day for appropriation, or, should the circle not be ascertained before the expiry of this time, then payment shall be due not later than 15 consecutive days after the circle is ascertained.

Where the circle includes contracts expressed in different currencies the lowest invoice amount shall be replaced by the market price on the first day for contractual shipment and invoices shall be settled between each Buyer and his Seller in the circle by payment of the differences between the market price and the relative contract price in currency of the contract.

All Sellers and Buyers shall give every assistance to ascertain the circle and when a circle shall have been ascertained in accordance with this clause same shall be binding on all parties to the circle. As between Buyers and Sellers in the circle, the non-presentation of documents by Sellers to their Buyers shall not be considered a breach of contract. Should any party in the circle prior to the due date of payment commit any act comprehended in the Insolvency Clause of this contract, settlement by all parties in the circle shall be calculated at the closing out price as provided for in the Insolvency Clause, which shall be taken as a basis for settlement, instead of the lowest invoice amount in the circle. In this event respective Buyers shall make payment to their Sellers or respective Sellers shall make payment to their Buyers of the difference between the closing out price and the contract price.

25. **DOMICILE**- This contract shall be deemed to have been made in England and to be performed in England, notwithstanding any contrary provision, and this contract shall be construed and take effect in accordance with the laws of England. Except for the purpose of enforcing any award made in pursuance of the Arbitration Clause of this contract, the Courts of England shall have exclusive jurisdiction to determine any application for ancillary relief, (save for obtaining security only for the claim or counter-claim),the exercise of the powers of the Court in relation to the arbitration proceedings and any dispute other than a dispute which shall fall within the jurisdiction of arbitrators or board of appeal of the Association pursuant to the Arbitration Clause of this contract. For the purpose of any legal proceedings each party shall be deemed to be ordinarily resident or carrying on business at the offices of The Grain and Feed Trade Association, (GAFTA), England, and any party residing or carrying on business in Scotland shall be held to have prorogated jurisdiction against himself to the English Courts or if in Northern Ireland to have submitted to the jurisdiction and to be bound by the decision of the English Courts. The service of

319 proceedings upon any such party by leaving the same at the offices of The Grain and Feed Trade Association, together with
320 the posting of a copy of such proceedings to his address outside England, shall be deemed good service, any rule of law or
321 equity to the contrary notwithstanding.
322
323 **26.    ARBITRATION-**
324 (a) Any and all disputes arising out of or under this contract or any claim regarding the interpretation or execution of this
325 contract shall be determined by arbitration in accordance with the GAFTA Arbitration Rules, No 125, in the edition current at
326 the date of this contract, such Rules are incorporated into and form part of this Contract and both parties hereto shall be
327 deemed to be fully cognisant of and to have expressly agreed to the application of such Rules.
328
329 (b) Neither party hereto, nor any persons claiming under either of them shall bring any action or other legal proceedings
330 against the other in respect of any such dispute, or claim until such dispute or claim shall first have been heard and determined
331 by the arbitrator(s) or a board of appeal, as the case may be, in accordance with the Arbitration Rules and it is expressly
332 agreed and declared that the obtaining of an award from the arbitrator(s) or board of appeal, as the case may be, shall be a
333 condition precedent to the right of either party hereto or of any persons claiming under either of them to bring any action or
334 other legal proceedings against the other of them in respect of any such dispute or claim.
335
336 (c) Nothing contained under this Arbitration Clause shall prevent the parties from seeking to obtain security in respect of their
337 claim or counterclaim via legal proceedings in any jurisdiction, provided such legal proceedings shall be limited to applying
338 for and/or obtaining security for a claim or counterclaim, it being understood and agreed that the substantive merits of any
339 dispute or claim shall be determined solely by arbitration in accordance with the GAFTA Arbitration Rules, No 125.
340
341 **27.    INTERNATIONAL CONVENTIONS-**
342 The following shall not apply to this contract: -
343 (a) The Uniform Law on Sales and the Uniform Law on Formation to which effect is given by the Uniform Laws on International
344 Sales Act 1967;
345 (b) The United Nations Convention on Contracts for the International Sale of Goods of 1980; and
346 (c) The United Nations Convention on Prescription (Limitation) in the International Sale of Goods of 1974 and the amending
347 Protocol of 1980.
348 (d) Incoterms.
349 (e) Unless the contract contains any statement expressly to the contrary, a person who is not a party to this contract has no
350 right under the Contract (Rights of Third Parties) Act 1999 to enforce any term of it.

Sellers ...................................................................................Buyers...................................................................................

Printed in England and issued by

# GAFTA
## (THE GRAIN AND FEED TRADE ASSOCIATION)
### GAFTA HOUSE, 6 CHAPEL PLACE, RIVINGTON ST, LONDON EC2A 3SH

EXHIBIT 2

REF.NR.05114896        04/07/2007 16:58 FROM        +3982876516 PG:001

4. LUG. 2007 16:49 13        JAKIL SPA        NR.248    P. 1/3  82

# Agrimpex Co. Limited

Regal House, 1138 High Road, London, N20 6RA.
Telephone: 020 8446 6921 Fax: 020 8446 7116 Telex: 296141 AGRICO G.
e-mail: trade@agrimpex.co.uk

Contract of Sale No. DFS/56307                    Date 3rd July 2007

Buyer
Jakil SPA
Foro Buonaparte, 68
20121 Milano
Italy

Dear Sirs,

We confirm having sold to you on 03/07/2007 the following:-

| | |
|---|---|
| COMMODITY: | Sudanese durra feterita 2005/2006 and/or 2006/2007 crop at sellers option cleaned to within maximum 3% admixture, maximum 0.50% Tannin in sound good condition at time and place of shipment. Quality/condition/description all final as per certificate/s issued at time of shipment by SGS or their agents in Sudan. Delivered weight. |
| QUANTITY/ | One cargo/cargoes 20,000 Mt 10% more or less at sellers option and at contract price. |
| SHIPMENT: | August / September 2007 from origin. Sellers option to ship any date during this shipment period provided that B/Ls are dated not earlier than 21 days from the date of the first B/Ls issued against shipment executing contract no. DFS/56207 (yours. 11381) dated 27/6/07. |
| PACKING: | In bulk. |
| PRICE: | US$ 230 (Two hundred and thirty US Dollars) per mton. C+F Free Out one Italian Adriatic port out of Venice/Ancona/Ravenna at buyers option, where buyers guarantee berth to accommodate vessel upto 31' feet swad. In the event buyers want additional ports, then this will be as per rates stipulated in the Charter Party which shall be for buyers account. Discharge port to be declared at sellers first demand but not later than commencement of loading of vessel. |
| PAYMENT: | 100% cash against documents on presentation in Italy with payment latest on arrival of vessel/s at discharge port and prior commencement of discharge by T/T. T/T charges for buyers account. Should documents be presented at buyers bank before 11:00 hrs AM then sellers will be credited with value within 48 hours, otherwise within 72 hours value. |

AGRIMPEX CO LIMITED

                                                        (Cont/d....)

Directors: P. G. Philipps. K. L. Philipps. Registration number: 01976576

REF.NR.05114096          04/07/2007 16:59 FROM          +3902076516 PG:002

4. UG. 2007 16:59          JAKIL SPA                    NR. 248    P. 2/3

# Agrimpex Co. Limited

Regal House, 1138 High Road, London, N20 0RA
Telephone: 020 8446 6921 Fax: 020 8446 7116 Telex: 296142 AGRICO G.
e-mail: trade@agrimpex.co.uk

*Contract of Sale No.* DFS/56307                    *Date* 3rd July 2007

**PAYMENT
CONT/D...:**
In the event vessel/s arrive prior presentation of shipping documents
sellers have the option to either ask buyers to take delivery on first class
bank guarantee as required by owners of vessel pending presentation of
shipping documents. The relative charges of such bank guarantee for
sellers account, or alternatively 100% cash latest on arrival of vessel/s
before breaking bulk against presentation of original invoice, insurance
certificate and indemnity letter for allowing the discharge of the goods
without production of B/Ls.
Such letter of indemnity to be confirmed directly from vessel agents to
the buyers. This confirmation to reach buyers before payment is effected
and then cargo will be released against presentation of the original
letter of indemnity to vessels agents.

**DISCHARGE:**
Buyers to discharge goods at their risk and expenses at the average rate
of 5,000 MT basis 4 hatches, in the case of 3 hatches or less discharging
rate to be adjusted/reduced prorata if vessel singledecker/bulkcarrier, or
at the rate of 1,500 Mt if vessel tweendecker per weather working day of
24 consecutive hours SSHEX unless used and prorata. If used only time
actually worked to count as laytime.
Time at first disport to start counting as from 08.00 AM hours the next
working day after presentation of N.O.R. given during ordinary office
hours. WIBON/WIPON/WIFPON/WICCON.
Demurrage as per C/P rate for buyers account. Despatch to be half of
demurrage.
All other terms and conditions not in conflict with the above as per
governing Charter Party.

**OTHER TERMS/
CONDITIONS:**
1) - All export duties and/or taxes and/or levies present and/or future are
for sellers account.
2) - All import duties and/or taxes and/or levies present and/or future
are for buyers account
3) - Buyers have the exclusivity on performing vessel/s at discharge
port
4) - Sellers guarantee provision on EUR 1 certificate at discharge port
before completion of discharge and a copy of phytosanitary certificate
on board vessel.

                                                            (Cont/d...)

AGRIMPEX CO. LIMITED

Page 2

Directors: P. G. Philippou, K. L. Philippou. Registration number 01370076



REF.NR.05114096          04/07/2007 17:00 FROM          +3902876516 P:003

2. LUG 2007 16:50:16     JAXIL SPA                      VR 248    P. 3/3-04

# Agrimpex Co. Limited

Regal House, 1134 High Road, London, N20 0RA
Telephone: 020 8446 6921 Fax: 020 8446 7116 Telex: 296142 AGRICO G.
e-mail: trade@agrimpex.co.uk

Contract of Sale No. DPS/56307                    Date 3rd July 2007

OTHER TERMS/
CONDITIONS
CONT/D.....:     5) – Fumigation certificate
                6) – Vessel/s to be singledecker/bulkcarrier/tweendecker classed
                highest Lloyds register or equivalent. Vessel/s over 20 years old is/are
                acceptable in which case overage premium to be for sellers account as
                per Official Lloyds London Schedule.
                7) – In the event that the quantity shown on the EUR 1 certificate is
                higher than that shown on B/L quantity, buyers to accept same.

All other terms, conditions and rules not in contradiction with the above, as per GAFTA
contract 61 including the Arbitration Rule form No: 125 (of which the parties admit that
they have knowledge and notice) apply to this contract, the details given shall be taken as
having been written into such form in the appropriate place.

The validity of this contract will be unaffected by the non return of the counter
confirmation duly signed by buyers.

SELLERS                                          BUYERS

AGRIMPEX CO LIMITED                              JAXIL S.p.A

Page 3

Directors: P. G. Phillips., X. L. Phillips. Registration number: 01370076

Effective 1ᵗ January 2006

# Gafta No.61

Copyright
**THE GRAIN AND FEED TRADE ASSOCIATION**

## CONTRACT FOR MEDITERRANEAN AND MOROCCO
## IN BULK OR BAGS
### CARGOES
### TALE QUALE - CIF TERMS

*\* delete/specify as applicable*                                         *Date* ........................................

1    SELLERS ...........................................................................................................................................
2
3    INTERVENING AS BROKERS ...........................................................................................................
4
5    BUYERS ............................................................................................................................................
6    have this day entered into a contract on the following terms and conditions.
7
8    **1.    GOODS-** a cargo of ...................................................................................................................
9            shipped in bulk and/or bags. If in bags, then the bags to be of suitable strength to withstand ordinary wear and tear to port of
10           destination. Such bags to be taken and paid for as goods.
11
12   **2.    QUANTITY-** ....................................................................................units, 5% more or less.
13           Sellers have the option of shipping a further 5% more or less on contract quantity, excess or deficiency over the above 5% to be
14           settled at the CIF price on the date of the last bill of lading, and on the quantity thereof; value to be fixed by arbitration, unless
15           mutually agreed
16
17   **3.    PRICE AND DESTINATION - At** ...........................................................................................
18           \* per tonne of 1000 kilograms              }
19                                                      } gross weight, cost, insurance and freight to .........................................
20           \* per ton of 1016 kilograms or 2240 lbs.   }
21
22   **4.    BROKERAGE**................................................per tonne, to be paid by Sellers on the mean contract quantity, goods lost or not
23           lost, contract fulfilled or not fulfilled unless such non-fulfilment is due to the cancellation of the contract under the terms of
24           the Prohibition Clause.  Brokerage shall be due on the day shipping documents are exchanged or, if the goods are not
25           appropriated then brokerage shall be due on the 30th consecutive day after the last day for appropriation.
26
27   **5.    QUALITY-**
28           \*    **Warranted to contain** ........................................................................ at time and place of discharge.
29
30           \*    **Natural weight of** ......................................................... kilograms per hectolitre guaranteed at time and place of
31                discharge, to be ascertained according to GAFTA Sampling Rules No.124, or other accepted authority, and any allowances
32                determined to be allowed for off contract price, in accordance with GAFTA Sampling Rules No. 124.
33
34           \*    **Admixture Barley-** Any admixture of dirt and/or other foreign substance over ....................... % to be allowed for by
35                Sellers at contract price, but any pulse, seed or grain other than Barley to be reckoned as foreign substances at half their
36                quantities.
37           \*    **Other Grain and Seed-** Any admixture of dirt and/or other foreign substance over ....................... % to be allowed for by
38                Sellers at contract price. The percentage of admixture to be determined by GAFTA, or its duly appointed Analyst.
39
40           \*    **Official** ........................... certificate of inspection, or certification of inspection of.................. at time and place of
41                loading into the ocean carrying vessel, shall be final as to quality.  The Buyers shall not be entitled to reject a tender of a
42                higher grade of grain of the same colour and description.
43           \*    **F.A.Q.** (fair average quality) of the season's shipment at time and place of loading, to be assessed upon the basis of, and by
44                comparison with the GAFTA F.A.Q. standard of the month during which the bill of lading is dated. In the event of no F.A.Q.
45                Standard being established by the Association, the Arbitrator(s) shall in his/their discretion decide what is the fair average
46                quality.  An average sample of the delivery shall be taken and sealed jointly at the port of discharge by the representatives of
47                the shipper and the representatives of the holders of the bill of lading or shipper's delivery order, and shall be forwarded
48                immediately to the Association for the purposes of establishing the F.A.Q. standard.  The expenses of such sampling and
49                forwarding shall be paid half by the Receiver and half by the Sellers.  Place of shipment under this contract shall be

50  understood as the port or group of ports adopted by the appointed Standards Committee in making the Standard. If the
51  difference between the delivery and the F.A.Q. Standard shall not amount to 0.50% on contract price, no allowance for
52  quality shall be due; otherwise the Buyers shall be entitled to the full difference in value.
53
54    *   **Sample**, at time and place of shipment about as per sealed sample marked............................ in possession of;.......................
55  the word "about" when referring to quality shall mean the equivalent of 0.50% on contract price.
56  Difference in quality shall not entitle Buyers to reject except under the award of arbitrator(s) or board of appeal, as the case may
57  be, referred to in the Arbitration Rules specified in the Arbitration Clause.
58  **Condition**- Shipment shall be made in good condition. Should the goods arrive out of condition, due regard shall be made for the
59  time of the year in which the shipment took place. The fact of the goods so arriving shall not necessarily be sufficient proof of an
60  improper shipment.
61
62  **6.  PERIOD OF SHIPMENT**- as per bill(s) of lading dated or to be dated ...................................................................................
63  The bill(s) of lading to be dated when the goods are actually on board. Date of the bill(s) of lading shall be accepted as proof of
64  date of shipment in the absence of evidence to the contrary. In any month containing an odd number of days, the middle day shall
65  be accepted as being in both halves of the month.
66
67  **7.  SALES BY NAMED VESSELS** – For all sales by named vessels, the following shall apply: -
68  (a)  Position of vessel is mutually agreed between Buyers and Sellers;
69  (b)  The word "now" to be inserted before the word "classed" in the Ship's Classification Clause;
70  (c)  Appropriation Clause cancelled if sold "shipped".
71
72  **8.  SHIP'S CLASSIFICATION** - Shipment from ...............................................................................................................................
73  by first class mechanically self-propelled vessel(s) suitable for the carriage of the contract goods, classed in accordance with the
74  Institute Classification Clause of the International Underwriting Association in force at time of shipment, excluding tankers and
75  vessels which are either classified in Lloyd's Register or described in Lloyd's Shipping Index as "Ore/Oil" vessels.
76
77  **9.  EXTENSION OF SHIPMENT**- The contract period for shipment, if such be 31 days or less, shall be extended by an additional
78  period of not more than 8 days, provided that Sellers serve notice claiming extension not later than the next business day following
79  the last day of the originally stipulated period. The notice need not state the number of additional days claimed. Sellers shall make
80  an allowance to Buyers, to be deducted in the invoice from the contract price, based on the number of days by which the originally
81  stipulated period is exceeded, in accordance with the following scale:-
82  1 to 4 additional days, 0.50%;
83  5 or 6 additional days, 1%;
84  7 or 8 additional days 1.50% of the gross contract price.
85  If, however, after having served notice to Buyers as above, Sellers fail to make shipment within such 8 days, then the contract shall
86  be deemed to have called for shipment during the originally stipulated period plus 8 days, at contract price less 1.50%, and any
87  settlement for default shall be calculated on that basis. If any allowance becomes due under this clause, the contract price shall be
88  deemed to be the original contract price less the allowance and any other contractual differences shall be settled on the basis of
89  such reduced price.
90
91  **10.  APPROPRIATION**-
92  (a)  Notice of appropriation shall state the vessel's name, the approximate weight shipped, and the date or the presumed date of
93  the bill of lading.
94  (b)  The notice of appropriation shall within 10 consecutive days, (or if shipped from a Moroccan port 7 consecutive days),
95  from the date of the bill(s) of lading be served by or on behalf of the Shipper direct on his Buyers or on the Selling Agent or
96  Brokers named in the contract. The Non-Business Days Clause shall not apply.
97  (c)  Notice of appropriation shall, within the period stated in sub-clause (b) be served by or on behalf of subsequent Sellers on
98  their Buyers or on the Selling Agent or Brokers named in the contract, but if notice of appropriation is received by subsequent
99  Sellers on the last day or after the period stated in sub-clause (b) from the date of the bill of lading, their notice of appropriation
100  shall be deemed to be in time if served: -
101    (1)  On the same calendar day, if received not later than 1600 hours on any business day, or
102
103    (2)  Not later than 1600 hours on the next business day, if received after 1600 hours or on a non-business day.
104  (d)  A notice of appropriation served on a Selling Agent or Brokers named in the contract shall be considered an appropriation
105  served on Buyers. A Selling Agent or Brokers receiving a notice of appropriation shall serve like notice of appropriation in
106  accordance with the provisions of this clause. Where the Shipper or subsequent Sellers serves the notice of appropriation on
107  the Selling Agent, such Selling Agent may serve notice of appropriation either direct to the Buyers or to the Brokers.
108  (e)  The bill of lading date stated in the notice of appropriation shall be for information only and shall not be binding, but in
109  fixing the period laid down by this clause for serving notices of appropriation the actual date of the bill of lading shall prevail.
110  (f)  Every notice of appropriation shall be open to correction of any errors occurring in transmission, provided that the sender
111  is not responsible for such errors, and for any previous error in transmission which has been repeated in good faith.
112  (g)  Should the vessel arrive before receipt of the appropriation and any extra expenses is incurred thereby, such expenses shall
113  be borne by Sellers.
114  (h)  When a valid notice of appropriation has been received by Buyers, it shall not be withdrawn except with their consent.
115  (i)  In the event of less than 95 tonnes being tendered by any one vessel Buyers shall be entitled to refund of any proved extra
116  expenses for sampling, analysis and lighterage incurred thereby at port of discharge.

61/2

## 11. PAYMENT-

(a) **Payment** ............................................................. % of invoice amount by cash in .........................................................
in exchange for and on presentation of shipping documents.

(b) **Shipping documents** – shall consist of - 1. Invoice. 2. Full set(s) of on board Bill(s) of Lading and/or Ship's Delivery Order(s) and/or other Delivery Order(s) in negotiable and transferable form. Such other Delivery Order(s) if required by Buyers, to be countersigned by the Shipowners, their Agents or a recognised bank. 3. Policy (ies) and/or Insurance Certificate(s) and/or Letter(s) of Insurance in the currency of the contract. The Letter(s) of Insurance to be certified by a recognised bank if required by Buyers. 4. Other documents as called for under the contract. Buyers agree to accept documents containing the Chamber of Shipping War Deviation Clause and/or other recognised official War Risk Clause.

(c) In the event of shipping documents not being available when called for by Buyers, or on arrival of the vessel at destination, Sellers shall provide other documents or an indemnity entitling Buyers to obtain delivery of the goods and payment shall be made by Buyers in exchange for same, but such payment shall not prejudice Buyers' rights under the contract when shipping documents are eventually available.

(d) Should Sellers fail to present shipping documents or other documents or an indemnity entitling Buyers to take delivery, Buyers shall take delivery under an indemnity provided by themselves and shall pay for the other documents when presented. Any reasonable extra expenses, including the costs of such indemnity or extra charges incurred by reason of the failure of Sellers to provide such documents, shall be borne by Sellers, but such payment shall not prejudice Buyers' rights under the contract when shipping documents are eventually available.

(e) Should shipping documents be presented with an incomplete set of bill(s) of lading or should other shipping documents be missing, payment shall be made provided that delivery of such missing documents is guaranteed, such guarantee to be countersigned, if required by Buyers, by a recognised bank.

(f) Costs of collection shall be for account of Sellers, but if Buyers demand presentation only through a bank of their choice, in that event any additional collection costs shall be borne by Buyers.

(g) No obvious clerical error in the documents shall entitle Buyers to reject them or delay payment, but Sellers shall be responsible for all loss or expense caused to Buyers by reason of such error and Sellers shall on request furnish an approved guarantee in respect thereto.

(h) Amounts payable under this contract shall be settled without delay. If not so settled, either party may notify the other that a dispute has arisen and serve a notice stating his intention to refer the dispute to arbitration in accordance with the Arbitration Rules.

(i) **Interest** – If there has been unreasonable delay in any payment, interest appropriate to the currency involved shall be charged. If such charge is not mutually agreed, a dispute shall be deemed to exist which shall be settled by arbitration. Otherwise interest shall be payable only where specifically provided in the terms of the contract or by an award of arbitration. The terms of this clause do not override the parties' contractual obligation under sub-clause (a).

## 12. INSURANCE- Sellers shall provide insurance on terms not less favourable than those set out hereunder, and as set out in detail in GAFTA Insurance Terms No.72 viz.:-

(a) Risks Covered: -

| | |
|---|---|
| Cargo Clauses (WA) with average payable, with 3% franchise or better terms | - Section 2 of Form 72 |
| War Clauses (Cargo) | - Section 4 of Form 72 |
| Strikes, Riots and Civil Commotions Clauses (Cargo) | - Section 5 of Form 72 |

(b) Insurers - The insurance to be effected with first class underwriters and/or companies who are domiciled or carrying on business in the United Kingdom or who, for the purpose of any legal proceedings, accept a British domicile and provide an address for service of process in London, but for whose solvency Sellers shall not be responsible.

(c) Insurable Value - Insured amount to be for not less than 2% over the invoice amount, including freight when freight is payable on shipment or due in any event, ship and/or cargo lost or not lost, and including the amount of any War Risk premium payable by Buyers.

(d) Freight Contingency - When freight is payable on arrival or on right and true delivery of the goods and the insurance does not include the freight, Sellers shall effect insurance upon similar terms, such insurance to attach only as such freight becomes payable, for the amount of the freight plus 2%, until the termination of the risk as provided in the above mentioned clauses, and shall undertake that their policies are so worded that in the case of a particular or general average claim the Buyers shall be put in the same position as if the C.I.F. value plus 2% were insured from the time of shipment.

(e) Certificates/Policies - Sellers shall give all policies and/or certificates and/or letters of insurance provided for in this contract, (duly stamped if applicable) for original and increased value (if any) for the value stipulated in (c) above. In the event of a certificate of insurance being supplied, it is agreed that such certificate shall be exchanged by Sellers for a policy if and when required and such certificate shall state on its face that it is so exchangeable. If required by Buyers, letter(s) of insurance shall be guaranteed by a recognised bank, or by any other guarantor who is acceptable to Buyers.

(f) Total Loss - In the event of total or constructive total loss, or where the amount of the insurance becomes payable in full, the insured amount in excess of 2% over the invoice amount shall be for Sellers' account and the party in possession of the policy (ies) shall collect the amount of insurance and shall thereupon settle with the other party on that basis.

(g) Currency of Claims - Claims to be paid in the currency of the contract.

(h) War and Strike Risks Premiums – Any premium in excess of 0.50% to be for account of Buyers. The rate of such insurance not to exceed the rate ruling in London at time of shipment or date of vessel's sailing whichever may be adopted by underwriters. Such excess premium shall be claimed from Buyers, wherever possible, with the Provisional Invoice, but in no case later than the date of vessel's arrival, or not later than 7 consecutive days after the rate has been agreed with underwriters, whichever may be the later, otherwise such claim shall be void unless, in the opinion of Arbitrators, the delay is justifiable. Sellers' obligation to provide War Risk Insurance shall be limited to the terms and conditions in force and generally obtainable in London at time of shipment.

184   (i) Where Sellers are responsible for allowances or other payments to Buyers under Rye Terms or other contractual terms, (and
185   which risks are also covered by the insurance provided by Sellers), the Buyers, on receipt of settlement, shall immediately return to
186   Sellers the insurance documents originally received from them and shall, if required, subrogate to Sellers all right of claim against
187   the Insurers in respect of such matters.
188
189   **13.   DUTIES, TAXES, LEVIES, ETC.** – All export duties, taxes, levies, etc., present or future, in country of origin, shall be for
190   Sellers' account. All import duties, taxes, levies, etc., present or future, in country of destination, shall be for Buyers' account.
191
192   **14.   DISCHARGE**- Ship to discharge according to the custom of the port. Ship to discharge at the rate of ...............................................
193
194   If documents are tendered which do not provide for discharge as above, or contain contrary stipulations, Sellers to be responsible
195   to Buyers for all extra expenses incurred thereby.
196
197   **15.   WEIGHING**- the terms and conditions of GAFTA Weighing Rules No. 123 are deemed to be incorporated into this contract.
198   Unless otherwise agreed, final settlement shall be made on the basis of gross delivered weights at time and place of discharge
199   at Buyers' expense. If the place of destination is outside the port limits, Buyers agree to pay the extra expenses incurred by
200   Sellers or their agents for weighing. No payment shall be made for increase in weight occasioned by water and/or oil during
201   the voyage. If final at time and place of loading, as per GAFTA registered superintendents' certificate at Sellers' choice and
202   expense, (in which case the Deficiency Clause will not apply).
203
204   **16.   DEFICIENCY**- any deficiency in the bill of lading weight shall be paid for by Sellers and any excess over bill of lading
205   weight shall be paid for by Buyers at contract price.
206
207   **17.   SAMPLING, ANALYSIS AND CERTIFICATES OF ANALYSIS**- the terms and conditions of GAFTA Sampling Rules
208   No.124, are deemed to be incorporated into this contract. Samples shall be taken at the time of discharge on or before removal
209   from the ship or quay, unless the parties agree that quality final at loading applies, in which event samples shall be taken at
210   time and place of loading. The parties shall appoint superintendents, for the purposes of supervision and sampling of the
211   goods, from the GAFTA Register of Superintendents. Unless otherwise agreed, analysts shall be appointed from the GAFTA
212   Register of Analysts.
213
214   **18.   PROHIBITION**- In case of prohibition of export, blockade or hostilities or in case of any executive or legislative act done by or
215   on behalf of the government of the country of origin or of the territory where the port or ports of shipment named herein is/are
216   situate, restricting export, whether partially or otherwise, any such restriction shall be deemed by both parties to apply to this
217   contract and to the extent of such total or partial restriction to prevent fulfilment whether by shipment or by any other means
218   whatsoever and to that extent this contract or any unfulfilled portion thereof shall be cancelled. Sellers shall advise Buyers without
219   delay with the reasons therefor and, if required, Sellers must produce proof to justify the cancellation.
220
221   **19.   LOADING STRIKE**-
222   (a) Should shipment of the goods or any part thereof be prevented at any time during the last 28 days of guaranteed time of
223   shipment or at any time during guaranteed contract period if such be less than 28 days, by reason of riots, strikes or lock-outs at
224   port(s) of loading or elsewhere preventing the forwarding of the goods to such port or ports, then the Shipper shall be entitled at
225   the termination of such riots, strikes or lock-outs to as much time, not exceeding 28 days, for shipment from such port or ports as
226   was left for shipment under the contract prior to the outbreak of the riots, strikes or lock-outs, and in the event of the time left for
227   shipment under the contract being 14 days or less, a minimum extension of 14 days shall be allowed.  In the event of further riots,
228   strikes or lock-outs occurring during the time by which the guaranteed time of shipment has been extended by reason of the
229   provisions of the foregoing paragraph, the additional extension shall be limited to the actual duration of such further riots, strikes
230   or lock-outs. In case of non-fulfilment under the above conditions the date of default shall be similarly deferred.
231   (b). The Shipper shall serve notice naming the ports not later than 3 business days after the last day of guaranteed time of shipment
232   if he intends to claim an extension of time for shipment, such notice shall limit the port(s) for shipment after expiry of contract
233   period to those from which an extension is claimed.
234   (c). If required by Buyers, Sellers must provide documentary evidence to establish any claim for extension under this clause.
235
236   **20.   NOTICES**- All notices required to be served on the parties pursuant to this contract shall be communicated rapidly in legible
237   form.  Methods of rapid communication for the purposes of this clause are defined and mutually recognised as: - either telex,
238   or letter if delivered by hand on the date of writing, or telefax, or E-mail, or other electronic means, always subject to the
239   proviso that if receipt of any notice is contested, the burden of proof of transmission shall be on the sender who shall, in the
240   case of a dispute, establish, to the satisfaction of the arbitrator(s) or board of appeal appointed pursuant to the Arbitration
241   Clause, that the notice was actually transmitted to the addressee. In case of resales/repurchases all notices shall be served
242   without delay by sellers on their respective buyers or vice versa and any notice received after 1600 hours on a business day
243   shall be deemed to have been received on the business day following. A notice to the Brokers or Agent shall be deemed a
244   notice under this contract.
245
246   **21.   NON-BUSINESS DAYS**- Saturdays, Sundays and the officially recognised and/or legal holidays of the respective countries and
247   any days, which GAFTA may declare as non-business days for specific purposes, shall be non-business days. Should the time
248   limit for doing any act or serving any notice expire on a non-business day, the time so limited shall be extended until the first
249   business day thereafter. The period of shipment shall not be affected by this clause.
250
251   **22.   DEFAULT**- In default of fulfilment of contract by either party, the following provisions shall apply: -

(a) The party other than the defaulter shall, at their discretion have the right, after serving a notice on the defaulter to sell or purchase, as the case may be, against the defaulter, and such sale or purchase shall establish the default price.

(b) If either party be dissatisfied with such default price or if the right at (a) above is not exercised and damages cannot be mutually agreed, then the assessment of damages shall be settled by arbitration.

(c) The damages payable shall be based on, but not limited to, the difference between the contract price and either the default price established under (a) above or upon the actual or estimated value of the goods, on the date of default, established under (b) above.

(d) In no case shall damages include loss of profit on any sub-contracts made by the party defaulted against or others unless the Arbitrator(s) or Board of Appeal, having regard to special circumstances, shall in his/their sole and absolute discretion think fit.

(e) Damages, if any, shall be computed on the quantity appropriated if any but, if no such quantity has been appropriated then on the mean contract quantity, and any option available to either party shall be deemed to have been exercised accordingly in favour of the mean contract quantity.

(f) Default may be declared by Sellers at any time after expiry of the contract period, and the default date shall then be the first business day after the date of Sellers' advice to their Buyers. If default has not already been declared then (notwithstanding the provisions stated in the Appropriation Clause) if notice of appropriation has not been served by the 10th consecutive day after the last day for appropriation laid down in the contract, the Sellers shall be deemed to be in default, and the default date shall then be the first business day thereafter.

23. **INSOLVENCY**- If before the fulfilment of this contract, either party shall suspend payments, notify any of the creditors that he is unable to meet debts or that he has suspended or that he is about to suspend payments of his debts, convene, call or hold a meeting of creditors, propose a voluntary arrangement, have an administration order made, have a winding up order made, have a receiver or manager appointed, convene, call or hold a meeting to go into liquidation (other than for re-construction or amalgamation) become subject to an Interim Order under Section 252 of the Insolvency Act 1986, or have a Bankruptcy Petition presented against him (any of which acts being hereinafter called an "Act of Insolvency") then the party committing such Act of Insolvency shall forthwith serve a notice of the occurrence of such Act of Insolvency on the other party to the contract and upon proof (by either the other party to the contract or the Receiver, Administrator, Liquidator or other person representing the party committing the Act of Insolvency) that such notice was thus served within 2 business days of the occurrence of the Act of Insolvency, the contract shall be closed out at the market price ruling on the business day following the serving of the notice. If such notice has not been served, then the other party, on learning of the occurrence of the Act of Insolvency, shall have the option of declaring the contract closed out at either the market price on the first business day after the date when such party first learnt of the occurrence of the Act of Insolvency or at the market price ruling on the first business day after the date when the Act of Insolvency occurred. In all cases the other party to the contract shall have the option of ascertaining the settlement price on the closing out of the contract by re-purchase or re-sale, and the difference between the contract price and the re-purchase or re-sale price shall be the amount payable or receivable under this contract.

24. **CIRCLE**- Where Sellers re-purchase from their Buyers or from any subsequent Buyer the same goods or part thereof, a circle shall be considered to exist as regards the particular goods so re-purchased, and the provisions of the Default Clause shall not apply. (For the purpose of this clause the same goods shall mean goods of the same description, from the same country of origin, of the same quality, and, where applicable, of the same analysis warranty, for shipment to the same port(s) of destination during the same period of shipment). Different currencies shall not invalidate the circle.

Subject to the terms of the Prohibition Clause in the contract, if the goods are not appropriated, or, having been appropriated documents are not presented, invoices based on the mean contract quantity shall be settled by all Buyers and their Sellers in the circle by payment by all Buyers to their Sellers of the excess of the Sellers' invoice amount over the lowest invoice amount in the circle. Payment shall be due not later than 15 consecutive days after the last day for appropriation, or, should the circle not be ascertained before the expiry of this time, then payment shall be due not later than 15 consecutive days after the circle is ascertained.

Where the circle includes contracts expressed in different currencies the lowest invoice amount shall be replaced by the market price on the first day for contractual shipment and invoices shall be settled between each Buyer and his Seller in the circle by payment of the differences between the market price and the relative contract price in currency of the contract.

All Sellers and Buyers shall give every assistance to ascertain the circle and when a circle shall have been ascertained in accordance with this clause same shall be binding on all parties to the circle. As between Buyers and Sellers in the circle, the non-presentation of documents by Sellers to their Buyers shall not be considered a breach of contract. Should any party in the circle prior to the due date of payment commit any act comprehended in the Insolvency Clause of this contract, settlement by all parties in the circle shall be calculated at the closing out price as provided for in the Insolvency Clause, which shall be taken as a basis for settlement, instead of the lowest invoice amount in the circle. In this event respective Buyers shall make payment to their Sellers or respective Sellers shall make payment to their Buyers of the difference between the closing out price and the contract price.

25. **DOMICILE**- This contract shall be deemed to have been made in England and to be performed in England, notwithstanding any contrary provision, and this contract shall be construed and take effect in accordance with the laws of England. Except for the purpose of enforcing any award made in pursuance of the Arbitration Clause of this contract, the Courts of England shall have exclusive jurisdiction to determine any application for ancillary relief, (save for obtaining security only for the claim or counter-claim),then the exercise of the powers of the Court in relation to the arbitration proceedings and any dispute other than a dispute which shall fall within the jurisdiction of arbitrators or board of appeal of the Association pursuant to the Arbitration Clause of this contract. For the purpose of any legal proceedings each party shall be deemed to be ordinarily resident or carrying on business at the offices of The Grain and Feed Trade Association, (GAFTA), England, and any party residing or carrying on business in Scotland shall be held to have prorogated jurisdiction against himself to the English Courts or if in Northern Ireland to have submitted to the jurisdiction and to be bound by the decision of the English Courts. The service of

proceedings upon any such party by leaving the same at the offices of The Grain and Feed Trade Association, together with the posting of a copy of such proceedings to his address outside England, shall be deemed good service, any rule of law or equity to the contrary notwithstanding.

**26.    ARBITRATION-**

(a) Any and all disputes arising out of or under this contract or any claim regarding the interpretation or execution of this contract shall be determined by arbitration in accordance with the GAFTA Arbitration Rules, No 125, in the edition current at the date of this contract, such Rules are incorporated into and form part of this Contract and both parties hereto shall be deemed to be fully cognisant of and to have expressly agreed to the application of such Rules.

(b) Neither party hereto, nor any persons claiming under either of them shall bring any action or other legal proceedings against the other in respect of any such dispute, or claim until such dispute or claim shall first have been heard and determined by the arbitrator(s) or a board of appeal, as the case may be, in accordance with the Arbitration Rules and it is expressly agreed and declared that the obtaining of an award from the arbitrator(s) or board of appeal, as the case may be, shall be a condition precedent to the right of either party hereto or of any persons claiming under either of them to bring any action or other legal proceedings against the other of them in respect of any such dispute or claim.

(c) Nothing contained under this Arbitration Clause shall prevent the parties from seeking to obtain security in respect of their claim or counterclaim via legal proceedings in any jurisdiction, provided such legal proceedings shall be limited to applying for and/or obtaining security for a claim or counterclaim, it being understood and agreed that the substantive merits of any dispute or claim shall be determined solely by arbitration in accordance with the GAFTA Arbitration Rules, No 125.

**27.    INTERNATIONAL CONVENTIONS-**

The following shall not apply to this contract: -

(a) The Uniform Law on Sales and the Uniform Law on Formation to which effect is given by the Uniform Laws on International Sales Act 1967;

(b) The United Nations Convention on Contracts for the International Sale of Goods of 1980; and

(c) The United Nations Convention on Prescription (Limitation) in the International Sale of Goods of 1974 and the amending Protocol of 1980.

(d) Incoterms.

(e) Unless the contract contains any statement expressly to the contrary, a person who is not a party to this contract has no right under the Contract (Rights of Third Parties) Act 1999 to enforce any term of it.

Sellers ...................................................................................Buyers.................................................................................

Printed in England and issued by

# GAFTA
# (THE GRAIN AND FEED TRADE ASSOCIATION)
### GAFTA HOUSE, 6 CHAPEL PLACE, RIVINGTON ST, LONDON EC2A 3SH

EXHIBIT 3

16. LUG. 2007 10:11        JAKIL SPA                            NR. 107    P. 1

# Agrimpex Co. Limited

Regal House, 1138 High Road, London, N20 0RA
Telephone: 020 8446 6921 Fax: 020 8446 7116 Telex: 296142 AGRICO G.
e-mail: trade@agrimpex.co.uk

Contract of Sale No. DFS/56407                    Date 10th July 2007
Buyer
Jakil SPA
Foro Buonaparte, 68
20121 Milano
Italy

Dear Sirs,

We confirm having sold to you on 10/07/2007 the following:-

**COMMODITY:**  Sudanese durra feterita 2005/2006 and/or 2006/2007
crop at sellers option cleaned to within maximum 3% admixture,
maximum 0.50% Tannin in sound good condition at time and place of
shipment.
Quality/condition/description all final as per certificate/s issued at time
of shipment by SGS or their agents in Sudan.
Delivered weight.

**QUANTITY/**  One cargo/cargoes 20,000 Mt 10% more or less at sellers option and at
contract price.

**SHIPMENT:**  September/October 2007 from origin.

**PACKING:**  In bulk.

**PRICE:**  US\$ 235 (Two hundred and thirty-five US Dollars) per mton.
C+F Free Out one Italian Adriatic port out of Venice/Ancona/Ravenna
at buyers option, where buyers guarantee berth to accommodate vessel
upto 31' feet swad. In the event buyers want additional ports, then this
will be as per rates stipulated in the Charter Party which shall be for
buyers account.
Discharge port to be declared at sellers first demand but not later
than commencement of loading of vessel.

**PAYMENT:**  100% cash against documents on presentation in Italy with payment
latest on arrival of vessel/s at discharge port and prior commencement
of discharge by T/T. T/T charges for buyers account.
Should documents be presented at buyers bank before 11:00 hrs AM
then sellers will be credited with value within 48 hours, otherwise
within 72 hours value.

(Cont'd...)

AGRIMPEX CO LIMITED

Page 1

Directors: P. G. Philippou. X. L. Phillipou. Registration number: 01370076

16. LUG. 2007 10:12    JAXIL SPA    NR. 107    P. 2

# Agrimpex Co. Limited

Regal House, 1138 High Road, London, N20 0RA
Telephone: 020 8446 6921 Fax: 020 8446 7116 Telex: 296142 AGRICO G.
e-mail: trade@agrimpex.co.uk

*Contract of Sale No.* DFS/56407                    *Date* 10th July 2007

**PAYMENT
CONT/D....:**
In the event vessel/s arrive prior presentation of shipping documents
sellers have the option to either ask buyers to take delivery on first class
bank guarantee as required by owners of vessel pending presentation of
shipping documents. The relative charges of such bank guarantee for
sellers account, or alternatively 100% cash latest on arrival of vessel/s
before breaking bulk against presentation of original invoice, insurance
certificate and indemnity letter for allowing the discharge of the goods
without production of B/Ls.
Such letter of indemnity to be confirmed directly from vessel agents to
the buyers. This confirmation to reach buyers before payment is effected
and then cargo will be released against presentation of the original
letter of indemnity to vessels agents.

**DISCHARGE:**
Buyers to discharge goods at their risk and expenses at the average rate
of 5,000 MT basis 4 hatches, in the case of 3 hatches or less discharging
rate to be adjusted/reduced prorata if vessel singledecker/bulkcarrier, or
at the rate of 1,500 Mt if vessel tweendecker per weather working day of
24 consecutive hours SSHEX unless used and prorata. If used only time
actually worked to count as laytime.
Time at first disport to start counting as from 08.00 AM hours the next
working day after presentation of N.O.R. given during ordinary office
hours. WIBON/WIPON/WIFPON/WICCON.
Demurrage as per C/P rate for buyers account. Despatch to be half of
demurrage.
All other terms and conditions not in conflict with the above as per
governing Charter Party.

**OTHER TERMS/
CONDITIONS:**
1) - All export duties and/or taxes and/or levies present and/or future are
for sellers account.
2) - All import duties and/or taxes and/or levies present and/or future
are for buyers account.
3) - Buyers have the exclusivity on performing vessel's at discharge
port.
4) - Sellers guarantee provision on EUR 1 certificate at discharge port
before completion of discharge and a copy of phytosanitary certificate
on board vessel.

AGRIMPEX CO LIMITED

Page 2

Directors: P. G. Phillippas, K. L. Phillips, Registration number: 01370076

16. LUG. 2007 10:12    JAKIL SPA                                    NR. 107    P. 3

# Agrimpex Co. Limited

Regal House, 1138 High Road, London, N20 0RA
Telephone: 020 8445 6921 Fax: 020 8446 7116 Telex: 296142 AGRICO G.
e-mail: trade@agrimpex.co.uk

(Cont/d...)

*Contract of Sale No.* DFS/56407                    *Date* 10th July 2007

OTHER TERMS/
CONDITIONS
CONT/D.....:        5) - Fumigation certificate
                   6) - Vessel/s to be singledecker/bulkcarrier/tweendecker classed
                   highest Lloyds register or equivalent. Vessel/s over 20 years old is/are
                   acceptable in which case overage premium to be for sellers account as
                   per Official Lloyds London Schedule.
                   7) - In the event that the quantity shown on the EUR 1 certificate is
                   higher than that shown on B/L quantity, buyers to accept same.

All other terms, conditions and rules not in contradiction with the above, as per GAFTA
contract 61 including the Arbitration Rule form No. 125 (of which the parties admit that
they have knowledge and notice) apply to this contract, the details given shall be taken as
having been written into such form in the appropriate place.

The validity of this contract will be unaffected by the non return of the counter
confirmation duly signed by buyers.

SELLERS                                            BUYERS

AGRIMPEX CO LIMITED                                JAKIL S.p.A

Page 3

Directors: P. G. Phillipps, K. L. Phillips, Registration number: 01370076

Effective 1ª January 2006

# Gafta No.61

Copyright

**THE GRAIN AND FEED TRADE ASSOCIATION**

## CONTRACT FOR MEDITERRANEAN AND MOROCCO IN BULK OR BAGS
### CARGOES
### TALE QUALE - CIF TERMS

\* delete/specify as applicable

Date ................................................................

1  **SELLERS** ...........................................................................................................................
2
3  **INTERVENING AS BROKERS** ....................................................................................................
4
5  **BUYERS** ............................................................................................................................
6  have this day entered into a contract on the following terms and conditions.
7
8  **1.   GOODS**- a cargo of ...................................................................................
9      shipped in bulk and/or bags. If in bags, then the bags to be of suitable strength to withstand ordinary wear and tear to port of
10     destination. Such bags to be taken and paid for as goods.
11
12 **2.   QUANTITY**- ..............................................................................................units, 5% more or less.
13     Sellers have the option of shipping a further 5% more or less on contract quantity, excess or deficiency over the above 5% to be
14     settled at the CIF price on the date of the last bill of lading, and on the quantity thereof; value to be fixed by arbitration, unless
15     mutually agreed
16
17 **3.   PRICE AND DESTINATION** - At ...............................................................................................
18     \* per tonne of 1000 kilograms            }
19                                               } gross weight, cost, insurance and freight to ...............................................
20     \* per ton of 1016 kilograms or 2240 lbs.  }
21
22 **4.   BROKERAGE**.................................per tonne, to be paid by Sellers on the mean contract quantity, goods lost or not
23     lost, contract fulfilled or not fulfilled unless such non-fulfilment is due to the cancellation of the contract under the terms of
24     the Prohibition Clause.  Brokerage shall be due on the day shipping documents are exchanged or, if the goods are not
25     appropriated then brokerage shall be due on the 30th consecutive day after the last day for appropriation.
26
27 **5.   QUALITY**-
28         \*  **Warranted to contain** ..................................................................... at time and place of discharge.
29
30         \*  **Natural weight of** ............................................................ kilograms per hectolitre guaranteed at time and place of
31            discharge, to be ascertained according to GAFTA Sampling Rules No.124, or other accepted authority, and any allowances
32            determined to be allowed for off contract price, in accordance with GAFTA Sampling Rules No. 124.
33
34         \*  **Admixture Barley**- Any admixture of dirt and/or other foreign substance over ...................... % to be allowed for by
35            Sellers at contract price, but any pulse, seed or grain other than Barley to be reckoned as foreign substances at half their
36            quantities.
37         \*  **Other Grain and Seed**- Any admixture of dirt and/or other foreign substance over ............................ % to be allowed for by
38            Sellers at contract price. The percentage of admixture to be determined by GAFTA, or its duly appointed Analyst.
39
40         \*  **Official** ................. certificate of inspection, or certification of inspection of........................ at time  and  place  of
41            loading into the ocean carrying vessel, shall be final as to quality.  The Buyers shall not be entitled to reject a tender of a
42            higher grade of grain of the same colour and description.
43         \*  **F.A.Q.** (fair average quality) of the season's shipment at time and place of loading, to be assessed upon the basis of, and by
44            comparison with the GAFTA F.A.Q. standard of the month during which the bill of lading is dated. In the event of no F.A.Q.
45            Standard being established by the Association, the Arbitrator(s) shall in his/their discretion decide what is the fair average
46            quality.  An average sample of the delivery shall be taken and sealed jointly at the port of discharge by the representatives of
47            the shipper and the representatives of the holders of the bill of lading or shipper's delivery order, and shall be forwarded
48            immediately to the Association for the purposes of establishing the F.A.Q. standard.  The expenses of such sampling and
49            forwarding shall be paid half by the Receiver and half by the Sellers.  Place of shipment under this contract shall be

understood as the port or group of ports adopted by the appointed Standards Committee in making the Standard. If the difference between the delivery and the F.A.Q. Standard shall not amount to 0.50% on contract price, no allowance for quality shall be due; otherwise the Buyers shall be entitled to the full difference in value.

* **Sample**, at time and place of shipment about as per sealed sample marked ............................. in possession of; .......................
the word "about" when referring to quality shall mean the equivalent of 0.50% on contract price.

Difference in quality shall not entitle Buyers to reject except under the award of arbitrator(s) or board of appeal, as the case may be, referred to in the Arbitration Rules specified in the Arbitration Clause.

**Condition**- Shipment shall be made in good condition. Should the goods arrive out of condition, due regard shall be made for the time of the year in which the shipment took place. The fact of the goods so arriving shall not necessarily be sufficient proof of an improper shipment.

6. **PERIOD OF SHIPMENT**- as per bill(s) of lading dated or to be dated ........................................................................
The bill(s) of lading to be dated when the goods are actually on board. Date of the bill(s) of lading shall be accepted as proof of date of shipment in the absence of evidence to the contrary. In any month containing an odd number of days, the middle day shall be accepted as being in both halves of the month.

7. **SALES BY NAMED VESSELS** – For all sales by named vessels, the following shall apply: -
   (a)  Position of vessel is mutually agreed between Buyers and Sellers;
   (b)  The word "now" to be inserted before the word "classed" in the Ship's Classification Clause;
   (c)  Appropriation Clause cancelled if sold "shipped".

8. **SHIP'S CLASSIFICATION** - Shipment from ...........................................................................................................
by first class mechanically self-propelled vessel(s) suitable for the carriage of the contract goods, classed in accordance with the Institute Classification Clause of the International Underwriting Association in force at time of shipment, excluding tankers and vessels which are either classified in Lloyd's Register or described in Lloyd's Shipping Index as "Ore/Oil" vessels.

9. **EXTENSION OF SHIPMENT**- The contract period for shipment, if such be 31 days or less, shall be extended by an additional period of not more than 8 days, provided that Sellers serve notice claiming extension not later than the next business day following the last day of the originally stipulated period. The notice need not state the number of additional days claimed. Sellers shall make an allowance to Buyers, to be deducted in the invoice from the contract price, based on the number of days by which the originally stipulated period is exceeded, in accordance with the following scale:-
   1 to 4 additional days, 0.50%;
   5 or 6 additional days, 1%;
   7 or 8 additional days 1.50% of the gross contract price.

If, however, after having served notice to Buyers as above, Sellers fail to make shipment within such 8 days, then the contract shall be deemed to have called for shipment during the originally stipulated period plus 8 days, at contract price less 1.50%, and any settlement for default shall be calculated on that basis. If any allowance becomes due under this clause, the contract price shall be deemed to be the original contract price less the allowance and any other contractual differences shall be settled on the basis of such reduced price.

10. **APPROPRIATION**-
   (a) Notice of appropriation shall state the vessel's name, the approximate weight shipped, and the date or the presumed date of the bill of lading.
   (b) The notice of appropriation shall within 10 consecutive days, (or if shipped from a Moroccan port 7 consecutive days), from the date of the bill(s) of lading be served by or on behalf of the Shipper direct on his Buyers or on the Selling Agent or Brokers named in the contract. The Non-Business Days Clause shall not apply.
   (c) Notice of appropriation shall, within the period stated in sub-clause (b) be served by or on behalf of subsequent Sellers on their Buyers or on the Selling Agent or Brokers named in the contract, but if notice of appropriation is received by subsequent Sellers on the last day or after the period stated in sub-clause (b) from the date of the bill of lading, their notice of appropriation shall be deemed to be in time if served:-
      (1)     On the same calendar day, if received not later than 1600 hours on any business day, or

      (2)     Not later than 1600 hours on the next business day, if received after 1600 hours or on a non-business day.
   (d) A notice of appropriation served on a Selling Agent or Brokers named in the contract shall be considered an appropriation served on Buyers. A Selling Agent or Brokers receiving a notice of appropriation shall serve like notice of appropriation in accordance with the provisions of this clause. Where the Shipper or subsequent Sellers serves the notice of appropriation on the Selling Agent, such Selling Agent may serve notice of appropriation either direct to the Buyers or to the Brokers.
   (e) The bill of lading date stated in the notice of appropriation shall be for information only and shall be binding, but in fixing the period laid down by this clause for serving notices of appropriation the actual date of the bill of lading shall prevail.
   (f) Every notice of appropriation shall be open to correction of any errors occurring in transmission, provided that the sender is not responsible for such errors, and for any previous error in transmission which has been repeated in good faith.
   (g) Should the vessel arrive before receipt of the appropriation and any extra expenses is incurred thereby, such expenses shall be borne by Sellers.
   (h) When a valid notice of appropriation has been received by Buyers, it shall not be withdrawn except with their consent.
   (i) In the event of less than 95 tonnes being tendered by any one vessel Buyers shall be entitled to refund of any proved extra expenses for sampling, analysis and lighterage incurred thereby at port of discharge.

**11. PAYMENT-**

(a) **Payment** ............................................................. % of invoice amount by cash in .......................................................

in exchange for and on presentation of shipping documents.

(b) **Shipping documents** – shall consist of - 1. Invoice. 2. Full set(s) of on board Bill(s) of Lading and/or Ship's Delivery Order(s) and/or other Delivery Order(s) in negotiable and transferable form. Such other Delivery Order(s) if required by Buyers, to be countersigned by the Shipowners, their Agents or a recognised bank. 3. Policy (ies) and/or Insurance Certificate(s) and/or Letter(s) of Insurance in the currency of the contract. The Letter(s) of Insurance to be certified by a recognised bank if required by Buyers. 4. Other documents as called for under the contract. Buyers agree to accept documents containing the Chamber of Shipping War Deviation Clause and/or other recognised official War Risk Clause.

(c) In the event of shipping documents not being available when called for by Buyers, or on arrival of the vessel at destination, Sellers shall provide other documents or an indemnity entitling Buyers to obtain delivery of the goods and payment shall be made by Buyers in exchange for same, but such payment shall not prejudice Buyers' rights under the contract when shipping documents are eventually available.

(d) Should Sellers fail to present shipping documents or other documents or an indemnity entitling Buyers to take delivery, Buyers shall take delivery under an indemnity provided by themselves and shall pay for the other documents when presented. Any reasonable extra expenses, including the costs of such indemnity or extra charges incurred by reason of the failure of Sellers to provide such documents, shall be borne by Sellers, but such payment shall not prejudice Buyers' rights under the contract when shipping documents are eventually available.

(e) Should shipping documents be presented with an incomplete set of bill(s) of lading or should other shipping documents be missing, payment shall be made provided that delivery of such missing documents is guaranteed, such guarantee to be countersigned, if required by Buyers, by a recognised bank.

(f) Costs of collection shall be for account of Sellers, but if Buyers demand presentation only through a bank of their choice, in that event any additional collection costs shall be borne by Buyers.

(g) No obvious clerical error in the documents shall entitle Buyers to reject them or delay payment, but Sellers shall be responsible for all loss or expense caused to Buyers by reason of such error and Sellers on request furnish an approved guarantee in respect thereto.

(h) Amounts payable under this contract shall be settled without delay. If not so settled, either party may notify the other that a dispute has arisen and serve a notice stating his intention to refer the dispute to arbitration in accordance with the Arbitration Rules.

(i) **Interest** – If there has been unreasonable delay in any payment, interest appropriate to the currency involved shall be charged. If such charge is not mutually agreed, a dispute shall be deemed to exist which shall be settled by arbitration. Otherwise interest shall be payable only where specifically provided in the terms of the contract or by an award of arbitration. The terms of this clause do not override the parties' contractual obligation under sub-clause (a).

**12. INSURANCE-** Sellers shall provide insurance on terms not less favourable than those set out hereunder, and as set out in detail in GAFTA Insurance Terms No.72 viz.:-

(a) Risks Covered: -

| | |
|---|---|
| Cargo Clauses (WA) with average payable, with 3% franchise or better terms | - Section 2 of Form 72 |
| War Clauses (Cargo) | - Section 4 of Form 72 |
| Strikes, Riots and Civil Commotions Clauses (Cargo) | - Section 5 of Form 72 |

(b) Insurers - The insurance to be effected with first class underwriters and/or companies who are domiciled or carrying on business in the United Kingdom or who, for the purpose of any legal proceedings, accept a British domicile and provide an address for service of process in London, but for whose solvency Sellers shall not be responsible.

(c) Insurable Value - Insured amount to be for not less than 2% over the invoice amount, including freight when freight is payable on shipment or due in any event, ship and/or cargo lost or not lost, and including the amount of any War Risk premium payable by Buyers.

(d) Freight Contingency - When freight is payable on arrival or on right and true delivery of the goods and the insurance does not include the freight, Sellers shall effect insurance upon similar terms, such insurance to attach only as such freight becomes payable, for the amount of the freight plus 2%, until the termination of the risk as provided in the above mentioned clauses, and shall undertake that their policies are so worded that in the case of a particular or general average claim the Buyers shall be put in the same position as if the C.I.F. value plus 2% were insured from the time of shipment.

(e) Certificates/Policies - Sellers shall give all policies and/or certificates and/or letters of insurance provided for in this contract, (duly stamped if applicable) for original and increased value (if any) for the value stipulated in (c) above. In the event of a certificate of insurance being supplied, it is agreed that such certificate shall be exchanged by Sellers for a policy if and when required and such certificate shall state on its face that it is so exchangeable. If required by Buyers, letter(s) of insurance shall be guaranteed by a recognised bank, or by any other guarantor who is acceptable to Buyers.

(f) Total Loss - In the event of total or constructive total loss, or where the amount of the insurance becomes payable in full, the insured amount in excess of 2% over the invoice amount shall be for Sellers' account and the party in possession of the policy (ies) shall collect the amount of insurance and shall thereupon settle with the other party on that basis.

(g) Currency of Claims - Claims to be paid in the currency of the contract.

(h) War and Strike Risks Premiums – Any premium in excess of 0.50% to be for account of Buyers. The rate of such insurance not to exceed the rate ruling in London at time of shipment or date of vessel's sailing whichever may be adopted by underwriters. Such excess premium shall be claimed from Buyers, wherever possible, with the Provisional Invoice, but in no case later than the date of vessel's arrival, or not later than 7 consecutive days after the rate has been agreed with underwriters, whichever may be the later, otherwise such claim shall be void unless, in the opinion of Arbitrators, the delay is justifiable. Sellers' obligation to provide War Risk Insurance shall be limited to the terms and conditions in force and generally obtainable in London at time of shipment.

184  (i) Where Sellers are responsible for allowances or other payments to Buyers under Rye Terms or other contractual terms, (and
185  which risks are also covered by the insurance provided by Sellers), the Buyers, on receipt of settlement, shall immediately return to
186  Sellers the insurance documents originally received from them and shall, if required, subrogate to Sellers all right of claim against
187  the Insurers in respect of such matters.
188

189  **13.  DUTIES, TAXES, LEVIES, ETC.** – All export duties, taxes, levies, etc., present or future, in country of origin, shall be for
190  Sellers' account. All import duties, taxes, levies, etc., present or future, in country of destination, shall be for Buyers' account.
191

192  **14.  DISCHARGE**- Ship to discharge according to the custom of the port. Ship to discharge at the rate of ...........................................
193

194  If documents are tendered which do not provide for discharge as above, or contain contrary stipulations, Sellers to be responsible
195  to Buyers for all extra expenses incurred thereby.
196

197  **15.  WEIGHING**- the terms and conditions of GAFTA Weighing Rules No. 123 are deemed to be incorporated into this contract.
198  Unless otherwise agreed, final settlement shall be made on the basis of gross delivered weights at time and place of discharge
199  at Buyers' expense. If the place of destination is outside the port limits, Buyers agree to pay the extra expenses incurred by
200  Sellers or their agents for weighing. No payment shall be made for increase in weight occasioned by water and/or oil during
201  the voyage. If final at time and place of loading, as per GAFTA registered superintendents' certificate at Sellers' choice and
202  expense, (in which case the Deficiency Clause will not apply).
203

204  **16.  DEFICIENCY**- any deficiency in the bill of lading weight shall be paid for by Sellers and any excess over bill of lading
205  weight shall be paid for by Buyers at contract price.
206

207  **17.  SAMPLING, ANALYSIS AND CERTIFICATES OF ANALYSIS**- the terms and conditions of GAFTA Sampling Rules
208  No.124, are deemed to be incorporated into this contract. Samples shall be taken at the time of discharge on or before removal
209  from the ship or quay, unless the parties agree that quality final at loading applies, in which event samples shall be taken at
210  time and place of loading. The parties shall appoint superintendents, for the purposes of supervision and sampling of the
211  goods, from the GAFTA Register of Superintendents. Unless otherwise agreed, analysts shall be appointed from the GAFTA
212  Register of Analysts.
213

214  **18.  PROHIBITION**- In case of prohibition of export, blockade or hostilities or in case of any executive or legislative act done by or
215  on behalf of the government of the country of origin or of the territory where the port or ports of shipment named herein is/are
216  situate, restricting export, whether partially or otherwise, any such restriction shall be deemed by both parties to apply to this
217  contract and to the extent of such total or partial restriction to prevent fulfilment whether by shipment or by any other means
218  whatsoever and to that extent this contract or any unfulfilled portion thereof shall be cancelled. Sellers shall advise Buyers without
219  delay with the reasons therefor and, if required, Sellers must produce proof to justify the cancellation.
220

221  **19.  LOADING STRIKE**-
222  (a) Should shipment of the goods or any part thereof be prevented at any time during the last 28 days of guaranteed time of
223  shipment or at any time during guaranteed contract period if such be less than 28 days, by reason of riots, strikes or lock-outs at
224  port(s) of loading or elsewhere preventing the forwarding of the goods to such port or ports, then the Shipper shall be entitled at
225  the termination of such riots, strikes or lock-outs to as much time, not exceeding 28 days, for shipment from such port or ports as
226  was left for shipment under the contract prior to the outbreak of the riots, strikes or lock-outs, and in the event of the time left for
227  shipment under the contract being 14 days or less, a minimum extension of 14 days shall be allowed. In the event of further riots,
228  strikes or lock-outs occurring during the time by which the guaranteed time of shipment has been extended by reason of the
229  provisions of the foregoing paragraph, the additional extension shall be limited to the actual duration of such further riots, strikes
230  or lock-outs. In case of non-fulfilment under the above conditions the date of default shall be similarly deferred.
231  (b). The Shipper shall serve notice naming the ports not later than 3 business days after the last day of guaranteed time of shipment
232  if he intends to claim an extension of time for shipment, such notice shall limit the port(s) for shipment after expiry of contract
233  period to those from which an extension is claimed.
234  (c). If required by Buyers, Sellers must provide documentary evidence to establish any claim for extension under this clause.
235

236  **20.  NOTICES**- All notices required to be served on the parties pursuant to this contract shall be communicated rapidly in legible
237  form. Methods of rapid communication for the purposes of this clause are defined and mutually recognised as: - either telex,
238  or letter if delivered by hand on the date of writing, or telefax, or E-mail, or other electronic means, always subject to the
239  proviso that if receipt of any notice is contested, the burden of proof of transmission shall be on the sender who shall, in the
240  case of a dispute, establish, to the satisfaction of the arbitrator(s) or board of appeal appointed pursuant to the Arbitration
241  Clause, that the notice was actually transmitted to the addressee. In case of resales/repurchases all notices shall be served
242  without delay by sellers on their respective buyers or vice versa and any notice received after 1600 hours on a business day
243  shall be deemed to have been received on the business day following. A notice to the Brokers or Agent shall be deemed a
244  notice under this contract.
245

246  **21.  NON-BUSINESS DAYS**- Saturdays, Sundays and the officially recognised and/or legal holidays of the respective countries and
247  any days, which GAFTA may declare as non-business days for specific purposes, shall be non-business days. Should the time
248  limit for doing any act or serving any notice expire on a non-business day, the time so limited shall be extended until the first
249  business day thereafter. The period of shipment shall not be affected by this clause.
250

251  **22.  DEFAULT**- In default of fulfilment of contract by either party, the following provisions shall apply: -

252 (a) The party other than the defaulter shall, at their discretion have the right, after serving a notice on the defaulter to sell or
253 purchase, as the case may be, against the defaulter, and such sale or purchase shall establish the default price.
254 (b) If either party be dissatisfied with such default price or if the right at (a) above is not exercised and damages cannot be
255 mutually agreed, then the assessment of damages shall be settled by arbitration.
256 (c) The damages payable shall be based on, but not limited to, the difference between the contract price and either the default price
257 established under (a) above or upon the actual or estimated value of the goods, on the date of default, established under (b) above.
258 (d) In no case shall damages include loss of profit on any sub-contracts made by the party defaulted against or others unless the
259 Arbitrator(s) or Board of Appeal, having regard to special circumstances, shall in his/their sole and absolute discretion think fit.
260 (e) Damages, if any, shall be computed on the quantity appropriated if any but, if no such quantity has been appropriated then on
261 the mean contract quantity, and any option available to either party shall be deemed to have been exercised accordingly in favour
262 of the mean contract quantity.
263 (f) Default may be declared by Sellers at any time after expiry of the contract period, and the default date shall then be the first
264 business day after the date of Sellers' advice to their Buyers. If default has not already been declared then (notwithstanding the
265 provisions stated in the Appropriation Clause) if notice of appropriation has not been served by the 10th consecutive day after the
266 last day for appropriation laid down in the contract, the Sellers shall be deemed to be in default, and the default date shall then be
267 the first business day thereafter.
268

269 **23. INSOLVENCY**- If before the fulfilment of this contract, either party shall suspend payments, notify any of the creditors that he is
270 unable to meet debts or that he has suspended or that he is about to suspend payments of his debts, convene, call or hold a meeting
271 of creditors, propose a voluntary arrangement, have an administration order made, have a winding up order made, have a receiver
272 or manager appointed, convene, call or hold a meeting to go into liquidation (other than for re-construction or amalgamation)
273 become subject to an Interim Order under Section 252 of the Insolvency Act 1986, or have a Bankruptcy Petition presented
274 against him (any of which acts being hereinafter called an "Act of Insolvency") then the party committing such Act of Insolvency
275 shall forthwith serve a notice of the occurrence of such Act of Insolvency on the other party to the contract and upon proof (by
276 either the other party to the contract or the Receiver, Administrator, Liquidator or other person representing the party committing
277 the Act of Insolvency) that such notice was thus served within 2 business days of the occurrence of the Act of Insolvency, the
278 contract shall be closed out at the market price ruling on the business day following the serving of the notice. If such notice has not
279 been served, then the other party, on learning of the occurrence of the Act of Insolvency, shall have the option of declaring the
280 contract closed out at either the market price on the first business day after the date when such party first learnt of the occurrence
281 of the Act of Insolvency or at the market price ruling on the first business day after the date when the Act of Insolvency occurred.
282 In all cases the other party to the contract shall have the option of ascertaining the settlement price on the closing out of the
283 contract by re-purchase or re-sale, and the difference between the contract price and the re-purchase or re-sale price shall be the
284 amount payable or receivable under this contract.
285

286 **24. CIRCLE**- Where Sellers re-purchase from their Buyers or from any subsequent Buyer the same goods or part thereof, a circle
287 shall be considered to exist as regards the particular goods so re-purchased, and the provisions of the Default Clause shall not
288 apply. (For the purpose of this clause the same goods shall mean goods of the same description, from the same country of origin,
289 of the same quality, and, where applicable, of the same analysis warranty, for shipment to the same port(s) of destination during
290 the same period of shipment). Different currencies shall not invalidate the circle.
291 Subject to the terms of the Prohibition Clause in the contract, if the goods are not appropriated, or, having been appropriated
292 documents are not presented, invoices based on the mean contract quantity shall be settled by all Buyers and their Sellers in the
293 circle by payment by all Buyers to their Sellers of the excess of the Sellers' invoice amount over the lowest invoice amount in the
294 circle. Payment shall be due not later than 15 consecutive days after the last day for appropriation, or, should the circle not be
295 ascertained before the expiry of this time, then payment shall be due not later than 15 consecutive days after the circle is
296 ascertained.
297 Where the circle includes contracts expressed in different currencies the lowest invoice amount shall be replaced by the market
298 price on the first day for contractual shipment and invoices shall be settled between each Buyer and his Seller in the circle by
299 payment of the differences between the market price and the relative contract price in currency of the contract.
300 All Sellers and Buyers shall give every assistance to ascertain the circle and when a circle shall have been ascertained in
301 accordance with this clause same shall be binding on all parties to the circle. As between Buyers and Sellers in the circle, the
302 non-presentation of documents by Sellers to their Buyers shall not be considered a breach of contract. Should any party in the
303 circle prior to the due date of payment commit any act comprehended in the Insolvency Clause of this contract, settlement by all
304 parties in the circle shall be calculated at the closing out price as provided for in the Insolvency Clause, which shall be taken as a
305 basis for settlement, instead of the lowest invoice amount in the circle. In this event respective Buyers shall make payment to their
306 Sellers or respective Sellers shall make payment to their Buyers of the difference between the closing out price and the contract
307 price.
308

309 **25. DOMICILE**- This contract shall be deemed to have been made in England and to be performed in England, notwithstanding
310 any contrary provision, and this contract shall be construed and take effect in accordance with the laws of England. Except for
311 the purpose of enforcing any award made in pursuance of the Arbitration Clause of this contract, the Courts of England shall
312 have exclusive jurisdiction to determine any application for ancillary relief, (save for obtaining security only for the claim or
313 counter-claim),the exercise of the powers of the Court in relation to the arbitration proceedings and any dispute other than a
314 dispute which shall fall within the jurisdiction of arbitrators or board of appeal of the Association pursuant to the Arbitration
315 Clause of this contract. For the purpose of any legal proceedings each party shall be deemed to be ordinarily resident or
316 carrying on business at the offices of The Grain and Feed Trade Association, (GAFTA), England, and any party residing or
317 carrying on business in Scotland shall be held to have prorogated jurisdiction against himself to the English Courts or if in
318 Northern Ireland to have submitted to the jurisdiction and to be bound by the decision of the English Courts. The service of

proceedings upon any such party by leaving the same at the offices of The Grain and Feed Trade Association, together with the posting of a copy of such proceedings to his address outside England, shall be deemed good service, any rule of law or equity to the contrary notwithstanding.

26. **ARBITRATION-**

(a) Any and all disputes arising out of or under this contract or any claim regarding the interpretation or execution of this contract shall be determined by arbitration in accordance with the GAFTA Arbitration Rules, No 125, in the edition current at the date of this contract, such Rules are incorporated into and form part of this Contract and both parties hereto shall be deemed to be fully cognisant of and to have expressly agreed to the application of such Rules.

(b) Neither party hereto, nor any persons claiming under either of them shall bring any action or other legal proceedings against the other in respect of any such dispute, or claim until such dispute or claim shall first have been heard and determined by the arbitrator(s) or a board of appeal, as the case may be, in accordance with the Arbitration Rules and it is expressly agreed and declared that the obtaining of an award from the arbitrator(s) or board of appeal, as the case may be, shall be a condition precedent to the right of either party hereto or of any persons claiming under either of them to bring any action or other legal proceedings against the other of them in respect of any such dispute or claim.

(c) Nothing contained under this Arbitration Clause shall prevent the parties from seeking to obtain security in respect of their claim or counterclaim via legal proceedings in any jurisdiction, provided such legal proceedings shall be limited to applying for and/or obtaining security for a claim or counterclaim, it being understood and agreed that the substantive merits of any dispute or claim shall be determined solely by arbitration in accordance with the GAFTA Arbitration Rules, No 125.

27. **INTERNATIONAL CONVENTIONS-**
The following shall not apply to this contract: -
(a) The Uniform Law on Sales and the Uniform Law on Formation to which effect is given by the Uniform Laws on International Sales Act 1967;
(b) The United Nations Convention on Contracts for the International Sale of Goods of 1980; and
(c) The United Nations Convention on Prescription (Limitation) in the International Sale of Goods of 1974 and the amending Protocol of 1980.
(d) Incoterms.
(e) Unless the contract contains any statement expressly to the contrary, a person who is not a party to this contract has no right under the Contract (Rights of Third Parties) Act 1999 to enforce any term of it.

Sellers ......................................................................Buyers................................................................................

Printed in England and issued by

**GAFTA**
**(THE GRAIN AND FEED TRADE ASSOCIATION)**
**GAFTA HOUSE, 6 CHAPEL PLACE, RIVINGTON ST, LONDON EC2A 3SH**

EXHIBIT 4

# Agrimpex Co. Limited

Regal House, 1138 High Road, London, N20 0RA.
Telephone: 020 8446 6921 Fax: 020 8446 7116 Telex: 296142 AGRICO G.
e-mail: trade@agrimpex.co.uk

Contract of Sale No. DFS/56607

Date 17th July 2007

**Buyer**
Jakil SPA
Foro Buonaparte, 68
20121 Milano
Italy

Dear Sirs,
We confirm having sold to you on 17/07/2007 the following:-

**COMMODITY:**   Sudanese durra feterita 2005/2006 and/or 2006/2007
crop at sellers option cleaned to within maximum 3% admixture,
maximum 0.50% Tannin in sound good condition at time and place of
shipment.
Quality/condition/description all final as per certificate/s issued at time
of shipment by SGS or their agents in Sudan.
Delivered weight.

**QUANTITY/**   One cargo/cargoes 20,000 Mt 10% more or less at sellers option and at
contract price.

**SHIPMENT:**   September/October 2007 from origin.
Sellers option to ship any date during this shipment period provided
that B/Ls are dated not earlier than 21 days from the date of the first
B/L's issued against shipment executing contract no. DFS/56407
dated 10/07/2007.

**PACKING:**   In bulk.

**PRICE:**   US$ 241.50 (Two hundred and forty one US Dollars and fifty cents)
per mton.
C+F Free Out one Italian Adriatic port out of Venice/Ancona/Ravenna
at buyers option, where buyers guarantee berth to accommodate vessel
upto 31' feet swad. In the event buyers want additional ports, then this
will be as per rates stipulated in the Charter Party which shall be for
buyers account.
Discharge port to be declared at sellers first demand but not later
than commencement of loading of vessel.

**PAYMENT:**   100% cash against documents on presentation in Italy with payment
latest on arrival of vessel/s at discharge port and prior commencement
of discharge by T/T. T/T charges for buyers account.
Should documents be presented at buyers bank before 11:00 hrs AM
then sellers will be credited with value within 48 hours, otherwise
within 72 hours value.

(Cont/d...)



AGRIMPEX CO LIMITED

Page 1

Directors: P. G. Phillippou, N. L. Phillipou, Registration number: 01370076

18. LUG. 2007 17:49     JAKIL SPA                                    NR. 391     P. 2

# Agrimpex Co. Limited

Regal House, 1138 High Road, London, N20 0RA
Telephone: 020 8446 6921 Fax: 020 8446 7116 Telex: 296142 AGRICO G.
e-mail: trade@agrimpex.co.uk

Contract of Sale No. DFS/56607                      Date 17th July 2007

**PAYMENT**
**CONT'D....:**     In the event vessel/s arrive prior presentation of shipping documents
sellers have the option to either ask buyers to take delivery on first class
bank guarantee as required by owners of vessel pending presentation of
shipping documents. The relative charges of such bank guarantee for
sellers account, or alternatively 100% cash latest on arrival of vessel/s
before breaking bulk against presentation of original invoice, insurance
certificate and indemnity letter for allowing the discharge of the goods
without production of B/Ls.
Such letter of indemnity to be confirmed directly from vessel agents to
the buyers. This confirmation to reach buyers before payment is effected
and then cargo will be released against presentation of the original
letter of indemnity to vessels agents.

**DISCHARGE:**     Buyers to discharge goods at their risk and expenses at the average rate
of 5,000 MT basis 4 hatches, in the case of 3 hatches or less discharging
rate to be adjusted/reduced prorata if vessel singledecker/bulkcarrier, or
at the rate of 1,500 Mt if vessel tweendecker per weather working day of
24 consecutive hours SSHEX unless used and prorata. If used only time
actually worked to count as laytime.
Time at first disport to start counting as from 08.00 AM hours the next
working day after presentation of N.O.R. given during ordinary office
hours. WIBON/WIPON/WIFPON/WICCON.
Demurrage as per C/P rate for buyers account. Despatch to be half of
demurrage.
All other terms and conditions not in conflict with the above as per
governing Charter Party.

**OTHER TERMS/**
**CONDITIONS:**     1) - All export duties and/or taxes and/or levies present and/or future are
for sellers account.
2) - All import duties and/or taxes and/or levies present and/or future
are for buyers account.
3) - Buyers have the exclusivity on performing vessel/s at discharge
port.
4) - Sellers guarantee provision on EUR 1 certificate at discharge port
before completion of discharge and a copy of phytosanitary certificate
on board vessel.

AGRIMPEX CO LIMITED                                    (Cont'd...)

Page 2          Directors: P. G. Philippou, K. L. Philipou. Registration number: 01370076

16. LUG. 2007 17:49     JAKIL SPA     NR. 391     P. 3

# Agrimpex Co. Limited

Regal House, 1138 High Road, London, N20 0RA.
Telephone: 020 8446 6921 Fax: 020 8446 7116 Telex: 296142 AGRICO G.
e-mail: trade@agrimpex.co.uk

*Contract of Sale No.* DFS/56607                    *Date* 17th July 2007

OTHER TERMS/
CONDITIONS
CONT/D....:

    5) - Fumigation certificate

    6) - Vessel/s to be singledecker/bulkcarrier/tweendecker classed
highest Lloyds register or equivalent. Vessel/s over 20 years old is/are
acceptable in which case overage premium to be for sellers account as
per Official Lloyds London Schedule.

    7) - In the event that the quantity shown on the EUR 1 certificate is
higher than that shown on B/L quantity, buyers to accept same.

All other terms, conditions and rules not in contradiction with the above, as per GAFTA
contract 61 including the Arbitration Rule form No: 125 (of which the parties admit that
they have knowledge and notice) apply to this contract, the details given shall be taken as
having been written into such form in the appropriate place.

The validity of this contract will be unaffected by the non return of the counter
confirmation duly signed by buyers.

SELLERS                                             BUYERS

AGRIMPEX CO LIMITED                                 JAKIL S.p.A.

Page 3            Directors: P. G. Philippou, K. L. Philippou. Registration number 01370076

Effective 1ˢᵗ January 2006

# *Gafta No.61*

Copyright
**THE GRAIN AND FEED TRADE ASSOCIATION**

## CONTRACT FOR MEDITERRANEAN AND MOROCCO IN BULK OR BAGS
### CARGOES
### TALE QUALE - CIF TERMS

*\* delete/specify as applicable*                    *Date* ................................................................

1   **SELLERS** ..........................................................................................................................................
2
3   **INTERVENING AS BROKERS** ..........................................................................................................
4
5   **BUYERS** ...........................................................................................................................................
6   have this day entered into a contract on the following terms and conditions.
7
8   **1.   GOODS-** a cargo of ...............................................................................................................
9        shipped in bulk and/or bags. If in bags, then the bags to be of suitable strength to withstand ordinary wear and tear to port of
10       destination. Such bags to be taken and paid for as goods.
11
12  **2.   QUANTITY-** ...............................................................................................units, 5% more or less.
13       Sellers have the option of shipping a further 5% more or less on contract quantity, excess or deficiency over the above 5% to be
14       settled at the CIF price on the date of the last bill of lading, and on the quantity thereof; value to be fixed by arbitration, unless
15       mutually agreed
16
17  **3.   PRICE AND DESTINATION - At** ..........................................................................................
18       * per tonne of 1000 kilograms                  }
19                                                      } gross weight, cost, insurance and freight to  .................................
20       * per ton of 1016 kilograms or 2240 lbs.       }
21
22  **4.   BROKERAGE**...................................per tonne, to be paid by Sellers on the mean contract quantity, goods lost or not
23       lost, contract fulfilled or not fulfilled unless such non-fulfilment is due to the cancellation of the contract under the terms of
24       the Prohibition Clause.   Brokerage shall be due on the day shipping documents are exchanged or, if the goods are not
25       appropriated then brokerage shall be due on the 30th consecutive day after the last day for appropriation.
26
27  **5.   QUALITY-**
28        *   **Warranted to contain** .................................................................................. at time and place of discharge.
29
30        *   **Natural weight of** .......................................................... kilograms per hectolitre guaranteed at time and place of
31            discharge, to be ascertained according to GAFTA Sampling Rules No.124, or other accepted authority, and any allowances
32            determined to be allowed for off contract price, in accordance with GAFTA Sampling Rules No. 124.
33
34        *   **Admixture Barley-** Any admixture of dirt and/or other foreign substance over .................................. % to be allowed for by
35            Sellers at contract price, but any pulse, seed or grain other than Barley to be reckoned as foreign substances at half their
36            quantities.
37        *   **Other Grain and Seed-** Any admixture of dirt and/or other foreign substance over ......................... % to be allowed for by
38            Sellers at contract price. The percentage of admixture to be determined by GAFTA, or its duly appointed Analyst.
39
40        *   **Official** ................... certificate of inspection, or certification of inspection of......................... at time and place of
41            loading into the ocean carrying vessel, shall be final as to quality.  The Buyers shall not be entitled to reject a tender of a
42            higher grade of grain of the same colour and description.
43        *   **F.A.Q.** (fair average quality) of the season's shipment at time and place of loading, to be assessed upon the basis of, and by
44            comparison with the GAFTA F.A.Q. standard of the month during which the bill of lading is dated. In the event of no F.A.Q.
45            Standard being established by the Association, the Arbitrator(s) shall in his/their discretion decide what is the fair average
46            quality.  An average sample of the delivery shall be taken and sealed jointly at the port of discharge by the representatives of
47            the shipper and the representatives of the holders of the bill of lading or shipper's delivery order, and shall be forwarded
48            immediately to the Association for the purposes of establishing the F.A.Q. standard.  The expenses of such sampling and
49            forwarding shall be paid half by the Receiver and half by the Sellers.  Place of shipment under this contract shall be

understood as the port or group of ports adopted by the appointed Standards Committee in making the Standard. If the difference between the delivery and the F.A.Q. Standard shall not amount to 0.50% on contract price, no allowance for quality shall be due; otherwise the Buyers shall be entitled to the full difference in value.

\* **Sample,** at time and place of shipment about as per sealed sample marked ............................. in possession of; .......................
the word "about" when referring to quality shall mean the equivalent of 0.50% on contract price.

Difference in quality shall not entitle Buyers to reject except under the award of arbitrator(s) or board of appeal, as the case may be, referred to in the Arbitration Rules specified in the Arbitration Clause.

**Condition**- Shipment shall be made in good condition. Should the goods arrive out of condition, due regard shall be made for the time of the year in which the shipment took place. The fact of the goods so arriving shall not necessarily be sufficient proof of an improper shipment.

6.  **PERIOD OF SHIPMENT**- as per bill(s) of lading dated or to be dated ..........................................................................
The bill(s) of lading to be dated when the goods are actually on board. Date of the bill(s) of lading shall be accepted as proof of date of shipment in the absence of evidence to the contrary. In any month containing an odd number of days, the middle day shall be accepted as being in both halves of the month.

7.  **SALES BY NAMED VESSELS** – For all sales by named vessels, the following shall apply: -
    (a) Position of vessel is mutually agreed between Buyers and Sellers;
    (b) The word "now" to be inserted before the word "classed" in the Ship's Classification Clause;
    (c) Appropriation Clause cancelled if sold "shipped".

8.  **SHIP'S CLASSIFICATION** - Shipment from ............................................................................................................
by first class mechanically self-propelled vessel(s) suitable for the carriage of the contract goods, classed in accordance with the Institute Classification Clause of the International Underwriting Association in force at time of shipment, excluding tankers and vessels which are either classified in Lloyd's Register or described in Lloyd's Shipping Index as "Ore/Oil" vessels.

9.  **EXTENSION OF SHIPMENT**- The contract period for shipment, if such be 31 days or less, shall be extended by an additional period of not more than 8 days, provided that Sellers serve notice claiming extension not later than the next business day following the last day of the originally stipulated period. The notice need not state the number of additional days claimed. Sellers shall make an allowance to Buyers, to be deducted in the invoice from the contract price, based on the number of days by which the originally stipulated period is exceeded, in accordance with the following scale:-
            1 to 4 additional days, 0.50%;
            5 or 6 additional days, 1%;
            7 or 8 additional days 1.50% of the gross contract price.

If, however, after having served notice to Buyers as above, Sellers fail to make shipment within such 8 days, then the contract shall be deemed to have called for shipment during the originally stipulated period plus 8 days, at contract price less 1.50%, and any settlement for default shall be calculated on that basis. If any allowance becomes due under this clause, the contract price shall be deemed to be the original contract price less the allowance and any other contractual differences shall be settled on the basis of such reduced price.

10. **APPROPRIATION**-
    (a) Notice of appropriation shall state the vessel's name, the approximate weight shipped, and the date or the presumed date of the bill of lading.
    (b) The notice of appropriation shall within 10 consecutive days, (or if shipped from a Moroccan port 7 consecutive days), from the date of the bill(s) of lading be served by or on behalf of the Shipper direct on his Buyers or on the Selling Agent or Brokers named in the contract. The Non-Business Days Clause shall not apply.
    (c) Notice of appropriation shall, within the period stated in sub-clause (b) be served by or on behalf of subsequent Sellers on their Buyers or on the Selling Agent or Brokers named in the contract, but if notice of appropriation is received by subsequent Sellers on the last day or after the period stated in sub-clause (b) from the date of the bill of lading, their notice of appropriation shall be deemed to be in time if served:-
            (1)    On the same calendar day, if received not later than 1600 hours on any business day, or

            (2)    Not later than 1600 hours on the next business day, if received after 1600 hours or on a non-business day.
    (d) A notice of appropriation served on a Selling Agent or Brokers named in the contract shall be considered an appropriation served on Buyers. A Selling Agent or Brokers receiving a notice of appropriation shall serve like notice of appropriation in accordance with the provisions of this clause. Where the Shipper or subsequent Sellers serves the notice of appropriation on the Selling Agent, such Selling Agent may serve notice of appropriation either direct to the Buyers or to the Brokers.
    (e) The bill of lading date stated in the notice of appropriation shall be for information only and shall not be binding, but in fixing the period laid down by this clause for serving notices of appropriation the actual date of the bill of lading shall prevail.
    (f) Every notice of appropriation shall be open to correction of any errors occurring in transmission, provided that the sender is not responsible for such errors, and for any previous error in transmission which has been repeated in good faith.
    (g) Should the vessel arrive before receipt of the appropriation and any extra expenses is incurred thereby, such expenses shall be borne by Sellers.
    (h) When a valid notice of appropriation has been received by Buyers, it shall not be withdrawn except with their consent.
    (i) In the event of less than 95 tonnes being tendered by any one vessel Buyers shall be entitled to refund of any proved extra expenses for sampling, analysis and lighterage incurred thereby at port of discharge.

## 11. PAYMENT-

(a) **Payment** ................................................................. % of invoice amount by cash in .........................................................
in exchange for and on presentation of shipping documents.

(b) **Shipping documents** – shall consist of - 1. Invoice. 2. Full set(s) of on board Bill(s) of Lading and/or Ship's Delivery Order(s) and/or other Delivery Order(s) in negotiable and transferable form. Such other Delivery Order(s) if required by Buyers, to be countersigned by the Shipowners, their Agents or a recognised bank. 3. Policy (ies) and/or Insurance Certificate(s) and/or Letter(s) of Insurance in the currency of the contract. The Letter(s) of Insurance to be certified by a recognised bank if required by Buyers. 4. Other documents as called for under the contract. Buyers agree to accept documents containing the Chamber of Shipping War Deviation Clause and/or other recognised official War Risk Clause.

(c) In the event of shipping documents not being available when called for by Buyers, or on arrival of the vessel at destination, Sellers shall provide other documents or an indemnity entitling Buyers to obtain delivery of the goods and payment shall be made by Buyers in exchange for same, but such payment shall not prejudice Buyers' rights under the contract when shipping documents are eventually available.

(d) Should Sellers fail to present shipping documents or other documents or an indemnity entitling Buyers to take delivery, Buyers shall take delivery under an indemnity provided by themselves and shall pay for the other documents when presented. Any reasonable extra expenses, including the costs of such indemnity or extra charges incurred by reason of the failure of Sellers to provide such documents, shall be borne by Sellers, but such payment shall not prejudice Buyers' rights under the contract when shipping documents are eventually available.

(e) Should shipping documents be presented with an incomplete set of bill(s) of lading or should other shipping documents be missing, payment shall be made provided that delivery of such missing documents is guaranteed, such guarantee to be countersigned, if required by Buyers, by a recognised bank.

(f) Costs of collection shall be for account of Sellers, but if Buyers demand presentation only through a bank of their choice, in that event any additional collection costs shall be borne by Buyers.

(g) No obvious clerical error in the documents shall entitle Buyers to reject them or delay payment, but Sellers shall be responsible for all loss or expense caused to Buyers by reason of such error and Sellers on request furnish an approved guarantee in respect thereto.

(h) Amounts payable under this contract shall be settled without delay. If not so settled, either party may notify the other that a dispute has arisen and serve a notice stating his intention to refer the dispute to arbitration in accordance with the Arbitration Rules.

(i) **Interest** – If there has been unreasonable delay in any payment, interest appropriate to the currency involved shall be charged. If such charge is not mutually agreed, a dispute shall be deemed to exist which shall be settled by arbitration. Otherwise interest shall be payable only where specifically provided in the terms of the contract or by an award of arbitration. The terms of this clause do not override the parties' contractual obligation under sub-clause (a).

## 12. INSURANCE- 

Sellers shall provide insurance on terms not less favourable than those set out hereunder, and as set out in detail in GAFTA Insurance Terms No.72 viz.:-

(a) Risks Covered: -

| | |
|---|---|
| Cargo Clauses (WA) with average payable, with 3% franchise or better terms | - Section 2 of Form 72 |
| War Clauses (Cargo) | - Section 4 of Form 72 |
| Strikes, Riots and Civil Commotions Clauses (Cargo) | - Section 5 of Form 72 |

(b) Insurers - The insurance to be effected with first class underwriters and/or companies who are domiciled or carrying on business in the United Kingdom or who, for the purpose of any legal proceedings, accept a British domicile and provide an address for service of process in London, but for whose solvency Sellers shall not be responsible.

(c) Insurable Value - Insured amount to be for not less than 2% over the invoice amount, including freight when freight is payable on shipment or due in any event, ship and/or cargo lost or not lost, and including the amount of any War Risk premium payable by Buyers.

(d) Freight Contingency - When freight is payable on arrival or on right and true delivery of the goods and the insurance does not include the freight, Sellers shall effect insurance upon similar terms, such insurance to attach only as such freight becomes payable, for the amount of the freight plus 2%, until the termination of the risk as provided in the above mentioned clauses, and shall undertake that their policies are so worded that in the case of a particular or general average claim the Buyers shall be put in the same position as if the C.I.F. value plus 2% were insured from the time of shipment.

(e) Certificates/Policies - Sellers shall give all policies and/or certificates and/or letters of insurance provided for in this contract, (duly stamped if applicable) for original and increased value (if any) for the value stipulated in (c) above. In the event of a certificate of insurance being supplied, it is agreed that such certificate shall be exchanged by Sellers for a policy if and when required and such certificate shall state on its face that it is so exchangeable. If required by Buyers, letter(s) of insurance shall be guaranteed by a recognised bank, or by any other guarantor who is acceptable to Buyers.

(f) Total Loss - In the event of total or constructive total loss, or where the amount of the insurance becomes payable in full, the insured amount in excess of 2% over the invoice amount shall be for Sellers' account and the party in possession of the policy (ies) shall collect the amount of insurance and shall thereupon settle with the other party on that basis.

(g) Currency of Claims - Claims to be paid in the currency of the contract.

(h) War and Strike Risks Premiums – Any premium in excess of 0.50% to be for account of Buyers. The rate of such insurance not to exceed the rate ruling in London at time of shipment or date of vessel's sailing whichever may be adopted by underwriters. Such excess premium shall be claimed from Buyers, wherever possible, with the Provisional Invoice, but in no case later than the date of vessel's arrival, or not later than 7 consecutive days after the rate has been agreed with underwriters, whichever may be the later, otherwise such claim shall be void unless, in the opinion of Arbitrators, the delay is justifiable. Sellers' obligation to provide War Risk Insurance shall be limited to the terms and conditions in force and generally obtainable in London at time of shipment.

184 (i) Where Sellers are responsible for allowances or other payments to Buyers under Rye Terms or other contractual terms, (and
185 which risks are also covered by the insurance provided by Sellers), the Buyers, on receipt of settlement, shall immediately return to
186 Sellers the insurance documents originally received from them and shall, if required, subrogate to Sellers all right of claim against
187 the Insurers in respect of such matters.
188

189 **13.  DUTIES, TAXES, LEVIES, ETC.** – All export duties, taxes, levies, etc., present or future, in country of origin, shall be for
190 Sellers' account. All import duties, taxes, levies, etc., present or future, in country of destination, shall be for Buyers' account.
191

192 **14.  DISCHARGE**- Ship to discharge according to the custom of the port. Ship to discharge at the rate of ..............................................
193

194 If documents are tendered which do not provide for discharge as above, or contain contrary stipulations, Sellers to be responsible
195 to Buyers for all extra expenses incurred thereby.
196

197 **15.  WEIGHING**- the terms and conditions of GAFTA Weighing Rules No. 123 are deemed to be incorporated into this contract.
198 Unless otherwise agreed, final settlement shall be made on the basis of gross delivered weights at time and place of discharge
199 at Buyers' expense.  If the place of destination is outside the port limits, Buyers agree to pay the extra expenses incurred by
200 Sellers or their agents for weighing. No payment shall be made for increase in weight occasioned by water and/or oil during
201 the voyage. If final at time and place of loading, as per GAFTA registered superintendents' certificate at Sellers' choice and
202 expense, (in which case the Deficiency Clause will not apply).
203

204 **16.  DEFICIENCY**- any deficiency in the bill of lading weight shall be paid for by Sellers and any excess over bill of lading
205 weight shall be paid for by Buyers at contract price.
206

207 **17.  SAMPLING, ANALYSIS AND CERTIFICATES OF ANALYSIS**- the terms and conditions of GAFTA Sampling Rules
208 No.124, are deemed to be incorporated into this contract. Samples shall be taken at the time of discharge on or before removal
209 from the ship or quay, unless the parties agree that quality final at loading applies, in which event samples shall be taken at
210 time and place of loading. The parties shall appoint superintendents, for the purposes of supervision and sampling of the
211 goods, from the GAFTA Register of Superintendents. Unless otherwise agreed, analysts shall be appointed from the GAFTA
212 Register of Analysts.
213

214 **18.  PROHIBITION**- In case of prohibition of export, blockade or hostilities or in case of any executive or legislative act done by or
215 on behalf of the government of the country of origin or of the territory where the port or ports of shipment named herein is/are
216 situate, restricting export, whether partially or otherwise, any such restriction shall be deemed by both parties to apply to this
217 contract and to the extent of such total or partial restriction to prevent fulfilment whether by shipment or by any other means
218 whatsoever and to that extent this contract or any unfulfilled portion thereof shall be cancelled. Sellers shall advise Buyers without
219 delay with the reasons therefor and, if required, Sellers must produce proof to justify the cancellation.
220

221 **19.  LOADING STRIKE**-
222 (a) Should shipment of the goods or any part thereof be prevented at any time during the last 28 days of guaranteed time of
223 shipment or at any time during guaranteed contract period if such be less than 28 days, by reason of riots, strikes or lock-outs at
224 port(s) of loading or elsewhere preventing the forwarding of the goods to such port or ports, then the Shipper shall be entitled at
225 the termination of such riots, strikes or lock-outs to as much time, not exceeding 28 days, for shipment from such port or ports as
226 was left for shipment under the contract prior to the outbreak of the riots, strikes or lock-outs, and in the event of the time left for
227 shipment under the contract being 14 days or less, a minimum extension of 14 days shall be allowed.  In the event of further riots,
228 strikes or lock-outs occurring during the time by which the guaranteed time of shipment has been extended by reason of the
229 provisions of the foregoing paragraph, the additional extension shall be limited to the actual duration of such further riots, strikes
230 or lock-outs. In case of non-fulfilment under the above conditions the date of default shall be similarly deferred.
231 (b). The Shipper shall serve notice naming the ports not later than 3 business days after the last day of guaranteed time of shipment
232 if he intends to claim an extension of time for shipment, such notice shall limit the port(s) for shipment after expiry of contract
233 period to those from which an extension is claimed.
234 (c). If required by Buyers, Sellers must provide documentary evidence to establish any claim for extension under this clause.
235

236 **20.  NOTICES**- All notices required to be served on the parties pursuant to this contract shall be communicated rapidly in legible
237 form.  Methods of rapid communication for the purposes of this clause are defined and mutually recognised as: - either telex,
238 or letter if delivered by hand on the date of writing, or telefax, or E-mail, or other electronic means, always subject to the
239 proviso that if receipt of any notice is contested, the burden of proof of transmission shall be on the sender who shall, in the
240 case of a dispute, establish, to the satisfaction of the arbitrator(s) or board of appeal appointed pursuant to the Arbitration
241 Clause, that the notice was actually transmitted to the addressee. In case of resales/repurchases all notices shall be served
242 without delay by sellers on their respective buyers or vice versa and any notice received after 1600 hours on a business day
243 shall be deemed to have been received on the business day following. A notice to the Brokers or Agent shall be deemed a
244 notice under this contract.
245

246 **21.  NON-BUSINESS DAYS**- Saturdays, Sundays and the officially recognised and/or legal holidays of the respective countries and
247 any days, which GAFTA may declare as non-business days for specific purposes, shall be non-business days. Should the time
248 limit for doing any act or serving any notice expire on a non-business day, the time so limited shall be extended until the first
249 business day thereafter. The period of shipment shall not be affected by this clause.
250

251 **22.  DEFAULT**- In default of fulfilment of contract by either party, the following provisions shall apply: -

(a) The party other than the defaulter shall, at their discretion have the right, after serving a notice on the defaulter to sell or purchase, as the case may be, against the defaulter, and such sale or purchase shall establish the default price.

(b) If either party be dissatisfied with such default price or if the right at (a) above is not exercised and damages cannot be mutually agreed, then the assessment of damages shall be settled by arbitration.

(c) The damages payable shall be based on, but not limited to, the difference between the contract price and either the default price established under (a) above or upon the actual or estimated value of the goods, on the date of default, established under (b) above.

(d) In no case shall damages include loss of profit on any sub-contracts made by the party defaulted against or others unless the Arbitrator(s) or Board of Appeal, having regard to special circumstances, shall in his/their sole and absolute discretion think fit.

(e) Damages, if any, shall be computed on the quantity appropriated if any but, if no such quantity has been appropriated then on the mean contract quantity, and any option available to either party shall be deemed to have been exercised accordingly in favour of the mean contract quantity.

(f) Default may be declared by Sellers at any time after expiry of the contract period, and the default date shall then be the first business day after the date of Sellers' advice to their Buyers. If default has not already been declared then (notwithstanding the provisions stated in the Appropriation Clause) if notice of appropriation has not been served by the 10th consecutive day after the last day for appropriation laid down in the contract, the Sellers shall be deemed to be in default, and the default date shall then be the first business day thereafter.

23. **INSOLVENCY**- If before the fulfilment of this contract, either party shall suspend payments, notify any of the creditors that he is unable to meet debts or that he has suspended or that he is about to suspend payments of his debts, convene, call or hold a meeting of creditors, propose a voluntary arrangement, have an administration order made, have a winding up order made, have a receiver or manager appointed, convene, call or hold a meeting to go into liquidation (other than for re-construction or amalgamation) become subject to an Interim Order under Section 252 of the Insolvency Act 1986, or have a Bankruptcy Petition presented against him (any of which acts being hereinafter called an "Act of Insolvency") then the party committing such Act of Insolvency shall forthwith serve a notice of the occurrence of such Act of Insolvency on the other party to the contract and upon proof (by either the other party to the contract or the Receiver, Administrator, Liquidator or other person representing the party committing the Act of Insolvency) that such notice was thus served within 2 business days of the occurrence of the Act of Insolvency, the contract shall be closed out at the market price ruling on the business day following the serving of the notice. If such notice has not been served, then the other party, on learning of the occurrence of the Act of Insolvency, shall have the option of declaring the contract closed out at either the market price on the first business day after the date when such party first learnt of the occurrence of the Act of Insolvency or at the market price ruling on the first business day after the date when the Act of Insolvency occurred.

In all cases the other party to the contract shall have the option of ascertaining the settlement price on the closing out of the contract by re-purchase or re-sale, and the difference between the contract price and the re-purchase or re-sale price shall be the amount payable or receivable under this contract.

24. **CIRCLE**- Where Sellers re-purchase from their Buyers or from any subsequent Buyer the same goods or part thereof, a circle shall be considered to exist as regards the particular goods so re-purchased, and the provisions of the Default Clause shall not apply. (For the purpose of this clause the same goods shall mean goods of the same description, from the same country of origin, of the same quality, and, where applicable, of the same analysis warranty, for shipment to the same port(s) of destination during the same period of shipment). Different currencies shall not invalidate the circle.

Subject to the terms of the Prohibition Clause in the contract, if the goods are not appropriated, or, having been appropriated documents are not presented, invoices based on the mean contract quantity shall be settled by all Buyers and their Sellers in the circle by payment by all Buyers to their Sellers of the excess of the Sellers' invoice amount over the lowest invoice amount in the circle. Payment shall be due not later than 15 consecutive days after the last day for appropriation, or, should the circle not be ascertained before the expiry of this time, then payment shall be due not later than 15 consecutive days after the circle is ascertained.

Where the circle includes contracts expressed in different currencies the lowest invoice amount shall be replaced by the market price on the first day for contractual shipment and invoices shall be settled between each Buyer and his Seller in the circle by payment of the differences between the market price and the relative contract price in currency of the contract.

All Sellers and Buyers shall give every assistance to ascertain the circle and when a circle shall have been ascertained in accordance with this clause same shall be binding on all parties to the circle. As between Buyers and Sellers in the circle, the non-presentation of documents by Sellers to their Buyers shall not be considered a breach of contract. Should any party in the circle prior to the due date of payment commit any act comprehended in the Insolvency Clause of this contract, settlement by all parties in the circle shall be calculated at the closing out price as provided for in the Insolvency Clause, which shall be taken as a basis for settlement, instead of the lowest invoice amount in the circle. In this event respective Buyers shall make payment to their Sellers or respective Sellers shall make payment to their Buyers of the difference between the closing out price and the contract price.

25. **DOMICILE**- This contract shall be deemed to have been made in England and to be performed in England, notwithstanding any contrary provision, and this contract shall be construed and take effect in accordance with the laws of England. Except for the purpose of enforcing any award made in pursuance of the Arbitration Clause of this contract, the Courts of England shall have exclusive jurisdiction to determine any application for ancillary relief, (save for obtaining security only for the claim or counter-claim),then the exercise of the powers of the Court in relation to the arbitration proceedings and any dispute other than a dispute which shall fall within the jurisdiction of arbitrators or board of appeal of the Association pursuant to the Arbitration Clause of this contract. For the purpose of any legal proceedings each party shall be deemed to be ordinarily resident or carrying on business at the offices of The Grain and Feed Trade Association, (GAFTA), England, and any party residing or carrying on business in Scotland shall be held to have prorogated jurisdiction against himself to the English Courts or if in Northern Ireland to have submitted to the jurisdiction and to be bound by the decision of the English Courts. The service of

proceedings upon any such party by leaving the same at the offices of The Grain and Feed Trade Association, together with the posting of a copy of such proceedings to his address outside England, shall be deemed good service, any rule of law or equity to the contrary notwithstanding.

**26.  ARBITRATION-**

(a) Any and all disputes arising out of or under this contract or any claim regarding the interpretation or execution of this contract shall be determined by arbitration in accordance with the GAFTA Arbitration Rules, No 125, in the edition current at the date of this contract, such Rules are incorporated into and form part of this Contract and both parties hereto shall be deemed to be fully cognisant of and to have expressly agreed to the application of such Rules.

(b) Neither party hereto, nor any persons claiming under either of them shall bring any action or other legal proceedings against the other in respect of any such dispute, or claim until such dispute or claim shall first have been heard and determined by the arbitrator(s) or a board of appeal, as the case may be, in accordance with the Arbitration Rules and it is expressly agreed and declared that the obtaining of an award from the arbitrator(s) or board of appeal, as the case may be, shall be a condition precedent to the right of either party hereto or of any persons claiming under either of them to bring any action or other legal proceedings against the other of them in respect of any such dispute or claim.

(c) Nothing contained under this Arbitration Clause shall prevent the parties from seeking to obtain security in respect of their claim or counterclaim via legal proceedings in any jurisdiction, provided such legal proceedings shall be limited to applying for and/or obtaining security for a claim or counterclaim, it being understood and agreed that the substantive merits of any dispute or claim shall be determined solely by arbitration in accordance with the GAFTA Arbitration Rules, No 125.

**27.  INTERNATIONAL CONVENTIONS-**

The following shall not apply to this contract: -

(a) The Uniform Law on Sales and the Uniform Law on Formation to which effect is given by the Uniform Laws on International Sales Act 1967;

(b) The United Nations Convention on Contracts for the International Sale of Goods of 1980; and

(c) The United Nations Convention on Prescription (Limitation) in the International Sale of Goods of 1974 and the amending Protocol of 1980.

(d) Incoterms.

(e) Unless the contract contains any statement expressly to the contrary, a person who is not a party to this contract has no right under the Contract (Rights of Third Parties) Act 1999 to enforce any term of it.

Sellers ......................................................................................Buyers.................................................................................................

Printed in England and issued by

# GAFTA
## (THE GRAIN AND FEED TRADE ASSOCIATION)
### GAFTA HOUSE, 6 CHAPEL PLACE, RIVINGTON ST, LONDON EC2A 3SH

EXHIBIT 5

30. LUG. 2007 10:51        JAKIL SPA                                    NR. 114    P. 1

# Agrimpex Co. Limited

Regal House, 1138 High Road, London, N20 0RA
Telephone: 020 8446 6921 Fax: 020 8446 7116 Telex: 296142 AGRICO G.
e-mail: trade@agrimpex.co.uk

Contract of Sale No. DFS/56907                         Date 27th July 2007
Buyer
Jakil SPA
Foro Buonaparte, 68
20121 Milano
Italy

Dear Sirs,
We confirm having sold to you on 27/07/2007 the following:-

| | |
|---|---|
| COMMODITY: | Sudanese durra feterita 2005/2006 and/or 2006/2007 crop at sellers option cleaned to within maximum 3% admixture, maximum 0.50% Tannin in sound good condition at time and place of shipment. Quality/condition/description all final as per certificate/s issued at time of shipment by SGS or their agents in Sudan. Delivered weight. |
| QUANTITY/ | One cargo/cargoes 20,000 Mt 10% more or less at sellers option and at contract price. |
| SHIPMENT: | October/November 2007 from origin. Sellers option to ship any date during this shipment period provided that B/Ls are dated not earlier than 21 days from the date of the first B/L's issued against shipment executing contract no. DFS/56607 dated 17/07/2007. |
| PACKING: | In bulk. |
| PRICE: | US$ 260 (Two hundred and sixty US Dollars) per mton. C+F Free Out one Italian Adriatic port out of Venice/Ancona/Ravenna at buyers option, where buyers guarantee berth to accommodate vessel upto 31' feet swad. In the event buyers want additional ports, then this will be as per rates stipulated in the Charter Party which shall be for buyers account. Discharge port to be declared at sellers first demand but not later than commencement of loading of vessel. |
| PAYMENT: | 100% cash against documents on presentation in Italy with payment latest on arrival of vessel/s at discharge port and prior commencement of discharge by T/T. T/T charges for buyers account. Should documents be presented at buyers bank before 11:00 hrs AM then sellers will be credited with value within 48 hours, otherwise within 72 hours value. |

AGRIMPEX CO. LTD

Directors: P. G. Philippas, K. L. Philipas. Registration number: 01370076

P-02

+39828765516 PG:002          +3390287655[?]          27-JUL-2007 16:27

REF. NR. 18008757

# Agrimpex Co. Limited

Regal House, 1138 High Road, London, N20 0RA
Telephone: 020 8446 6921 Fax: 020 8446 7116 Telex: 296142 AGRICO G.
e-mail: trade@agrimpex.co.uk

(Cont/d...)

*Contract of Sale No.* DFS/56907                    *Date* 27th July 2007

**PAYMENT**
**CONT/D....:**         In the event vessel/s arrive prior presentation of shipping documents
sellers have the option to either ask buyers to take delivery on first class
bank guarantee as required by owners of vessel pending presentation of
shipping documents. The relative charges of such bank guarantee for
sellers account, or alternatively 100% cash latest on arrival of vessel/s
before breaking bulk against presentation of original invoice, insurance
certificate and indemnity letter for allowing the discharge of the goods
without production of B/Ls.
Such letter of indemnity to be confirmed directly from vessel agents to
the buyers. This confirmation to reach buyers before payment is effected
and then cargo will be released against presentation of the original
letter of indemnity to vessels agents.

**DISCHARGE:**          Buyers to discharge goods at their risk and expenses at the average rate
of 5,000 MT basis 4 hatches, in the case of 3 hatches or less discharging
rate to be adjusted/reduced prorata if vessel singledecker/bulkcarrier, or
at the rate of 2,000 Mt if vessel tweendecker per weather working day of
24 consecutive hours SSHEX unless used and prorata. If used only time
actually worked to count as laytime.
Time at first disport to start counting as from 08.00 AM hours the next
working day after presentation of N.O.R. given during ordinary office
hours. WIBON/WIPON/WIFPON/WICCON.
Demurrage as per C/P rate for buyers account. Despatch to be half of
demurrage.
All other terms and conditions not in conflict with the above as per
governing Charter Party.

**OTHER TERMS/**
**CONDITIONS:**         1) - All export duties and/or taxes and/or levies present and/or future are
for sellers account.
2) - All import duties and/or taxes and/or levies present and/or future
are for buyers account.
3) - Buyers have the exclusivity on performing vessel/s at discharge
port.
4) - Sellers guarantee provision on EUR 1 certificate at discharge port
before completion of discharge and a copy of phytosanitary certificate
on board vessel.

(Cont/d...)

AGRIMPEX CO. LTD

Page 2

Directors: P. G. Philippas, E. L. Phillips, Registration number: 01370076

30. LUG. 2007 10:52    JAKIL SPA    NR. 114    P. 3

# Agrimpex Co. Limited

Regal House, 1138 High Road, London, N20 0RA
Telephone: 020 8446 6921 Fax: 020 8446 7116 Telex: 296142 AGRICO G.
e-mail: trade@agrimpex.co.uk

Contract of Sale No. DFS/56907                    Date 27th July 2007

OTHER TERMS/
CONDITIONS
CONT/D.....:        5) - Fumigation certificate
                    6) - Vessel/s to be singledecker/bulkcarrier/tweendecker classed
                    highest Lloyds register or equivalent. Vessel/s over 20 years old is/are
                    acceptable in which case overage premium to be for sellers account as
                    per Official Lloyds London Schedule.
                    7) - In the event that the quantity shown on the EUR 1 certificate is
                    higher than that shown on B/L quantity, buyers to accept same.

All other terms, conditions and rules not in contradiction with the above, as per GAFTA
contract 61 including the Arbitration Rule form No: 125 (of which the parties admit that
they have knowledge and notice) apply to this contract, the details given shall be taken as
having been written into such form in the appropriate place.

The validity of this contract will be unaffected by the non return of the counter
confirmation duly signed by buyers,

SELLERS                                            BUYERS

AGRIMPEX CO. LTD                                   JAKIL S.p.A.

Page 3

Directors: P. G. Phillipas, K. L. Phillipas. Registration number 01370076

Effective 1ˢᵗ January 2006

# *Gafta No.61*

Copyright
**THE GRAIN AND FEED TRADE ASSOCIATION**

## CONTRACT FOR MEDITERRANEAN AND MOROCCO
## IN BULK OR BAGS
### CARGOES
### TALE QUALE - CIF TERMS

*\* delete/specify as applicable*                    Date ................................................

1   **SELLERS** ................................................................................................................
2
3   **INTERVENING AS BROKERS** ................................................................................
4
5   **BUYERS** ................................................................................................................
6   have this day entered into a contract on the following terms and conditions.
7
8   **1.   GOODS**- a cargo of ..........................................................................................
9       shipped in bulk and/or bags. If in bags, then the bags to be of suitable strength to withstand ordinary wear and tear to port of
10      destination. Such bags to be taken and paid for as goods.
11
12  **2.   QUANTITY**- ....................................................................................units, 5% more or less.
13      Sellers have the option of shipping a further 5% more or less on contract quantity, excess or deficiency over the above 5% to be
14      settled at the CIF price on the date of the last bill of lading, and on the quantity thereof; value to be fixed by arbitration, unless
15      mutually agreed
16
17  **3.   PRICE AND DESTINATION** - At .......................................................................
18      \* per tonne of 1000 kilograms                    }
19                                                         } gross weight, cost, insurance and freight to ...........................................
20      \* per ton of 1016 kilograms or 2240 lbs.     }
21
22  **4.   BROKERAGE**...................................per tonne, to be paid by Sellers on the mean contract quantity, goods lost or not
23      lost, contract fulfilled or not fulfilled unless such non-fulfilment is due to the cancellation of the contract under the terms of
24      the Prohibition Clause.  Brokerage shall be due on the day shipping documents are exchanged or, if the goods are not
25      appropriated then brokerage shall be due on the 30th consecutive day after the last day for appropriation.
26
27  **5.   QUALITY**-
28      \*   **Warranted to contain** ................................................................ at time and place of discharge.
29
30      \*   **Natural weight** of ................................................................ kilograms per hectolitre guaranteed at time and place of
31          discharge, to be ascertained according to GAFTA Sampling Rules No.124, or other accepted authority, and any allowances
32          determined to be allowed for off contract price, in accordance with GAFTA Sampling Rules No. 124.
33
34      \*   **Admixture Barley**- Any admixture of dirt and/or other foreign substance over ................................% to be allowed for by
35          Sellers at contract price, but any pulse, seed or grain other than Barley to be reckoned as foreign substances at half their
36          quantities.
37      \*   **Other Grain and Seed**- Any admixture of dirt and/or other foreign substance over ..........................% to be allowed for by
38          Sellers at contract price. The percentage of admixture to be determined by GAFTA, or its duly appointed Analyst.
39
40      \*   **Official** ................................ certificate of inspection, or certification of inspection of..........................at time and place of
41          loading into the ocean carrying vessel, shall be final as to quality.  The Buyers shall not be entitled to reject a tender of a
42          higher grade of grain of the same colour and description.
43      \*   **F.A.Q.** (fair average quality) of the season's shipment at time and place of loading, to be assessed upon the basis of, and by
44          comparison with the GAFTA F.A.Q. standard of the month during which the bill of lading is dated. In the event of no F.A.Q.
45          Standard being established by the Association, the Arbitrator(s) shall in his/their discretion decide what is the fair average
46          quality.  An average sample of the delivery shall be taken and sealed jointly at the port of discharge by the representatives of
47          the shipper and the representatives of the holders of the bill of lading or shipper's delivery order, and shall be forwarded
48          immediately to the Association for the purposes of establishing the F.A.Q. standard.  The expenses of such sampling and
49          forwarding shall be paid half by the Receiver and half by the Sellers.  Place of shipment under this contract shall be

50     understood as the port or group of ports adopted by the appointed Standards Committee in making the Standard. If the
51     difference between the delivery and the F.A.Q. Standard shall not amount to 0.50% on contract price, no allowance for
52     quality shall be due; otherwise the Buyers shall be entitled to the full difference in value.

54     \*    **Sample**, at time and place of shipment about as per sealed sample marked ............................ in possession of; ......................
55     the word "about" when referring to quality shall mean the equivalent of 0.50% on contract price.
56     Difference in quality shall not entitle Buyers to reject except under the award of arbitrator(s) or board of appeal, as the case may
57     be, referred to in the Arbitration Rules specified in the Arbitration Clause.
58     **Condition**- Shipment shall be made in good condition. Should the goods arrive out of condition, due regard shall be made for the
59     time of the year in which the shipment took place. The fact of the goods so arriving shall not necessarily be sufficient proof of an
60     improper shipment.

62   **6.**     **PERIOD OF SHIPMENT**- as per bill(s) of lading dated or to be dated ........................................................................................
63     The bill(s) of lading to be dated when the goods are actually on board. Date of the bill(s) of lading shall be accepted as proof of
64     date of shipment in the absence of evidence to the contrary. In any month containing an odd number of days, the middle day shall
65     be accepted as being in both halves of the month.

67   **7.**     **SALES BY NAMED VESSELS** – For all sales by named vessels, the following shall apply: -
68     (a)   Position of vessel is mutually agreed between Buyers and Sellers;
69     (b)   The word "now" to be inserted before the word "classed" in the Ship's Classification Clause;
70     (c)   Appropriation Clause cancelled if sold "shipped".

72   **8.**     **SHIP'S CLASSIFICATION** - Shipment from ...............................................................................................................
73     by first class mechanically self-propelled vessel(s) suitable for the carriage of the contract goods, classed in accordance with the
74     Institute Classification Clause of the International Underwriting Association in force at time of shipment, excluding tankers and
75     vessels which are either classified in Lloyd's Register or described in Lloyd's Shipping Index as "Ore/Oil" vessels.

77   **9.**     **EXTENSION OF SHIPMENT**- The contract period for shipment, if such be 31 days or less, shall be extended by an additional
78     period of not more than 8 days, provided that Sellers serve notice claiming extension not later than the next business day following
79     the last day of the originally stipulated period. The notice need not state the number of additional days claimed. Sellers shall make
80     an allowance to Buyers, to be deducted in the invoice from the contract price, based on the number of days by which the originally
81     stipulated period is exceeded, in accordance with the following scale:-
82         1 to 4 additional days, 0.50%;
83         5 or 6 additional days, 1%;
84         7 or 8 additional days 1.50% of the gross contract price.
85     If, however, after having served notice to Buyers as above, Sellers fail to make shipment within such 8 days, then the contract shall
86     be deemed to have called for shipment during the originally stipulated period plus 8 days, at contract price less 1.50%, and any
87     settlement for default shall be calculated on that basis. If any allowance becomes due under this clause, the contract price shall be
88     deemed to be the original contract price less the allowance and any other contractual differences shall be settled on the basis of
89     such reduced price.

91   **10.**   **APPROPRIATION-**
92     (a) Notice of appropriation shall state the vessel's name, the approximate weight shipped, and the date or the presumed date of
93     the bill of lading.
94     (b) The notice of appropriation shall within 10 consecutive days, (or if shipped from a Moroccan port 7 consecutive days),
95     from the date of the bill(s) of lading be served by or on behalf of the Shipper direct on his Buyers or on the Selling Agent or
96     Brokers named in the contract. The Non-Business Days Clause shall not apply.
97     (c) Notice of appropriation shall, within the period stated in sub-clause (b) be served by or on behalf of subsequent Sellers on
98     their Buyers or on the Selling Agent or Brokers named in the contract, but if notice of appropriation is received by subsequent
99     Sellers on the last day or after the period stated in sub-clause (b) from the date of the bill of lading, their notice of appropriation
100     shall be deemed to be in time if served: -
101     (1)     On the same calendar day, if received not later than 1600 hours on any business day, or

103     (2)     Not later than 1600 hours on the next business day, if received after 1600 hours or on a non-business day.
104     (d) A notice of appropriation served on a Selling Agent or Brokers named in the contract shall be considered an appropriation
105     served on Buyers. A Selling Agent or Brokers receiving a notice of appropriation shall serve like notice of appropriation in
106     accordance with the provisions of this clause. Where the Shipper or subsequent Sellers serves the notice of appropriation on
107     the Selling Agent, such Selling Agent may serve notice of appropriation either direct to the Buyers or to the Brokers.
108     (e) The bill of lading date stated in the notice of appropriation shall be for information only and shall not be binding, but in
109     fixing the period laid down by this clause for serving notices of appropriation the actual date of the bill of lading shall prevail.
110     (f) Every notice of appropriation shall be open to correction of any errors occurring in transmission, provided that the sender
111     is not responsible for such errors, and for any previous error in transmission which has been repeated in good faith.
112     (g) Should the vessel arrive before receipt of the appropriation and any extra expenses is incurred thereby, such expenses shall
113     be borne by Sellers.
114     (h) When a valid notice of appropriation has been received by Buyers, it shall not be withdrawn except with their consent.
115     (i) In the event of less than 95 tonnes being tendered by any one vessel Buyers shall be entitled to refund of any proved extra
116     expenses for sampling, analysis and lighterage incurred thereby at port of discharge.

**11. PAYMENT-**

(a) **Payment** ................................................................... % of invoice amount by cash in ......................................................
in exchange for and on presentation of shipping documents.

(b) **Shipping documents** – shall consist of - 1. Invoice. 2. Full set(s) of on board Bill(s) of Lading and/or Ship's Delivery Order(s) and/or other Delivery Order(s) in negotiable and transferable form. Such other Delivery Order(s) if required by Buyers, to be countersigned by the Shipowners, their Agents or a recognised bank. 3. Policy (ies) and/or Insurance Certificate(s) and/or Letter(s) of Insurance in the currency of the contract. The Letter(s) of Insurance to be certified by a recognised bank if required by Buyers. 4. Other documents as called for under the contract. Buyers agree to accept documents containing the Chamber of Shipping War Deviation Clause and/or other recognised official War Risk Clause.

(c) In the event of shipping documents not being available when called for by Buyers, or on arrival of the vessel at destination, Sellers shall provide other documents or an indemnity entitling Buyers to obtain delivery of the goods and payment shall be made by Buyers in exchange for same, but such payment shall not prejudice Buyers' rights under the contract when shipping documents are eventually available.

(d) Should Sellers fail to present shipping documents or other documents or an indemnity entitling Buyers to take delivery, Buyers shall take delivery under an indemnity provided by themselves and shall pay for the other documents when presented. Any reasonable extra expenses, including the costs of such indemnity or extra charges incurred by reason of the failure of Sellers to provide such documents, shall be borne by Sellers, but such payment shall not prejudice Buyers' rights under the contract when shipping documents are eventually available.

(e) Should shipping documents be presented with an incomplete set of bill(s) of lading or should other shipping documents be missing, payment shall be made provided that delivery of such missing documents is guaranteed, such guarantee to be countersigned, if required by Buyers, by a recognised bank.

(f) Costs of collection shall be for account of Sellers, but if Buyers demand presentation only through a bank of their choice, in that event any additional collection costs shall be borne by Buyers.

(g) No obvious clerical error in the documents shall entitle Buyers to reject them or delay payment, but Sellers shall be responsible for all loss or expense caused to Buyers by reason of such error and Sellers shall on request furnish an approved guarantee in respect thereto.

(h) Amounts payable under this contract shall be settled without delay. If not so settled, either party may notify the other that a dispute has arisen and serve a notice stating his intention to refer the dispute to arbitration in accordance with the Arbitration Rules.

(i) **Interest** – If there has been unreasonable delay in any payment, interest appropriate to the currency involved shall be charged. If such charge is not mutually agreed, a dispute shall be deemed to exist which shall be settled by arbitration. Otherwise interest shall be payable only where specifically provided in the terms of the contract or by an award of arbitration. The terms of this clause do not override the parties' contractual obligation under sub-clause (a).

**12. INSURANCE-** Sellers shall provide insurance on terms not less favourable than those set out hereunder, and as set out in detail in GAFTA Insurance Terms No.72 viz.:-

(a) Risks Covered: -

| | |
|---|---|
| Cargo Clauses (WA) with average payable, with 3% franchise or better terms | - Section 2 of Form 72 |
| War Clauses (Cargo) | - Section 4 of Form 72 |
| Strikes, Riots and Civil Commotions Clauses (Cargo) | - Section 5 of Form 72 |

(b) Insurers - The insurance to be effected with first class underwriters and/or companies who are domiciled or carrying on business in the United Kingdom or who, for the purpose of any legal proceedings, accept a British domicile and provide an address for service of process in London, but for whose solvency Sellers shall not be responsible.

(c) Insurable Value - Insured amount to be for not less than 2% over the invoice amount, including freight when freight is payable on shipment or due in any event, ship and/or cargo lost or not lost, and including the amount of any War Risk premium payable by Buyers.

(d) Freight Contingency - When freight is payable on arrival or on right and true delivery of the goods and the insurance does not include the freight, Sellers shall effect insurance upon similar terms, such insurance to attach only as such freight becomes payable, for the amount of the freight plus 2%, until the termination of the risk as provided in the above mentioned clauses, and shall undertake that their policies are so worded that in the case of a particular or general average claim the Buyers shall be put in the same position as if the C.I.F. value plus 2% were insured from the time of shipment.

(e) Certificates/Policies - Sellers shall give all policies and/or certificates and/or letters of insurance provided for in this contract, (duly stamped if applicable) for original and increased value (if any) for the value stipulated in (c) above. In the event of a certificate of insurance being supplied, it is agreed that such certificate shall be exchanged by Sellers for a policy if and when required and such certificate shall state on its face that it is so exchangeable. If required by Buyers, letter(s) of insurance shall be guaranteed by a recognised bank, or by any other guarantor who is acceptable to Buyers.

(f) Total Loss - In the event of total or constructive total loss, or where the amount of the insurance becomes payable in full, the insured amount in excess of 2% over the invoice amount shall be for Sellers' account and the party in possession of the policy (ies) shall collect the amount of insurance and shall thereupon settle with the other party on that basis.

(g) Currency of Claims - Claims to be paid in the currency of the contract.

(h) War and Strike Risks Premiums – Any premium in excess of 0.50% to be for account of Buyers. The rate of such insurance not to exceed the rate ruling in London at time of shipment or date of vessel's sailing whichever may be adopted by underwriters. Such excess premium shall be claimed from Buyers, wherever possible, with the Provisional Invoice, but in no case later than the date of vessel's arrival, or not later than 7 consecutive days after the rate has been agreed with underwriters, whichever may be the later, otherwise such claim shall be void unless, in the opinion of Arbitrators, the delay is justifiable. Sellers' obligation to provide War Risk Insurance shall be limited to the terms and conditions in force and generally obtainable in London at time of shipment.

(i) Where Sellers are responsible for allowances or other payments to Buyers under Rye Terms or other contractual terms, (and which risks are also covered by the insurance provided by Sellers), the Buyers, on receipt of settlement, shall immediately return to Sellers the insurance documents originally received from them and shall, if required, subrogate to Sellers all right of claim against the Insurers in respect of such matters.

13. **DUTIES, TAXES, LEVIES, ETC.** – All export duties, taxes, levies, etc., present or future, in country of origin, shall be for Sellers' account. All import duties, taxes, levies, etc., present or future, in country of destination, shall be for Buyers' account.

14. **DISCHARGE-** Ship to discharge according to the custom of the port. Ship to discharge at the rate of ............................................

If documents are tendered which do not provide for discharge as above, or contain contrary stipulations, Sellers to be responsible to Buyers for all extra expenses incurred thereby.

15. **WEIGHING-** the terms and conditions of GAFTA Weighing Rules No. 123 are deemed to be incorporated into this contract. Unless otherwise agreed, final settlement shall be made on the basis of gross delivered weights at time and place of discharge at Buyers' expense. If the place of destination is outside the port limits, Buyers agree to pay the extra expenses incurred by Sellers or their agents for weighing. No payment shall be made for increase in weight occasioned by water and/or oil during the voyage. If final at time and place of loading, as per GAFTA registered superintendents' certificate at Sellers' choice and expense, (in which case the Deficiency Clause will not apply).

16. **DEFICIENCY-** any deficiency in the bill of lading weight shall be paid for by Sellers and any excess over bill of lading weight shall be paid for by Buyers at contract price.

17. **SAMPLING, ANALYSIS AND CERTIFICATES OF ANALYSIS-** the terms and conditions of GAFTA Sampling Rules No.124, are deemed to be incorporated into this contract. Samples shall be taken at the time of discharge on or before removal from the ship or quay, unless the parties agree that quality final at loading applies, in which event samples shall be taken at time and place of loading. The parties shall appoint superintendents, for the purposes of supervision and sampling of the goods, from the GAFTA Register of Superintendents. Unless otherwise agreed, analysts shall be appointed from the GAFTA Register of Analysts.

18. **PROHIBITION-** In case of prohibition of export, blockade or hostilities or in case of any executive or legislative act done by or on behalf of the government of the country of origin or of the territory where the port or ports of shipment named herein is/are situate, restricting export, whether partially or otherwise, any such restriction shall be deemed by both parties to apply to this contract and to the extent of such total or partial restriction to prevent fulfilment whether by shipment or by any other means whatsoever and to that extent this contract or any unfulfilled portion thereof shall be cancelled. Sellers shall advise Buyers without delay with the reasons therefor and, if required, Sellers must produce proof to justify the cancellation.

19. **LOADING STRIKE-**
(a) Should shipment of the goods or any part thereof be prevented at any time during the last 28 days of guaranteed time of shipment or at any time during guaranteed contract period if such be less than 28 days, by reason of riots, strikes or lock-outs at port(s) of loading or elsewhere preventing the forwarding of the goods to such port or ports, then the Shipper shall be entitled at the termination of such riots, strikes or lock-outs to as much time, not exceeding 28 days, for shipment from such port or ports as was left for shipment under the contract prior to the outbreak of the riots, strikes or lock-outs, and in the event of the time left for shipment under the contract being 14 days or less, a minimum extension of 14 days shall be allowed. In the event of further riots, strikes or lock-outs occurring during the time by which the guaranteed time of shipment has been extended by reason of the provisions of the foregoing paragraph, the additional extension shall be limited to the actual duration of such further riots, strikes or lock-outs. In case of non-fulfilment under the above conditions the date of default shall be similarly deferred.
(b). The Shipper shall serve notice naming the ports not later than 3 business days after the last day of guaranteed time of shipment if he intends to claim an extension of time for shipment, such notice shall limit the port(s) for shipment after expiry of contract period to those from which an extension is claimed.
(c). If required by Buyers, Sellers must provide documentary evidence to establish any claim for extension under this clause.

20. **NOTICES-** All notices required to be served on the parties pursuant to this contract shall be communicated rapidly in legible form. Methods of rapid communication for the purposes of this clause are defined and mutually recognised as: - either telex, or letter if delivered by hand on the date of writing, or telefax, or E-mail, or other electronic means, always subject to the proviso that if receipt of any notice is contested, the burden of proof of transmission shall be on the sender who shall, in the case of a dispute, establish, to the satisfaction of the arbitrator(s) or board of appeal appointed pursuant to the Arbitration Clause, that the notice was actually transmitted to the addressee. In case of resales/repurchases all notices shall be served without delay by sellers on their respective buyers or vice versa and any notice received after 1600 hours on a business day shall be deemed to have been received on the business day following. A notice to the Brokers or Agent shall be deemed a notice under this contract.

21. **NON-BUSINESS DAYS-** Saturdays, Sundays and the officially recognised and/or legal holidays of the respective countries and any days, which GAFTA may declare as non-business days for specific purposes, shall be non-business days. Should the time limit for doing any act or serving any notice expire on a non-business day, the time so limited shall be extended until the first business day thereafter. The period of shipment shall not be affected by this clause.

22. **DEFAULT-** In default of fulfilment of contract by either party, the following provisions shall apply: -

61/4

(a) The party other than the defaulter shall, at their discretion have the right, after serving a notice on the defaulter to sell or purchase, as the case may be, against the defaulter, and such sale or purchase shall establish the default price.

(b) If either party be dissatisfied with such default price or if the right at (a) above is not exercised and damages cannot be mutually agreed, then the assessment of damages shall be settled by arbitration.

(c) The damages payable shall be based on, but not limited to, the difference between the contract price and either the default price established under (a) above or upon the actual or estimated value of the goods, on the date of default, established under (b) above.

(d) In no case shall damages include loss of profit on any sub-contracts made by the party defaulted against or others unless the Arbitrator(s) or Board of Appeal, having regard to special circumstances, shall in his/their sole and absolute discretion think fit.

(e) Damages, if any, shall be computed on the quantity appropriated if any but, if no such quantity has been appropriated then on the mean contract quantity, and any option available to either party shall be deemed to have been exercised accordingly in favour of the mean contract quantity.

(f) Default may be declared by Sellers at any time after expiry of the contract period, and the default date shall then be the first business day after the date of Sellers' advice to their Buyers. If default has not already been declared then (notwithstanding the provisions stated in the Appropriation Clause) if notice of appropriation has not been served by the 10th consecutive day after the last day for appropriation laid down in the contract, the Sellers shall be deemed to be in default, and the default date shall then be the first business day thereafter.

23. **INSOLVENCY**- If before the fulfilment of this contract, either party shall suspend payments, notify any of the creditors that he is unable to meet debts or that he has suspended or that he is about to suspend payments of his debts, convene, call or hold a meeting of creditors, propose a voluntary arrangement, have an administration order made, have a winding up order made, have a receiver or manager appointed, convene, call or hold a meeting to go into liquidation (other than for re-construction or amalgamation) become subject to an Interim Order under Section 252 of the Insolvency Act 1986, or have a Bankruptcy Petition presented against him (any of which acts being hereinafter called an "Act of Insolvency") then the party committing such Act of Insolvency shall forthwith serve a notice of the occurrence of such Act of Insolvency on the other party to the contract and upon proof (by either the other party to the contract or the Receiver, Administrator, Liquidator or other person representing the party committing the Act of Insolvency) that such notice was thus served within 2 business days of the occurrence of the Act of Insolvency, the contract shall be closed out at the market price ruling on the business day following the serving of the notice. If such notice has not been served, then the other party, on learning of the occurrence of the Act of Insolvency, shall have the option of declaring the contract closed out at either the market price on the first business day after the date when such party first learnt of the occurrence of the Act of Insolvency or at the market price ruling on the first business day after the date when the Act of Insolvency occurred.

In all cases the other party to the contract shall have the option of ascertaining the settlement price on the closing out of the contract by re-purchase or re-sale, and the difference between the contract price and the re-purchase or re-sale price shall be the amount payable or receivable under this contract.

24. **CIRCLE**- Where Sellers re-purchase from their Buyers or from any subsequent Buyer the same goods or part thereof, a circle shall be considered to exist as regards the particular goods so re-purchased, and the provisions of the Default Clause shall not apply. (For the purpose of this clause the same goods shall mean goods of the same description, from the same country of origin, of the same quality, and, where applicable, of the same analysis warranty, for shipment to the same port(s) of destination during the same period of shipment). Different currencies shall not invalidate the circle.

Subject to the terms of the Prohibition Clause in the contract, if the goods are not appropriated, or, having been appropriated documents are not presented, invoices based on the mean contract quantity shall be settled by all Buyers and their Sellers in the circle by payment by all Buyers to their Sellers of the excess of the Sellers' invoice amount over the lowest invoice amount in the circle. Payment shall be due not later than 15 consecutive days after the last day for appropriation, or, should the circle not be ascertained before the expiry of this time, then payment shall be due not later than 15 consecutive days after the circle is ascertained.

Where the circle includes contracts expressed in different currencies the lowest invoice amount shall be replaced by the market price on the first day for contractual shipment and invoices shall be settled between each Buyer and his Seller in the circle by payment of the differences between the market price and the relative contract price in currency of the contract.

All Sellers and Buyers shall give every assistance to ascertain the circle and when a circle shall have been ascertained in accordance with this clause same shall be binding on all parties to the circle. As between Buyers and Sellers in the circle, the non-presentation of documents by Sellers to their Buyers shall not be considered a breach of contract. Should any party in the circle prior to the due date of payment commit any act comprehended in the Insolvency Clause of this contract, settlement by all parties in the circle shall be calculated at the closing out price as provided for in the Insolvency Clause, which shall be taken as a basis for settlement, instead of the lowest invoice amount in the circle. In this event respective Buyers shall make payment to their Sellers or respective Sellers shall make payment to their Buyers of the difference between the closing out price and the contract price.

25. **DOMICILE**- This contract shall be deemed to have been made in England and to be performed in England, notwithstanding any contrary provision, and this contract shall be construed and take effect in accordance with the laws of England. Except for the purpose of enforcing any award made in pursuance of the Arbitration Clause of this contract, the Courts of England shall have exclusive jurisdiction to determine any application for ancillary relief, (save for obtaining security only for the claim or counter-claim),the exercise of the powers of the Court in relation to the arbitration proceedings and any dispute other than a dispute which shall fall within the jurisdiction of arbitrators or board of appeal of the Association pursuant to the Arbitration Clause of this contract. For the purpose of any legal proceedings each party shall be deemed to be ordinarily resident or carrying on business at the offices of The Grain and Feed Trade Association, (GAFTA), England, and any party residing or carrying on business in Scotland shall be held to have prorogated jurisdiction against himself to the English Courts or if in Northern Ireland to have submitted to the jurisdiction and to be bound by the decision of the English Courts. The service of

319 proceedings upon any such party by leaving the same at the offices of The Grain and Feed Trade Association, together with
320 the posting of a copy of such proceedings to his address outside England, shall be deemed good service, any rule of law or
321 equity to the contrary notwithstanding.
322

323 **26.   ARBITRATION-**
324 (a) Any and all disputes arising out of or under this contract or any claim regarding the interpretation or execution of this
325 contract shall be determined by arbitration in accordance with the GAFTA Arbitration Rules, No 125, in the edition current at
326 the date of this contract, such Rules are incorporated into and form part of this Contract and both parties hereto shall be
327 deemed to be fully cognisant of and to have expressly agreed to the application of such Rules.
328

329 (b) Neither party hereto, nor any persons claiming under either of them shall bring any action or other legal proceedings
330 against the other in respect of any such dispute, or claim until such dispute or claim shall first have been heard and determined
331 by the arbitrator(s) or a board of appeal, as the case may be, in accordance with the Arbitration Rules and it is expressly
332 agreed and declared that the obtaining of an award from the arbitrator(s) or board of appeal, as the case may be, shall be a
333 condition precedent to the right of either party hereto or of any persons claiming under either of them to bring any action or
334 other legal proceedings against the other of them in respect of any such dispute or claim.
335

336 (c) Nothing contained under this Arbitration Clause shall prevent the parties from seeking to obtain security in respect of their
337 claim or counterclaim via legal proceedings in any jurisdiction, provided such legal proceedings shall be limited to applying
338 for and/or obtaining security for a claim or counterclaim, it being understood and agreed that the substantive merits of any
339 dispute or claim shall be determined solely by arbitration in accordance with the GAFTA Arbitration Rules, No 125.
340

341 **27.   INTERNATIONAL CONVENTIONS-**
342 The following shall not apply to this contract: -
343 (a) The Uniform Law on Sales and the Uniform Law on Formation to which effect is given by the Uniform Laws on International
344 Sales Act 1967;
345 (b) The United Nations Convention on Contracts for the International Sale of Goods of 1980; and
346 (c) The United Nations Convention on Prescription (Limitation) in the International Sale of Goods of 1974 and the amending
347 Protocol of 1980.
348 (d) Incoterms.
349 (e) Unless the contract contains any statement expressly to the contrary, a person who is not a party to this contract has no
350 right under the Contract (Rights of Third Parties) Act 1999 to enforce any term of it.

Sellers ................................................................................Buyers................................................................................

**Printed in England and issued by**

# GAFTA
# (THE GRAIN AND FEED TRADE ASSOCIATION)
### GAFTA HOUSE, 6 CHAPEL PLACE, RIVINGTON ST, LONDON EC2A 3SH

EXHIBIT 6

Noble v Yugtranzitservis (7.23.08)(GAFTA Contract within Admiralty Jurisdiction)

                                                                    1

        87N6NOBL
   1    UNITED STATES DISTRICT COURT
   1    SOUTHERN DISTRICT OF NEW YORK
   2    ------------------------------x
   2
   3    NOBLE RESOURCES,
   3
   4                    Plaintiff,
   4
   5              v.                          08 CV 3876(LAP)
   5
   6    YUGTRANZITSERVIS and
   6    SILVERSTONE,
   7
   7                    Defendants.
   8
   8    ------------------------------x
   9                                      New York, N.Y.
   9                                      July 23, 2008
  10                                      9:45 a.m.
  10
  11    Before:
  11
  12                    HON. LORETTA A. PRESKA,
  12
  13                                      District Judge
  13
  14                    APPEARANCES
  14
  15    TISDALE LAW OFFICES, LLC
  15          Attorneys for Plaintiff
  16    BY:  CLAURISSE OROZCO
  16
  17    CHALOS & CO.
  17          Attorneys for Defendants
  18    BY:  GEORGE M. CHALOS
  18
  19
  20
  21
  22
  23
  24
  25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                    2
        87N6NOBL
   1            (Case called; in open court)
   2
   3            THE COURT:  Counsel have very graciously agreed to
   4    prepare their papers quickly so that the hearing required to be
   5    conducted quickly on a motion to vacate a maritime attachment
   6    could take place promptly.  I am grateful to counsel for doing
   7    that.
   8            Defendant argues first that the contract at issue is
   9    not subject to maritime jurisdiction.  We all agree to the law
  10    which is that the threshold inquiry examines the subject matter
  11    of dispute as opposed to the underlying contract.  To determine
  12    if an issue related to maritime interests has been raised, an
  13    issue will not give rise to maritime jurisdiction if the
  14    subject matter of the dispute is so attenuated from the

                                Page 1

Noble v Yugtranzitservis (7.23.08)(GAFTA Contract within Admiralty Jurisdiction)
```
15    business of maritime commerce that it does not implicate the
16    concerns underlying admiralty and maritime jurisdiction.
17              As the Court of Appeals acknowledged in FolksAmerica,
18    Reinsurance Co. v. Cleanwater New York, Inc., 413 F.3d 307 (2d
19    Cir. 2005) the court directed that the jurisdictional inquiry
20    be focused upon whether the nature of the transaction was
21    maritime and observed that the fundamental interest giving rise
22    to maritime jurisdiction is the protection of maritime
23    commerce.
24              Here, the contract itself makes clear that maritime
25    transportation was integral to the agreement.  For example, the
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

87N6NOBL
```
1     contract provided that Plaintiff Noble would purchase a cargo
2     from YTS and the contract set out in great detail the
3     conditions for transportation and delivery.
4               The contract set out in the portion under delivery the
5     window of dates open for loading in the specified port, that
6     portion of the contract also required that the vessel nominated
7     by buyers was required to tender her notice of readiness at the
8     designated port.  It set out how the loading of the vessel was
9     to be effected.  It set out in great detail the type of vessel
10    that would be acceptable, that is, "A self-trimming bulk
11    carrier, single-decker vessel suitable for direct loading
12    (wagon-board of the vessel)."
13              The Contract also provided that the vessel could be --
14    should be confirmed or rejected by sellers in writing and, in
15    fact, here the sellers rejected the first three vessels that
16    were nominated eventually accepting the Southgate.
17              The contract further set out the preadvise that buyers
18    were to give the sellers of the vessel's ETA, name, flag,
19    dimensions, hatches and hold dimensions and alike.  It set out
20    in detail the loading instructions, the loading rate, detailed
21    the notice of readiness and the laytime and the demurrage,
22    among other provisions.  So the underlying contract certainly
23    touched upon the business of maritime commerce.
24              In addition, the dispute between the parties also
25    touches upon the maritime commerce.  As set out in plaintiff's
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

87N6NOBL
```
1     claim submissions in the arbitration, and perhaps more
2     importantly as reflected in the award, the dispute centered on
3     two issues.  First, the default by YTS in failing to provide a
4     berth for the vessel after she had tendered her notice of
5     readiness and refusal to load the vessel constituting a default
6     under the contract.  And, secondly, a request for wasted vessel
7     costs, that is, the costs incurred by the vessel following
8     tendering of her notice of readiness.
9               As set out in the award damages were awarded for both
10    these items and indeed there was a lengthy discussion in
11    Section 6 of the award about the wasted costs incurred on
12    account of the vessel's lack of use because of defendant YTS's
13    default.  The wasted vessel expenses included bunkering costs,
14    port and survey costs, and hire payments, all clearly within
15    the maritime jurisdiction.
16              For all those reasons, I find that the contract and
17    dispute at issue fall within the Court's maritime jurisdiction.
18              The question has also been presented as to whether or
19    not the guarantee by Silverstone falls within the Court's
```
Page 2

Noble v Yugtranzitservis (7.23.08)(GAFTA Contract within Admiralty Jurisdiction)
20    maritime jurisdiction.  As the Court has set out recently in C
21    Transport Panamax, Ltd. v. Kremikovtzi Trade, et al., 07 CR 893
22    (June 19, 2008 S.D.N.Y.) courts in this circuit and elsewhere
23    have long held that an agreement to act as a surety on a
24    maritime contract is not maritime in nature.  They have
25    recognized that the same is not true of an agreement to

5

87N6NOBL
1    guarantee the performance of a maritime contract.
2            See e.g. Compagnie Francaise, DE Navigational Avapeur
3    v. Bonnase, 19 F.2d 777, 779 (2d Cir. 1927) (L. Hand, J).
4            Here the guarantee by Silverstone specifically states
5    "The guarantor (Silverstone) irrevocably and unconditionally,
6    A, as principal obligor guarantees to the Buyers the prompt
7    performance by (YTS) of all its obligations under the
8    Contract...."  Accordingly, the guarantee at issue here based
9    on longstanding Second Circuit law falls within the meaning of
10   maritime contracts.
11           Finally, with respect to defendant's argument that the
12   matter is not ripe, the arbitral award has ordered that the
13   payment be made and it has not yet been paid.  Accordingly, the
14   matter is ripe with respect to the guarantor.  In addition, it
15   is most frequently the case that Rule B attachments are used to
16   provide security for arbitral awards and that has been the use
17   here.  Accordingly, defendants' motion to vacate the attachment
18   is denied.
19           THE COURT:  Is there anything else today?
20           MR. CHALOS:  Yes, your Honor, two points if I may.
21           THE COURT:  Sir.
22           MR. CHALOS:  We thank the Court for hearing us on an
23   expedited basis.  We would first off like to make an
24   application to the Court to reduce the amount of security.  On
25   page 14 of the award, the panel clearly sets forth that the

6

87N6NOBL
1    plaintiff was awarded $3,362,400 and no more as the words of
2    the panel.  Here the amount of the order attachment is almost
3    double that.  It is significantly more.
4            THE COURT:  What is the story with the interest,
5    Mr. Chalos?
6            MR. CHALOS:  According to the panel, it is 7.5 percent
7    beginning August 16, 2007.  That is only one year's worth of
8    interest.  Surely this can be resolved in the next, I would
9    assume, six months or so with the upcoming appellate deadlines.
10           THE COURT:  Has anyone done the calculation of the
11   interest?
12           MS. OROZCO:  I have, your Honor.  But I would just
13   like to speak on that point.  The panel awards the amount less
14   than we had sought in our application, but it also awards
15   interest 7.5 percent from the date of the default until it is
16   paid and it also awards costs of arbitrator, not legal costs.
17           We have attached to date as outlined in my declaration
18   $4 million.  It is paragraph 34 of my declaration at page 6.
19   We have not calculated the interest out for a year.  What we
20   have done is calculated it out for three years, which is
21   normally what we undertake in anticipating appeals and that
22   sort of thing.  If we allow for three years of interest,
23   security for three years of interest, plus the costs of the
24   Gafta arbitration, the security that we would be entitled to
Page 3

Noble v Yugtranzitservis (7.23.08)(GAFTA Contract within Admiralty Jurisdiction)
```
     25     would be $4,225,000.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

```
            87N6NOBL
      1           So we are at this time undersecured by 200,000.
      2     However, if the Court wants us to reevaluate the interest, we
      3     would be willing to do so and then release the funds
      4     accordingly if that was a proper analysis.
      5           THE COURT:  Counsel.
      6           MR. CHALOS:  Those calculations are flawed.  Those
      7     calculations are based on the principal claim of 3.9 million.
      8     That is not what the panel awarded.  7.5 percent on the $3.3
      9     million award is about, 21 to $210,000.
     10           MS. OROZCO:  I actually calculated the three-year
     11     interest on the amount awarded by the arbitrators, which was
     12     $3,362,400.  And the interest from August 15th, 2007 through
     13     August 15th, 2010 is $840,000.
     14           MR. CHALOS:  I submit through 2010 is a bit long.  I
     15     can certainly understand maybe two years, but not three.
     16           Also, seeing as they are already secured from the
     17     guarantor's EFTs, I renew my application and dismiss the matter
     18     against YTS.  They are secured or they are not secured.  They
     19     have it already attached.  There is no in rem quasi
     20     jurisdiction over the party whose funds who haven't been
     21     attached.
     22           THE COURT:  I don't hear counsel going out and seeking
     23     further attachments here.
     24           MR. CHALOS:  But they would, though.  That is the
     25     point if they sought to move money.  In fact, in the papers
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

```
            87N6NOBL
      1     that counsel submitted last night, they said exactly that they
      2     would do that.  If they wound up -- U.S. dollar transfers on
      3     behalf of Yugtranzitservis came through New York, they would
      4     catch that and release monies belonging to the guarantor.
      5           THE COURT:  What do you say to that, counsel?
      6           MS. OROZCO:  Was that was a statement that we made.
      7     That statement as made with respect to the application of the
      8     New York CPLR in that case, which we didn't address and we say
      9     we are not applied.  We actually have stopped serving the writ
     10     of attachment in this case and we are no longing serving on any
     11     of the defendants.
     12           THE COURT:  First, I decline to reduce the amount.
     13           Second, obviously counsel knows that plaintiff may not
     14     be oversecured.  If, Mr. Chalos, you find that plaintiff is
     15     attaching more than the four million two number -- is that the
     16     total number?  Please remind me.
     17           MS. OROZCO:  Yes.  The total number is comprised of
     18     $3,362,400 of principal pursuant to the arbitration award
     19     issued on July 4th, 2008, with the rate of interest calculated
     20     at 7.5 percent which is also the rate awarded for three years
     21     from August 15th, 2007 through August 15th, 2010.  The interest
     22     on that amount is $840,501.
     23           In addition, the arbitration award also allowed costs,
     24     Gafta costs, to the plaintiff and the Gafta costs incurred were
     25     23,000 U.S. dollars.  So the total security we would be
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

```
            87N6NOBL
```
Page 4

Noble v Yugtranzitservis (7.23.08)(GAFTA Contract within Admiralty Jurisdiction)
```
 1    entitled to or we would be seeking is $4,225,901.
 2              THE COURT:  To the extent, Mr. Chalos, counsel
 3    attaches more than that, you let me know.
 4              MR. CHALOS:  Thank you, your Honor.
 5              Finally, your Honor, we would like to ask the Court to
 6    certify this for immediate appeal to the Second Circuit.
 7              THE COURT:  I will take a letter on that.
 8              How is this a complex or novel issue?
 9              MR. CHALOS:  Well, it is a novel issue in the sense
10    that the Court has for the first time found a Gafta contract to
11    be within the meaning of a maritime contract and a maritime
12    claim under Rule B.  It stands starkly in contrast to Judge
13    Daniels' decision as to Aston Agro as well as Judge Sullivan, I
14    am not sure about that, in the Tan Shan case.  These exact
15    arguments were presented there with a 180-degree different
16    result and I do believe that if we can bring this to a head
17    Second Circuit level promptly that would help provide some
18    clarity on these types of issues.
19              THE COURT:  The law is not in doubt.  It is the
20    application, right?
21              MR. CHALOS:  Well, I think the law is in doubt in a
22    sense that our position is that the Court needs to look to the
23    primarily objective of the contract.  Our argument has been
24    that the primary objective of the contract is one of sale and
25    purchase.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

87N6NOBL
```
 1              THE COURT:  I didn't see any of the Second Circuit
 2    cases talking about the primary objective of the contract.
 3              MR. CHALOS:  Well, I think we set out the argument
 4    based on the precedent of Judge Daniels' decision, which can be
 5    found for the Court's reference on page 3 of the Aston Agro
 6    decision where he writes, In this case the contracts are not
 7    maritime contracts because they are primary objective was not
 8    the transportation of goods by sea.  Instead, their primary
 9    objective was undoubtedly the sale of wheat.  That the wheat
10    was transported on a ship does not make the contracts maritime
11    contracts anymore than it would make them aviation contracts
12    had the wheat been shipped via airplane.  Nor would the
13    contracts between a seller and shipper -- that is true here.
14    the judge in that matter goes on to write, Nor can maritime
15    jurisdiction be exercised under an exception to the general
16    rule that maritime jurisdiction "Arises only when the subject
17    matter of the contract is purely or wholly maritime in nature.
18    Under the first exception, federal court can exercise --
19              THE COURT:  Counsel, do you want this taken down?  If
20    you do, you better read so the court reporter can take it down.
21              MR. CHALOS:  The Court has it before it.
22              THE COURT:  So you don't need to read it.
23              MS. OROZCO:  May I respond?
24              THE COURT:  Yes, ma'am.
25              MS. OROZCO:  The key to the quotes by defendant from
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

87N6NOBL
```
 1    the Ashon Agro case is the first line where it says, "In this
 2    case." and further or in the quote Judge Daniels says that
 3    based on the facts of that particular case they are not within
 4    the maritime jurisdiction.
 5              I would just like to point out that the Exxon case,
```
Page 5

Noble v Yugtranzitservis (7.23.08)(GAFTA Contract within Admiralty Jurisdiction)
6    500 U.S. 603, 612 reminds us -- this is the U.S. Supreme
7    Court -- reminds us that courts are required to look to the
8    subject matter of the relevant contract.  And in this case the
9    relevant contract, the Noble YTS contract, provides maritime
10   jurisdiction.
11            MR. CHALOS:  Your Honor, this is the shifting sands
12   that I have been arguing again.  The Court is required to look
13   to the nature of the contract, not the dispute.  Twenty minutes
14   ago counsel was arguing the Court needs to look to the dispute
15   and I rejected that.  The contract is a sale and purchase
16   contract, not a maritime contract.  It is not maritime contract
17   with third parties.  We had nothing do with it.  My clients had
18   nothing to do with it.  That is the dispute here. If you look
19   to the nature and substance of the contract, we are selling and
20   they are buying.  Full stop.  It is the sale and purchase
21   contract.
22            In fact, your Honor, that was precisely what was
23   addressed by Judge Daniels.  He writes here invoking the first
24   exception, Aston contends that maritime jurisdiction exists
25   because the particular claims at issue involve only the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    12

     87N6NOBL
1    maritime portions of the contracts, and it was rejected, which
2    is precisely the argument presented by plaintiff.  Our
3    opposition is precisely the argument adopted by Judge Daniels.
4            THE COURT:  The Court denies the request for
5    certification under 28, U.S.C., Section 1292(b).  The
6    controlling law is not at all at issue in this case.  Everyone
7    agrees on the cases that should be looked to for guidance.  The
8    only dispute is the application of those cases to the facts of
9    this case as opposed to the facts of other cases.  Accordingly
10   certification for immediate appeal is denied.
11            Anything else, counsel?
12            MR. CHALOS:  Nothing further, your Honor.
13            THE COURT:  Thank you, ladies and gentlemen.  Thank
14   you for your excellent arguments.
15                               oOo
16
17
18
19
20
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

EXHIBIT 7

Noble v Sarl Ouest (Oral Argument & Decision)(Judge Lynch)

1

88C9NOBA

```
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   NOBLE RESOURCES SA,
 3
 4              Plaintiff,
 4
 5        v.                              08 CV 3587 (GEL)
 5
 6   SARL OUEST IMPORT,
 6
 7              Defendant.
 7
 8   ------------------------------x
 8                                       New York, N.Y.
 9                                       August 12, 2008
 9                                       10:15 a.m.
10
10   Before:
11
11                   HON. GERARD E. LYNCH,
12
12                                          District Judge
13
13                   APPEARANCES
14
14   TISDALE LAW OFFICES, LLC
15        Attorney for Plaintiff
15   BY:  CLAURISSE OROZCO
16
16   CICHANOWICZ, CALLAN, KEANE, VENGROW & TEXTOR, LLP
17        Attorney for Defendant
17   BY:  JOSEPH F. DeMAY, JR.
18
18
19
20
21
22
23
24
25
```

2

88C9NOBA

```
 1           (Case called)
 2           MS. OROZCO:  Good morning, your Honor.  Claurisse
 3   Orozco from Tisdale Law Offices for the plaintiff, Noble
 4   Resources.
 5           THE COURT:  Good morning.
 6           MR. DeMAY:  Good morning.  Joseph DeMay, Jr. from
 7   Cichanowicz, Callan, Keane, Vengrow & Textor for the defendant.
 8           THE COURT:  Mr. DeMay, good morning.
 9           Well, I think that what is technically before me is a
10   request for a hearing on a potential motion to vacate an order
11   for marine attachment.  The parties have written a number of
12   letters to the court regarding that.  It's my impression -- and
13   I think it's been confirmed by my law clerk -- that the parties
14   have fully briefed the merits of the issue and that what we're
```

Page 1

Noble v Sarl Ouest (Oral Argument & Decision)(Judge Lynch)
15    really here to do today is to have oral argument towards
16    deciding the motion to vacate the attachment.
17          Is that everybody's understanding, or does anybody
18    think we need more of anything?
19          MS. OROZCO:  No.  That's my understanding, your Honor.
20          MR. DeMAY:  Oral argument, your Honor.
21          THE COURT:  Very good.
22          So, I think what I'd really like to hear -- I suppose
23    starting with the defendant as the movant -- is an account from
24    each side of what they think is at issue in the arbitration in
25    this case; that is, what are the factual issues and legal
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              3

88C9NOBA
1     issues that the arbitrators had to decide.
2           Mr. DeMay.
3           MR. DeMAY:  Your Honor, I'll confess that I was not
4     fully briefed on the arbitral aspect of it.  Our application
5     and our retention as attorneys was directed solely toward the
6     propriety of the maritime attachment.  For that purpose, we
7     have assumed, for argument's sake only, the validity of the
8     arbitration award, and the accurate and true condition of the
9     contracts of sale that the plaintiff has already provided.
10          THE COURT:  Yes.  I'm not so much concerned with the
11    merits of the arbitration.  But, as I understood it, your
12    argument is that this is really not a maritime case.
13          MR. DeMAY:  Yes, your Honor.
14          THE COURT:  And on reading the arbitration award, it
15    seemed to me that what the arbitrators were concerned with was
16    what, as a nonadmiralty lawyer you'll forgive me for calling,
17    boaty things; assumed to be about what happened to the ship and
18    why it was late and things of that sort.
19          And I wanted to give everyone a chance to address that
20    in case I misperceived what was the -- what is the real dispute
21    between the parties because it sounded to me, in my landlubber
22    way, to be a maritime kind of dispute.
23          MR. DeMAY:  Your Honor, my understanding is that what
24    we're talking about here are essentially pricing terms.  The
25    sales contract were just that.  They were contracts for the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              4

88C9NOBA
1     sale of sugar.
2           Under like the contracts in Judge Preska's case, which
3     has already been provided to you, these particular contracts
4     made reference to the ship.
5           They made reference to the fact that the buyer, our
6     client, would be responsible for certain discharging costs, and
7     they provided references to the charter party by which those
8     costs would be calculated.
9           My understanding, however, is that unlike the typical
10    maritime case, our client did not assume any direct obligation
11    toward the operation or navigation of the ship.  In other
12    words, the contract for the sale of the sugar made reference to
13    the operation of the ship, made reference to things like
14    demurrage.  But I think the case law is fairly clear that
15    simply making reference to those things do not give rise to a
16    maritime obligation.  The maritime obligation arises when you
17    assume an obligation that directly relates to the operation and
18    navigation of a ship in commerce on the high seas.
19          THE COURT:  Well, I mean it seems to me that there
                              Page 2

Noble v Sarl Ouest (Oral Argument & Decision)(Judge Lynch)
20  are, as I've understood the case law, two different kinds of
21  ways in which a contract can give rise to admiralty
22  jurisdiction.  The one is, as you say, where the contract
23  itself is predominantly about maritime issues.  And I'd have to
24  agree with you, this looks more like, for example, the case
25  that I have that the parties cited in that it's really a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                5
88C9NOBA
1   contract for the sale of goods that says:  Well, but by the
2   way, it's going to be going by ship.
3           But then there is a separate issue where the claim at
4   issue arises from a breach of the maritime obligations that are
5   part of the contract.  And it seemed to me that what the
6   parties were actually fighting about here was the maritime part
7   of the contract.  In other words, they were concerned about
8   what the demurrage costs were going to be based on what
9   happened at sea.
10          Am I wrong about that?
11          MR. DeMAY:  No, your Honor.  To the extent that this
12  is a demurrage claim, that's absolutely correct.  And the
13  contract does make provision for our client to reimburse the
14  seller for all demurrage costs that they incur.
15          But demurrage is primarily an obligation that's
16  incurred by the charterer, in this case the seller, to the
17  vessel owner.  Our client, the buyer, is neither the charterer
18  nor the vessel owner.
19          What they did, in effect, was to say that:  We, the
20  buyer, will indemnify or compensate you, the seller, for
21  whatever demurrage costs that you incur during the performance
22  of the charter party.
23          And think the case law is clear that unlike a
24  situation where somebody, say a guarantor, assumes the direct
25  performance and obligation to the vessel owner, where you
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                6
88C9NOBA
1   merely take or undertake to indemnify or compensate somebody
2   for a maritime obligation that they have incurred, that
3   obligation to pay, to indemnify, is not itself a maritime
4   obligation.
5           It is inevitable if you've undertaken to compensate or
6   indemnify somebody for a maritime obligation that the dispute
7   will necessarily center on the details of that maritime
8   obligation.  But, here the maritime obligation was not our
9   client's maritime obligation.  It was first and foremost the
10  seller/charterer's obligation, and our client was merely called
11  upon to indemnify, which meant that inevitably that the details
12  of the charter party of the performance would have to be
13  raised.  But that's not the same thing as saying that our
14  client undertook a maritime obligation, undertook to compensate
15  the charterer for its maritime obligations.
16          THE COURT:  I see.  So you're saying even if the
17  dispute was in substance about the facts of what occurred at
18  sea, that your obligation here was purely to pay whatever the
19  chartering party had to pay in demurrage costs?
20          MR. DeMAY:  Exactly.  The contract for sale set out
21  the way in which that compensation would be calculated.  But
22  that is essentially the case.
23          THE COURT:  Again, when you say the contract for sale
24  set out the way in which it would be calculated, what did the
                           Page 3

Noble v Sarl Ouest (Oral Argument & Decision)(Judge Lynch)
25   contract of sale say?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

7

88C9NOBA
1        Again, it seems to me that your argument works best if
2   the contract simply says whatever the -- am I using the right
3   terminology -- the chartering party has to pay in demurrage
4   costs, you will reimburse, not us.  And we don't care
5   whether -- what the rights and wrongs are of that charge.
6   whatever he gets charged, you will pay.
7        And in that event, you would not have a dispute about
8   whether the charges were correct or about anything maritime at
9   all.  It would simply be:  Here's the bill that we were
10   presented and you better pay it.
11        MR. DeMAY:  That would be the cleanest way of doing
12   it.  But in commerce, it is not unusual that the parties
13   bargained for whatever advantage they can get.  And it was
14   certainly open to the parties in this case, in our case the
15   buyer, to negotiate with the seller that, yes, it would be
16   responsible for demurrage but only within certain parameters
17   and on certain conditions.
18        So that the mere fact that they tried to cut
19   themselves a better deal than the seller/charterer might have
20   had with the vessel owner, I don't think changes the essential
21   fact that they're not assuming a maritime obligation.  They are
22   assuming a payment obligation.
23        THE COURT:  But the obligation then is very similar to
24   the payment obligation that would occur if the contract simply
25   said we're responsible for getting the ship to port and if you
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

8

88C9NOBA
1   don't get there you pay demurrage, right?
2        I mean it winds up being the same thing.  Once you
3   incorporate the maritime issues into what has to be paid,
4   you're essentially talking about a very maritime kind of set of
5   issues, aren't you?
6        MR. DeMAY:  Yes.  The issues can be maritime.  I don't
7   think that's determinative.
8        THE COURT:  I see.
9        MR. DeMAY:  The question is:  Are the obligations
10   maritime?  And, of course, if, as I said before, you're talking
11   about having the buyer, having to compensate the seller, for
12   money incurred in the performance of maritime obligations,
13   unless the seller has somehow undertaken to directly assume an
14   obligation to the shipowner, I don't see that it's a maritime
15   obligation; it's simply a payment obligation that has reference
16   to maritime issues.
17        THE COURT:  I see.  And that further explains why you
18   would take the position that I really shouldn't worry very much
19   about what the arbitrators had to do?  I should just look at
20   the contract itself to decide what the nature of the obligation
21   is that the parties are disputing?
22        MR. DeMAY:  Yes, your Honor.
23        THE COURT:  Okay.  That's very helpful.  Thank you.
24        Ms. Orozco, what's your view?
25        MS. OROZCO:  Well, clearly, I disagree with Mr. DeMay.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

9

88C9NOBA
                        Page 4

Noble v Sarl Ouest (Oral Argument & Decision)(Judge Lynch)
1   I think that the dispute here is clearly a maritime dispute.
2   And I think that the case law requires us and directs us to
3   look at the nature of the dispute of this particular contract.
4   That's what the Second Circuit has directed in Folksamerica.
5           And I believe that the very dispute in this case,
6   which is admitted by both parties, is identified in the
7   arbitration award.  And I think that the arbitration award is
8   important because it outlines and indicates what the parties'
9   understandings were and what their rights and obligations were
10  under the contract.  So, I think that the arbitration is
11  important.
12          But before getting to the arbitration award, the
13  contract itself has very specific maritime provisions.  Each of
14  the six contracts are generally the same.  The only differences
15  being the date, the quantity of goods to be shipped, and the
16  vessels.
17          THE COURT:  Can you point me to where in the
18  voluminous materials I will most easily find the contracts so I
19  can follow?
20          MS. OROZCO:  They are -- to my letter dated July 8,
21  they are Exhibits 1 through 6.  They are all generally the
22  same.
23          THE COURT:  Okay.  Got it.
24          MS. OROZCO:  If you go to the fourth page of the
25  contract under discharging conditions --
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    10

88C9NOBA
1           THE COURT:  Okay.
2           MS. OROZCO:  -- it specifically identifies and
3   specifically states that all of the discharging costs are for
4   the buyer's account, in this case the defendant.
5           So, there is no secret or no hidden agenda.  It's
6   basically any discharging costs, discharging, port expenses,
7   demurrage incurred, any other vessel-related costs that would
8   be incurred are for the buyer's account.
9           More importantly, in this particular contract -- each
10  contract identifies the vessel, as well.  So, the buyer's
11  already aware of the discharging terms, the conditions, the
12  payments they are going to incur, the vessel that is going to
13  be nominated, And I think what's very important is the very
14  last sentence says, "All of the other conditions to be in
15  accordance with the amended version of the Sugar Charter Party
16  Form 1999."
17          The arbitrators, when they were reviewing their award,
18  made a note at page 4 of the arbitration award, which is your
19  Exhibit 7, in paragraph 6.  They stated and they recognized
20  that at the oral argument hearing during the arbitration both
21  parties agreed in accordance with clause 22 of the standard
22  sugar charter party 1999, which was incorporated into each of
23  the six contracts, gross weight, rather than net weight, was
24  relevant.
25          This statement was made for the purposes of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    11

88C9NOBA
1   calculating the demurrage rate.  But what's, I find -- I think
2   is very important in this particular case is that the charter
3   parties were incorporated.  And to the extent that the
4   discharging conditions in the standard form were different than
5   this particular contract, this particular contract would
                            Page 5

Noble v Sarl Ouest (Oral Argument & Decision)(Judge Lynch)
6   govern.  But otherwise, all of the standard terms of the sugar
7   charter party were incorporated.
8              In addition --
9              THE COURT:  So, looking back at the contract for a
10  moment, the contract doesn't, in your view, simply say that
11  there's going to be reimbursement of costs; instead, you're
12  saying that the contract provides specifically for terms about,
13  for example, how the vessel is going to be discharged?
14             MS. OROZCO:  Yes.
15             THE COURT:  And those are provisions between these
16  parties, not involving the shipowner.  They are between these
17  parties.  And they are agreeing as to how the vessel is going
18  to be discharged and what -- when lay time is going to count
19  and when it's not going to count; and how the demurrage is
20  going to be settled; and what the water draft is at the port of
21  discharge.  These are all obligations that the buyer is
22  guaranteeing, not something that the buyer is just going to pay
23  costs that somebody else incurs?
24             MS. OROZCO:  Yes.  I believe -- my position would be,
25  your Honor, that this is not at all an indemnity provision.  If
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    12
    88C9NOBA
1   it was an indemnity provision, I think it would say it was an
2   indemnity provision.
3              In the case of Aston Agro v. Star Grain, which the
4   defendant had cited in one of their letters, which is a case of
5   Judge Daniels, it was a sales contract, and I believe it was
6   for the sale of wheat, I don't recall off the top of my head.
7              But, in that particular case, the issue before the
8   court and what the court stated was with respect to the
9   demurrage obligations in that case, it was not clear under the
10  contract which party would pay for or incur demurrage.
11             In that case, Judge Daniels found that it may very
12  well just have been an indemnity provision.  But the demurrage
13  clause in that contract just said demurrage to be calculated in
14  accordance with the charter party.  So at the time of entering
15  into the contracts in this case, the defendant was very much
16  aware that it was obligating itself to pay demurrage.
17             In addition, the arbitration decision --
18             THE COURT:  Now, again, just to go back to this.
19             MS. OROZCO:  Yes.
20             THE COURT:  I cited a moment ago various provisions in
21  the contract that seemed to be of a maritime nature, but it's
22  not clear to me -- I suspect it's the other way -- it's not
23  clear to me that those were -- the ones I cited are the -- what
24  the dispute was about.  No one was fighting about whether there
25  was lay time on a Thursday afternoon, I take it.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    13
    88C9NOBA
1              So, what exactly -- well maybe they were.  There's a
2   lay time allowance being calculated.  There is an effective
3   demurrage -- on demurrage of rain periods during the discharge.
4              What contract provisions do those disputes fall under?
5              MS. OROZCO:  Those disputes fall under the discharge
6   conditions.  And to the extent that they are not outlined
7   within the discharging conditions of the particular contracts,
8   then the sugar charter party form would come into play.
9              And at page 2 of the arbitration award in the overview
10  paragraph, it's clearly stated that Noble, the plaintiff in
                           Page 6

Noble v Sarl Ouest (Oral Argument & Decision)(Judge Lynch)

11  this case, their claims are for demurrage which were incurred.
12  And Ouest Import, the defendant, admitted that the demurrage
13  costs were incurred.  But, the dispute was the defendant had
14  counterclaims for dead freight and for dispatch -- I'm sorry,
15  not dead freight -- dispatch and discharge port fines.
16       So, it wasn't a question of:  Do we owe demurrage or
17  not?  It was a question of how demurrage is calculated, and how
18  do we treat lay time periods, how do we treat rain delays, how
19  do we treat lack of bills of lading at the discharge port.
20  Those were the disputes.
21       Just two more important points.  If it was an
22  indemnity contract, perhaps the issue would be:  You paid the
23  charterer -- Noble, you paid the owner too much money and we
24  don't think we should indemnify you.  But, it's not.  It's a
25  dispute of how to calculate, when does lay time run.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

88C9NOBA
1        More importantly, on page 9 at paragraph 25 and page
2   10 at paragraph 27 in the arbitration award, the defendant in
3   this case relied on charter party case law in London to support
4   its positions.  So I don't think that it's -- I think that the
5   parties were very much aware of the maritime nature of the
6   obligations with this particular dispute.
7        And I think that this case is very similar to the
8   Noble v. YTS case that I submitted to your Honor, recently
9   decided by Judge Preska.  I think that these are clearly
10  maritime obligations.
11       THE COURT:  Okay.
12       Mr. DeMay, any last words?
13       MR. DeMAY:  Yes, your Honor.
14       Number one, I disagree that this case is on all fours
15  with Judge Preska's decision.  If you look at Judge Preska's
16  decision, I think on the second page she outlines a number of
17  details that were present in those contracts that are not
18  present in these contracts.
19       Number two, I believe only four of the six contracts
20  actually named the vessel.  Two of them do not.
21       Number three, I take issue with the notion that the
22  charter party was incorporated.  What it says is that, "All of
23  the other conditions to be in accordance with the amended
24  version of the sugar charter party."  And "conditions" in that
25  sense has to refer to the caption, which is discharge

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

88C9NOBA
1   conditions.
2        So, once again, all the parties have done is to refer
3   to another document as a standard by which they determine their
4   own obligations.
5        The notion that the buyer guarantees the minimum water
6   draft, again, that's fine if the guarantee is being made
7   directly to the vessel owner, where it certainly then would be
8   a maritime obligation.  But as between two businessmen, a buyer
9   and seller of sugar, that means something else.  It simply
10  means that the buyer says:  If the water draft is not 99 feet,
11  we'll compensate you for damages suffered as a result of that.
12  And the notion that if this were intended to be an indemnity
13  provision, they would have said so.
14       This is a businessman's contract.  And I think it's
15  unreasonable to assume that businessmen would necessarily

Page 7

Noble v Sarl Ouest (Oral Argument & Decision)(Judge Lynch)

16  phrase their obligations as would an attorney.
17       THE COURT:  I understand.  I think I'm prepared to
18  rule.
19       As I said, what's before the court is effectively a
20  motion by the defendant to vacate an order for the process of
21  maritime attachment.  The underlying dispute concerns a series
22  of agreements between the plaintiff and defendant for the sale
23  of sugar.  A dispute arose between the parties regarding the
24  performance of those contracts, and following arbitration a
25  panel awarded the plaintiff $674,558 in outstanding demurrage
            SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

                                                            16

88C9NOBA
1   charges owed by the defendant.
2        The plaintiff then sought this order of maritime
3   attachment in an attempt to satisfy that judgment which remains
4   unsatisfied.
5        The defendant contests the existence of federal
6   admiralty jurisdiction, which is of course a prerequisite to
7   the applicability of the rules governing maritime attachments.
8        After hearing argument and reviewing the papers
9   submitted by the parties, for the following reasons the court
10  denies the defendant's motion to vacate the order for maritime
11  attachment.
12       Traditionally, the rule was that a federal court could
13  exercise admiralty jurisdiction only over "contracts, claims,
14  and services, purely maritime," in nature.  That's Rea v. The
15  Eclipse, 135 U.S. 599, 608 (1890).  However, that rule has
16  loosened considerably and today mixed contracts, those
17  containing both maritime and nonmaritime provisions, can be
18  subject to admiralty jurisdiction in two situations.  As set
19  forth by the Second Circuit in Folksamerica Reinsurance Company
20  v. Clean Water of New York, Incorporated, 413 F.3d 307, (Second
21  Circuit 2005), those situations are, first, where "the
22  principal objective of a contract is maritime commerce," and
23  second, where the claim at issue in the dispute, "arises from a
24  breach of maritime obligations that are severable from the
25  nonmaritime obligations of the contract."  And that quotation
            SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

                                                            17

88C9NOBA
1   is from page 315 of the opinion.
2        It's clear that the first situation does not apply
3   here.  The contracts in this case deal primarily with the sale
4   of goods.  Each is styled as a "Confirmation of Sale."  See
5   Exhibits 1 to 6 of the plaintiff's letter of July 7, 2008.
6        Each of the contracts sets forth the standard terms
7   one expects to see in a contract for a sale of goods, including
8   a buyer, a seller, a price, quantity, and quality.
9        The contracts also set forth the terms of payment.
10       The contracts do, however, specify some details about
11  shipment.  Some indicate shipment dates and others the actual
12  ships to be used.  The contracts specify that "discharging
13  costs" are to be borne by the buyer.  See, for example, Exhibit
14  1 to the plaintiff's letter of July 7, 2008.
15       But, the contracts are not themselves contracts for
16  the carriage of goods and they clearly contemplate separate
17  bills of lading to be negotiated between the seller and a third
18  party carrier.
19       Materially similar contracts were found not to have
20  maritime commerce as their principal objective in Aston
                        Page 8

Noble v Sarl Ouest (Oral Argument & Decision)(Judge Lynch)

21    Agro-Industrial AG v. Star Grain Limited, 2006 U.S. District
22    Court, LEXIS 91636, (Southern District of New York,
23    December 20, 2006).   Star Grain considered contracts for the
24    sale of wheat that contained some details about the shipment of
25    the wheat such as, "the conditions under which the shipment and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

88C9NOBA
1    unloading of the wheat should occur," and how demurrage costs
2    were to be calculated.   See pages 1 to 2 of this opinion.   The
3    court held that despite these details, the contracts' "primary
4    objective was undoubtedly the sale of wheat," not "the
5    transportation of goods at sea," at page 9.
6          Similarly, in Shanghai Sinom Import and Export v.
7    Exfin (India) Mineral Ore Company, 2006 A.M.C. 2950, (Southern
8    District of New York 2006), an oral opinion, this court, that
9    is I, considered a contract for the sale of iron ore that also
10   included maritime provisions "requiring the ore to be shipped
11   by sea and specifying certain requirements regarding the
12   conditions for such shipment." 2006 A.M.C. at 2950.   Noting the
13   dangers of interpreting federal maritime jurisdiction too
14   broadly, this court decided it did not have jurisdiction
15   because the contract was "essentially a land-based contract for
16   the sale of goods," at page 2954.
17         Although the contracts here clearly contemplate
18   shipping, the bulk of the contracts are devoted to defining
19   terms of sale rather than terms of transport.   The fact that
20   the movement of the goods over sea is essential to the
21   performance of the contract does not by itself make a contract
22   maritime.   If that were so, then any contract for the sale of
23   goods between countries on different continents would become
24   maritime law.   The court does not find support for so broad an
25   interpretation of its maritime jurisdiction.   For similar

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

88C9NOBA
1    reasons, that the contracts for sale of goods incidentally
2    specify some terms of transport does not make their principal
3    objective a maritime one.
4          The second basis for admiralty jurisdiction, however,
5    is where the dispute "arises from a breach of maritime
6    obligations that are severable from the nonmaritime obligations
7    of the contract."   That is to say, to the extent that the
8    contracts here are mixed contracts, if the dispute concerns
9    those parts of the contracts that are maritime in nature, then
10   this court has jurisdiction.   Because the dispute does concern
11   those parts of the contract that are maritime in nature, this
12   provides a basis for the court's jurisdiction.
13         The dispute here centers on the payment of demurrage
14   that resulted from delays in the discharge of ships' cargoes at
15   their destination ports.   Resolution of the competing claims
16   required the arbitration panel to analyze a number of
17   obligations under the contracts.   These included provisions
18   relating to the assignment of discharging costs, conditions for
19   the commencement of discharge, the calculation of demurrage
20   rates, and the parties' obligations under related bills of
21   lading, letters of credit, and a charter party.   See, for
22   example, the interim final arbitration award, Exhibit 7 to the
23   plaintiff's letter of July 7, 2008 at pages 7, 17, 19, 24, 33,
24   and many other places.
25         Such obligations fall squarely within the court's

Page 9

Noble v Sarl Ouest (Oral Argument & Decision)(Judge Lynch)
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

88C9NOBA
1  admiralty jurisdiction.  In deciding whether obligations are
2  maritime in nature, the test is, "whether the subject matter of
3  the dispute is so attenuated from the business of maritime
4  commerce that it does not implicate the concerns underlying
5  admiralty and maritime jurisdiction."  That is from Atlantic
6  Mutual Insurance Company v. Balfour Maclaine International
7  Limited, 968 F.2d 196, page 200, (Second Circuit 1992).
8           Far from being attenuated from the business of
9  maritime commerce, discharge of cargo, calculation of
10  demurrage, bills of lading, and letters of credit are subjects
11  intimately connected to the business of maritime commerce.
12  Federal adjudication of disputes over such matters serves the
13  goals of admiralty jurisdiction in providing "a neutral federal
14  forum and a uniform body of law to adjudicate rights and
15  liabilities as they relate to the trafficking of sea-faring
16  vessels," from the same place in the Atlantic Mutual case.
17  Consequently, admiralty jurisdiction is warranted over disputes
18  between the parties arising out of these obligations.
19           Reference to the contract at Exhibit 1 clearly
20  provides for a variety of obligations that the buyer in this
21  case undertook, which are not simply obligations to pay but are
22  obligations to see to certain performance, and that performance
23  relates to things like how the vessel should discharge, how lay
24  time should be treated, even what the water draft should be at
25  the port of discharge, and furthermore, the parties then
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21

88C9NOBA
1  incorporate additional provisions from an underlying charter
2  party.
3           Mr. DeMay argues, as a very well made argument,
4  indeed, that these are simply conditions of payment.  But, of
5  course, all conditions between commercial parties, maritime and
6  otherwise, boil down to agreements to pay if the conditions
7  that are established are not satisfied.  And these are no
8  different in that regard from any other provision that
9  specifically requires that vessels be discharged in particular
10  ways.  All such provisions boil down to an agreement to pay
11  damages or pay costs in some way if those conditions are not
12  met.
13           The question is:  What are you paying for?  And here,
14  it seems clear, that what the buyer is agreeing to do is to pay
15  certain specifically maritime obligations are not met, or to
16  pay for particular shipping costs, to be calculated in ways
17  that, quite understandably, are referred to arbitrators with
18  expertise in admiralty matters, who then proceed to decide the
19  case by reference to various maritime commercial concepts.
20           Anyone who reads the arbitration agreement, it seems
21  to me, is forced to the conclusion that what these parties are
22  disputing in this case is nothing related to the sale of sugar
23  but is everything related to the proper conduct of the vessel
24  with respect to discharging the conduct.
25           Now, the parties have cited a number of district court
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

88C9NOBA
1  cases.  And, of course, it's worth remembering that none of
Page 10

Noble v Sarl Ouest (Oral Argument & Decision)(Judge Lynch)
2  these cases, whoever cites them and whichever side they seem to
3  fall on, are binding authority in this court.  Nevertheless,
4  the court respects the value of consistency and the importance
5  of considering those cases and specifically respects the
6  expertise of the judges who decided them.
7        So, I have considered those cases.  And it seems to me
8  that the holding in Star Grain, the principal case on which the
9  defendant relies, is not really to the contrary.  That case was
10  similar to this one insofar as the claim there was also for the
11  payment of demurrage.  However, as I read the case, the claim
12  in Star Grain arose not out of a specific obligation in the
13  contract with regard to demurrage but ultimately from a
14  standard contract term that assigned the risk of loss of goods
15  during transit to the buyer.  See page 14 of 2006 U.S. District
16  Court LEXIS 91636.
17        Because the demurrage was the result of damage to the
18  goods during transit, the dispute centered on this standard
19  nonmaritime contract term and not on parts of the contract that
20  were, "uniquely maritime," quoting from page 12 of the opinion.
21        Now, it's not entirely clear to me that the uniquely
22  maritime standard applied in Star Grain is exactly consistent
23  with the standard laid down by the Second Circuit in Atlantic
24  Mutual Insurance, which seems to me to put the burden to some
25  degree -- the presumption in the other direction saying that
            SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

                                                              23
88C9NOBA
1  the provisions are not maritime if they are so attenuated from
2  maritime commerce as opposed to that they are only to be
3  considered maritime if they are uniquely maritime.
4        It may be that the court in Star Grain applied a
5  narrower rule of maritime jurisdiction than the Second Circuit
6  law justifies.
7        But this case is sufficiently different from Star
8  Grain that I don't have to decide in any way whether I would
9  decide Star Grain the same way as Judge Daniels did.  This case
10  concerns obligations that are common and instrumental features
11  of maritime contracts and not terms that are typical features
12  of contracts for the sale of goods generally.
13        Accordingly, it's hereby ordered that the defendant's
14  motion to vacate this court's April 15, 2008 ex parte order for
15  process of maritime attachment is denied.
16        Now, Ms. Orozco, one of the things I always wonder
17  about with these maritime attachment cases is when do they end?
18  What typically happens, it seems to me -- and again, I'm hardly
19  an expert in this stuff -- is that a plaintiff brings an action
20  in this court and seeks maritime attachment by way of gaining
21  security, and then doesn't really have any intention of
22  following up the case.  Here, the case is decided in some other
23  forum, usually an arbitral forum.  And in this case if I have
24  the timing right, the arbitration actually happened in the
25  first place and then this was sought in aid of execution of the
            SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

                                                              24
88C9NOBA
1  judgment.
2        Is this a tempest in a teapot?  Do you have money?
3  And if so, how much do you have?  And what happens by way of --
4        MS. OROZCO:  Procedurally, we actually have not
5  captured any funds yet.  But what the intention would be, would
6  be that in the event we capture funds, we would move to confirm
                      Page 11

Noble v Sarl Ouest (Oral Argument & Decision)(Judge Lynch)
```
 7    the award in this court.  And once the award is confirmed,
 8    which we have no reason to believe it would not be confirmed,
 9    it's a London arbitrating, then we would move to secure any
10    security to satisfy that New York judgment.
11             THE COURT:  But how long does this go on?  I don't
12    know -- I gather from the fact that Mr. DeMay is here, that the
13    defendant exists and has ongoing business and can afford to
14    retain a lawyer to engage in this dispute.  So maybe some day
15    some money will show up in this district.
16             But, one thing that has concerned me, both from a
17    very, perhaps, pedantic concern for the court's docket, to a
18    more substantive concern about the nature of these attachments,
19    is that it's one thing to attach property that's here, even if
20    that is intangible property.  It's another thing to have a sort
21    of open-ended order that will attach something someday if it
22    should appear when there is no particular reason, other than
23    the fact that a lot of money comes through New York, to assume
24    that it's ever going to.
25             Now, I've had to deal with this issue in other cases
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    25
88C9NOBA
```
 1    and it seems to me the Second Circuit law is clear that these
 2    prospective attachments are valid.  It seems to me that the
 3    underlying Second Circuit cases are ones precisely in which the
 4    district court issued an order saying you could attach some
 5    money transfer when nobody actually was aware of a particular
 6    transfer being there.  So, the validity of this I take as
 7    established by circuit case law, but I don't think, as far as I
 8    know, that the circuit has addressed:  Is this open-ended
 9    forever, or at what point is it perfect for a court to say:
10    But there ain't no property to attach, and there never has
11    been, and it's unclear when, if ever, there will be, and why
12    don't we just close this up.
13             Now, this one hasn't been pending for very long and I
14    don't know that we're close to any point of whatever it might
15    be of closing it down.  But, do you have any thought or
16    suggestion as to when this just becomes ridiculous?
17             MS. OROZCO:  I do, your Honor.  Actually it's an issue
18    that we deal with.  Our general rule of thumb, if we have not
19    caught any funds after about six to eight months -- depending
20    upon what type of information we can find that confirms that
21    the defendant is still in business or that they are not in
22    business or that there are eight other attachments -- if we
23    haven't caught funds after about the six-to-eight-month period,
24    we generally recommend to our client that we dismiss without
25    prejudice.  In the future if you have information; you discover
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    26
88C9NOBA
```
 1    they are trading, they are liquid, we can revisit, perhaps
 2    reopening the file.  But that is our general recommendation for
 3    the same reason of it's overwhelming the courts.  It's
 4    overwhelming to us, and it's daily service -- it's throwing
 5    money -- the client spends money for daily service and they are
 6    getting nowhere.  And if the company is really not trading,
 7    there's really no point.  The attachment is there.
 8             It can be -- we've had cases where we've dismissed the
 9    attachment and then we've gotten information and refiled and
10    we've caught money within 30 days, but it's generally -- we do
11    put an end to it.  We go back to our clients and say, look,
```
                                Page 12

Noble v Sarl Ouest (Oral Argument & Decision)(Judge Lynch)
12  this is -- you know.
13          THE COURT:  Well, of course, that's what you do and
14  you're free to do as you like.  The question is --
15          MS. OROZCO:  As are you?
16          THE COURT:  Well, that's the question.  Am I?  Is this
17  solely a matter for my discretion, or are there any rules that
18  ought to apply here?
19          Now, at this point -- I just said the date, now I'm
20  forgetting.  It was April --
21          MS. OROZCO:  April 12 it was issued.  I believe we
22  started serving April 15.
23          THE COURT:  So, it's been four months and nothing has
24  turned up yet.  Certainly six months sounds like to me
25  relatively an outside period unless there is some evidence that
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                27
    88C9NOBA
1   something is likely to happen now.
2           Again, I suppose it's possible that a party could try
3   to simply avoid New York for a period and then if something
4   gets vacated resume normal business practices.  I doubt that
5   would be easy to do, but maybe it's possible.
6           And I suppose, further, that absent the process of
7   daily service and having an open order, you would never really
8   have any way of knowing whether that's resumed.
9           At any rate, it seems to me that come October this is
10  going to be vacated anyway if there is not some success in
11  attaching something.  And I don't know any way of dealing with
12  this kind of problem other than by rule of thumb of that sort.
13          Mr. DeMay, do you have a thought or -- this is a
14  different issue than what you all came here to talk about,
15  but --
16          MR. DeMAY:  Your honor, I've been on both sides of the
17  transaction.  I take it as a given that no Rule B case would be
18  allowed to remain open-ended.
19          THE COURT:  I should think not.
20          MR. DeMAY:  My understanding is that under Rule 4,
21  there's a 120-day limit for service of process.  If the
22  defendant is one on whom service of process can be made in the
23  United States, I think that 120-day rule probably would apply
24  absent good cause.  If the defendant is located overseas, my
25  understanding is the 120-day rule does not strictly apply.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                28
    88C9NOBA
1   It's up to the court's discretion; may be applicable in a case
2   where the defendant is located in a western nation where
3   service can easily be made.
4           But my understanding is that Rule B is essentially
5   equitable in nature.  It's subject to the court's discretion.
6   The court can limit the attachment; it can vacate an
7   attachment.  So I would read into that, that the court has
8   inherent power, after a passage of time that the court deems to
9   be reasonable, to decide that there is no point in continuing,
10  that the case would have to be dismissed without prejudice.
11          THE COURT:  Well, that sounds about right to me.  I
12  think what I've done in the past -- and I don't know whether
13  there's ever been a particular time -- but once I started
14  seeing these things piling up on the docket, I did a little
15  project of just issuing orders saying tell me what's going on.
16  And it turned out that most of the plaintiffs had attached
                          Page 13

Noble v Sarl Ouest (Oral Argument & Decision)(Judge Lynch)
17  something during that period and we just didn't know about it.
18  So, they weren't totally dormant.  But it seems to me that some
19  sort of time limit is appropriate.
20          And I guess it sounds as if the practice at the bar so
21  far has been not to include such a time period, an expiration
22  date in the order of attachment itself.  And that makes some
23  sense.  It may be that leaving this to case-by-case issues and
24  allowing the plaintiff an opportunity to explain why they
25  think, if they do, that the order should be extended after some
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

29

88C9NOBA
1   period of time, is the best way to go.
2           But at any rate, what I'm indicating is you can expect
3   that come October either this will be vacated outright or I'll
4   be at least asking the plaintiff for some account of is there
5   any reason they can think of why this should go on.  Of course,
6   it's my expectation that the defendant will say no, it
7   shouldn't.  And barring some new news, this dispute is resolved
8   now only for the next two months and it may well be that
9   today's order is largely academic.
10          All right.  Thank you very much.
11          MS. OROZCO:  Thank you, your Honor.
12          MR. DeMAY:  Thank you, your Honor.
13          (Adjourned)
14
15
16
17
18
19
20
21
22
23
24
25

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300